**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

IN RE CABOT OIL & GAS CORPORATION
DERIVATIVE LITIGATION

Case No. 4:21-cv-02046

## VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>TABLE OF CONTENTS</u>

I.     NATURE AND SUMMARY OF THE ACTION ...................................................1

II.    JURISDICTION AND VENUE ............................................................................3

III.   PARTIES ..............................................................................................................4

IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS .............................................8

    A.     Fiduciary Duties ...................................................................................8

    B.     Code of Business Conduct ...................................................................9

    C.     Environmental, Health and Safety Committee Charter .....................10

V.    SUBSTANTIVE ALLEGATIONS .....................................................................11

    A.     Background ..........................................................................................11

          1.     The Clean Streams Law ..........................................................12

          2.     The Oil and Gas Act ...............................................................13

          3.     December 2010 Consent Order ...............................................13

    B.     The Individual Defendants Cause the Company to Issue Misleading Statements ...........................................................................................15

    C.     The Truth Begins to Emerge While the Individual Defendants Continue to Issue Materially Misleading Statements ..............................................25

    D.     The Truth Fully Emerges ...................................................................27

          1.     Grand Jury Proceedings ..........................................................28

          2.     June 15, 2020 Presentment of Charges ...................................31

          3.     Cabot's Own Former Geologist Confirms Statements at Issue are False and Misleading ..........................................................34

    E.     Defendant Dinges Sold Nearly $2 Million in Cabot Stock While in Possession of Material Non-Public Information .................................36

    F.     The Director Defendants Caused Cabot to Expend Significant Funds to Repurchase Its Stock .........................................................................37

VI.   DAMAGES TO THE COMPANY ....................................................................39

VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ........................................40

COUNT I ...............................................................................................................43

COUNT II ..............................................................................................................44

COUNT III .............................................................................................................46

COUNT IV .............................................................................................................47

COUNT V ..............................................................................................................48

COUNT VI .............................................................................................................48

PRAYER FOR RELIEF .........................................................................................49

JURY DEMAND ....................................................................................................50

Plaintiffs Jody Ezell, Leon Fischer, and Robert Isaacs (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this derivative complaint for the benefit of nominal defendant, Cabot Oil & Gas Corporation ("Cabot" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (i.e. *Brophy* claim), waste of corporate assets, and unjust enrichment, and seeking contribution for under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Cabot with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE AND SUMMARY OF THE ACTION

1.     Cabot is an oil and gas company that explores, develops, produces, and markets oil and gas properties in the United States.  Its primary focus is the Marcellus Shale in Susquehanna County, Pennsylvania.

2.     In December 2010, Cabot agreed to a consent order with the Pennsylvania Department of Environmental Protection ("PaDEP") because the Company's drilling activities had caused stray methane gas to migrate into and contaminate the water supply for Susquehanna County, Pennsylvania. The consent order imposed certain obligations, including that Cabot must restore and replace impacted water supplies and prevent further methane migration.

3.     For the next decade, the Company claimed that it "substantially compl[ies]" with applicable environmental laws and regulations. However, in November 2015, Cabot received another proposed consent order and agreement from the PaDEP related to allegations that the

Company's faulty gas wells had polluted certain other water supplies.  In December 2016, the Company agreed to pay a civil penalty of $300,000, and Cabot assured that the "the source of methane has been remediated."

4.      However, on July 26, 2019, Cabot disclosed that it had received notices of violation from PaDEP in June and November 2017—within months of entering into the consent order—related to complaints by local residents in Susquehanna County about their drinking water supply. The Company also disclosed that it had received two proposed consent orders from PaDEP, which collectively would result in a civil penalty up to $570,000 and would require Cabot to submit "a detailed written remediation plan, continue water sampling and other investigative measures."

5.      On this news, the Company's stock price fell $2.63, or 12%, to close at $19.16 per share on July 26, 2019, on unusually heavy trading volume.

6.      On March 3, 2020, media reported that Pennsylvania Attorney General Josh Shapiro was conducting "more than a dozen ongoing criminal investigations into fracking and pipeline companies" and that "criminal charges" were expected "in the near future."

7.      On June 15, 2020, the Pennsylvania Attorney General's office charged Cabot with fifteen criminal counts following a grand jury investigation that found the Company failed to fix faulty gas wells that are leaking methane into residential water supplies. The PaDEP had sent a letter in June 2018 outlining outstanding issues under the December 2010 consent order as well as additional instances of methane migration that had not been resolved for several years. As a result, the Company was charged with knowingly discharging or permitting the flow of methane into groundwater, resulting in several felony counts for violations of Pennsylvania's Clean Streams Law.

8.      On this news, the Company's stock price fell $0.67, or 3.3%, to close at $19.40 per share on June 15, 2020.

9.      These revelations precipitated the filing of a securities class action now in this Court against Cabot and certain of its officers and directors, captioned *Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation, et al.*, Case No. 4:21-cv-2045 (the "Securities Class Action").

10.     At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations because, among other things, seven of the nine directors at the time this action was filed knew or should have known of the outstanding issues related to Cabot's wells in Susquehanna County and the lack of compliance with the December 2010 Consent Order, yet they failed to remediate the same and in fact issued materially misleading statements regarding the Company's purported environmental compliance, thereby subjecting the Company to criminal and civil liability.  As a result, a majority of the Board could not disinterestedly investigate whether their conduct constituted breaches of fiduciary duties under Delaware law.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act of 1934.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiff**

13.     Plaintiff Jody Ezell purchased 13,896 shares of Cabot stock in May 2015 and has continuously owned his Cabot stock since that date. Plaintiff Jody Ezell resides in Jefferson County, Arkansas.

14.     Plaintiff Leon Fischer owns shares of Cabot stock and has continuously owned his Cabot stock at all relevant times. Plaintiff Leon Fischer resides in Kansas.

15.     Plaintiff Robert Isaacs owns shares of Cabot stock and has continuously owned his Cabot stock at all relevant times. Plaintiff Robert Isaacs resides in North Carolina.

**Nominal Defendant**

16.     Nominal Defendant Cabot is a Delaware corporation with its principal executive offices located at 840 Gessner Road, Suite 1400, Houston, Texas 77024. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "COG."

**Defendants**

17.     Defendant Dan O. Dinges ("Dinges") has served as President, Chief Executive Officer ("CEO") and a Chairman of the Board since May 2002.  He is named as a defendant in the Securities Class Action. He resides in Texas. According to Cabot's proxy statements, Dinges received the following compensation for fiscal years 2015 through 2019:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan | All other compensation | Total |
|---|---|---|---|---|---|
| 2019 | $1,090,392 | $10,441,509 | $1,930,500 | $368,525 | $13,830,926 |

| 2018 | $1,035,581 | $9,546,325 | $2,100,000 | $368,414 | $13,050,320 |
| 2017 | $960,580 | $8,709,748 | $2,437,500 | $293,205 | $12,401,033 |
| 2016 | $900,016 | $8,327,237 | $1,856,240 | $228,334 | $11,311,837 |
| 2015 | $900,016 | $5,573,177 | $1,237,500 | $288,048 | $8,998,741 |

18.     Defendant Scott C. Schroeder ("Schroeder") has served as Chief Financial Officer ("CFO") of the Company since February 2014.  He is named as a defendant in the Securities Class Action.  He resides in Texas. According to Cabot's proxy statements, Schroeder received the following compensation for fiscal years 2015 through 2019:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan | All other compensation | Total |
| --- | --- | --- | --- | --- | --- |
| 2019 | $623,437 | $4,746,113 | $934,065 | $212,467 | $6,516,082 |
| 2018 | $590,402 | $4,295,827 | $960,000 | $196,616 | $6,042,845 |
| 2017 | $535,590 | $3,981,597 | $1,100,000 | $165,258 | $5,782,445 |
| 2016 | $475,010 | $3,843,343 | $783,750 | $129,845 | $5,231,948 |
| 2015 | $475,010 | $3,033,773 | $522,500 | $174,646 | $4,205,929 |

19.     Defendant Phillip L. Stalnaker ("Stalnaker") has served the Company in various executive capacities since 2009, and joined the Company in 2000.  Currently, he is Senior Vice President, Operations. He is named as a defendant in the Securities Class Action. He resides in Pennsylvania.   According to Cabot's proxy statements, Stalnaker received the following compensation for the fiscal years 2015 through 2019:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan | All other compensation | Total |
| --- | --- | --- | --- | --- | --- |
| 2019 | $440,208 | $1,406,618 | $480,600 | $105,816 | $2,433,242 |
| 2018 | $413,282 | $1,193,269 | $504,000 | $91,505 | $2,202,056 |
| 2017 | $378,276 | $995,393 | $577,500 | $91,580 | $2,042,749 |
| 2016 | $350,002 | $960,831 | $433,130 | $79,275 | $1,823,238 |
| 2015 | $344,234 | $758,443 | $288,750 | $101,197 | $1,492,624 |

20.     Defendant Dorothy M. Ables ("Ables") has served as a director of the Company since 2015.  She is Chairman of the Audit Committee. She resides in Virginia. According to Cabot's proxy statements, Ables received the following compensation for fiscal years 2015 through 2019:

5

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2019 | $90,000 | $230,039 | $16,265 | $336,304 |
| 2018 | $75,000 | $230,175 | $8,003 | $313,178 |
| 2017 | $75,000 | $200,010 | $6,236 | $281,246 |
| 2016 | $62,500 | $200,003 | $712 | $263,215 |
| 2015 | $6,250 | N/A | N/A | $6,235 |

21.     Defendant Rhys J. Best ("Best") has served as a director of the Company since 2008. He resides in Texas. According to Cabot's proxy statements, Best received the following compensation for fiscal years 2015 through 2019:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2019 | $95,000 | $230,039 | $43,238 | $368,277 |
| 2018 | $93,750 | $230,175 | $28,446 | $352,371 |
| 2017 | $90,000 | $200,010 | $17,887 | $307,897 |
| 2016 | $90,000 | $200,003 | $7,598 | $297,601 |
| 2015 | $90,000 | $200,066 | $6,868 | $296,934 |

22.     Defendant Robert S. Boswell ("Boswell") has served as a director of the Company since 2015.  He is Chairman of the Environment, Health and Safety Committee and a member of the Audit Committee. He resides in Colorado. According to Cabot's proxy statements, Boswell received the following compensation for fiscal years 2015 through 2019:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2019 | $90,000 | $230,039 | $16,044 | $336,083 |
| 2018 | $88,750 | $230,175 | $7,546 | $326,471 |
| 2017 | $75,000 | $200,010 | $6,602 | $281,612 |
| 2016 | $62,500 | $200,003 | $648 | $263,151 |
| 2015 | $6,250 | N/A | N/A | $6,250 |

23.     Defendant Amanda M. Brock ("Brock") has served as a director of the Company since 2017.  She is a member of the Audit and Environment, Health and Safety Committees. She resides in Texas. According to Cabot's proxy statements, Brock received the following compensation for fiscal years 2017 through 2019:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2019 | $75,000 | $230,039 | $8,649 | $313,688 |
| 2018 | $75,000 | $230,175 | $2,656 | $307,831 |
| 2017 | $18,750 | $76,229 | $1,576 | $96,555 |

24.     Defendant Peter B. Delaney ("Delaney") has served as a director of the Company since 2018.  He is a member of the Audit and Environment, Health and Safety Committees. He resides in Oklahoma. According to Cabot's proxy statements, Delaney received the following compensation for fiscal years 2018 and 2019:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2019 | $75,000 | $230,039 | $4,416 | $309,455 |
| 2018 | $6,250 | $77,507 | $225 | $83,982 |

25.     Defendant Robert Kelley ("Kelley") served as a director of the Company from 2003 to April 2021.  He is a member of the Audit Committee. He resides in Texas. According to Cabot's proxy statements, Kelley received the following compensation for fiscal years 2015 through 2019:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2019 | $110,500 | $230,039 | $72,935 | $412,974 |
| 2018 | $122,500 | $230,175 | $47,607 | $400,282 |
| 2017 | $115,000 | $200,010 | $31,884 | $346,894 |
| 2016 | $112,500 | $200,003 | $13,485 | $325,988 |
| 2015 | $100,000 | $200,066 | $12,755 | $312,821 |

26.     Defendant W. Matt Ralls ("Ralls") has served as a director of the Company since 2011. He resides in Texas. According to Cabot's proxy statements, Ralls received the following compensation for fiscal years 2015 through 2019:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2019 | $90,000 | $230,039 | $32,880 | $352,919 |
| 2018 | $88,750 | $230,175 | $19,740 | $338,665 |
| 2017 | $95,000 | $200,010 | $12,959 | $307,969 |
| 2016 | $92,500 | $200,003 | $4,199 | $296,702 |
| 2015 | $80,000 | $200,066 | $3,146 | $283,212 |

27.     Defendant Marcus A. Watts ("Watts") has served as a director of the Company since 2017.  He is a member of the Environment, Health, and Safety Committees. He resides in Texas. According to Cabot's proxy statements, Watts received the following compensation for fiscal years 2017 through 2019:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2019 | $75,000 | $230,039 | $8,641 | $313,680 |
| 2018 | $75,000 | $230,175 | $2,656 | $307,831 |
| 2017 | $18,750 | $76,229 | $2,777 | $97,756 |

28.     Dinges, Schroeder, Stalnaker, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts are sometimes referred to hereinafter as the "Individual Defendants." Dinges, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts are sometimes referred to hereinafter as the "Director Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

29.     By reason of their positions as officers, directors, and/or fiduciaries of Cabot and because of their ability to control the business and corporate affairs of Cabot, at all relevant times, the Individual Defendants owed Cabot and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Cabot in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Cabot and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Cabot and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cabot, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Cabot, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

31.     To discharge their duties, the officers and directors of Cabot were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Cabot were required to, among other things:

    (a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    (b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    (c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    (d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.      Code of Business Conduct**

32.     Cabot's Code of Business Conduct "define[s] certain responsibilities of the Company's employees" and "is [a] guide to ethical and lawful conduct and serves as a reminder of the policies, roles and laws that affect [their] performance."

33.     The Code of Business Conduct also provides that Cabot's directors, officers, and employees are committed to "full, fair, accurate, timely and understandable disclosure in reports

and documents the Company files with or submits to the SEC and in other public communications made by the Company."

34.     In a section titled, "Transactions in Securities" the Code of Business Conduct states that:

> The United States securities laws prohibit persons from trading on material information which has not been made public. No employee (nor any person acting on such employee's behalf) who is aware of material information relating to the Company or another company that has not been generally available to the public . . . may sell or purchase shares of the stock or other securities (or puts, calls or similar options to buy or sell stock or other securities) of COGC or the other company.

35.     In a section titled "The Environment," the Code of Business Conduct states:

> It is Company policy to comply fully with the letter and the spirit of all applicable federal, state, and local environmental protection laws and regulations (the "Environmental Laws"). The Company will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities. The Company will routinely review the conduct of its operations in an effort to strive for continuous improvement in its environmental performance.

**C.     Environmental, Health and Safety Committee Charter**

36.     The Environmental, Health and Safety Committee "provid[es] oversight and support of the Company's policies, programs and initiatives on the environment, health and safety."

37.     Specifically, the Committee's charter charges its members with the following responsibilities, among others:

> 3. ***Reviewing and providing input to management and the Board of Directors regarding the Company's compliance with laws, regulations, policies, programs and practices with regard to environmental, health and safety matters*** by, among other things, receiving and reviewing with management reports regarding:
>
> > a. the Company's management of and responses to releases, investigations, notices of violations, remediations, civil action or other occurrences involving environmental laws or regulations;

10

b. the Company's safety program, including reports of incidents, statistics and actions or investigations by any governmental body, as well as the Company's response to the same;

c. the Company's management of and responses to pending legislative and regulatory efforts in the environmental, health and safety and areas likely to significantly affect the Company's business;

d. environmental, health and safety matters relating to the Company's projects and operations and initiatives and training designed to improve the Company's performance with regard to such matters; and

e. the Company's efforts to gather data and communicate externally regarding its environmental, health and safety sustainability programs, initiatives and outcomes.

4. Consulting with the Board of Directors and internal and external advisers of the Company, as appropriate, regarding the management of the Company's health, safety and environmental programs, trends in environmental compliance and the economic effect of such trends on the Company's business.

5. ***Overseeing and reviewing all external disclosures regarding the Company's environmental, health and safety sustainability data, programs, initiatives and outcomes*** and providing insight and recommendations to the Board of Directors on such matters.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

38.    Cabot is an oil and gas company that explores, develops, produces, and markets oil and gas properties in the United States.  The Company's operations in the Marcellus Shale in Susquehanna County, Pennsylvania have been the "primary driver of record production and reserve growth" since 2008.  The area represents the largest operating and growth area in terms of oil or gas that can be recovered at a financially feasible cost; in 2015, the area accounted for 90% of Cabot's total equivalent production, a standardized measure of oil and gas production, and by 2019, Marcellus Shale accounted for "substantially all" of Cabot's annual total equivalent production.

39.     By 2019, all of Cabot's proved undeveloped reserves were located in Susquehanna County, meaning Marcellus Shale is the Company's opportunity for future growth.  Therefore, Cabot's operations in Pennsylvania were critical to the Company's success, and it is imperative that Cabot comply with the "extensive federal, state and local laws and regulations relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment."

### 1.     The Clean Streams Law

40.     Pennsylvania's Clean Streams Law aims to prevent further pollution of the state's waters and to restore its streams to a clean and unpolluted state.  The law prohibits water pollution, which includes the "contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare."

41.     Section 301 of the Clean Streams Law prohibits the placement, flow, or discharge of industrial wastes into any of the state's waters.  Similarly, Section 401 prohibits the placement or discharge of "any substance of any kind or character resulting in pollution" into Pennsylvania's waters.  Section 307 further provides that the discharge of industrial wastes, directly or indirectly, into Pennsylvania's waters is prohibited "unless such discharge is authorized by the rules and regulations of the department or such person or municipality has first obtained a permit[.]"

42.     Any violation of the Clean Streams Law is a crime.  Specifically, the negligent violations of any provision of the Clean Streams Law is characterized as a second degree misdemeanor, and any intentional or knowing violation is a third degree felony.  *See* Section 602, Clean Streams Law.

43.     The PaDEP enforces the Clean Streams Law.  In this respect, the department investigates the source of pollution of the state's waters, institutes appropriate proceedings to

discontinue any such pollution, and issues orders as necessary to "aid in the enforcement of the provisions of this act" or modifies, suspends, or revokes permits.

### 2.    The Oil and Gas Act

44.    Pennsylvania's Oil and Gas Act requires, among other things, that operators properly case and cement their wells to prevent the migration of gas or other fluids into fresh groundwater. 25 Pa. Code § 78.81(a)(2)–(3). In addition to setting the standards for cement and well construction, the act requires operators to report and correct defective, improper, or insufficient cement casings on gas wells. 25 Pa. Code §§ 78.86; 78a.73(b); 78a.85(a)(5). The PaDEP also enforces the Oil and Gas Act.

### 3.    December 2010 Consent Order

45.    Cabot is already subject to a global Consent Order and Agreement signed December 15, 2010 following a water well explosion in Dimock Township, Susquehanna County, Pennsylvania ("Dimock").

46.    The Company began drilling gas wells in Dimock in 2006, and by 2008, residents experienced changes in the water, leading them to suspect that methane gas from Cabot's nearby wells had migrated into their water supply. It culminated in the spontaneous explosion of a resident's water well, causing the PaDEP to investigate Cabot's gas wells in the area.

47.    The PaDEP determined that Cabot's drilling activities caused stray methane gas to migrate into and contaminate the aquifer in Dimock and that more than eighteen drinking water supplies serving nineteen homes had been affected. Thermogenic methane gas, which is created by heat and pressure, has a different chemistry than biogenic methane gas, which is naturally present in the surface and groundwater from the decomposition of organic matter. Thermogenic gas remains underground until it is released by newly opened pathways resulting from drilling activities. According to the PaDEP's investigation, gas flowed through the cement of Cabot's

wells while it was hardening (creating permanent pathways permitting gas to flow) or else the cement did not completely fill the spaces between the casing and the wellbore.

48.    As a result, the PaDEP and Cabot entered into a Consent Order and Agreement on November 4, 2009 (the "November 2009 Consent Order").  However, just six months later, the parties entered into a new Consent Order and Agreement on or about April 15, 2010 due to "Cabot's failure to abide by the terms" of the November 2009 Consent Order (the "April 2010 Consent Order").  Dinges signed the April 2010 Consent Order.  According to a press release by PaDEP Secretary John Hanger, "Cabot had every opportunity to correct these violations, but failed to do so. Instead, it chose to ignore its responsibility to safeguard the citizens of this community and to protect the natural resources there."

49.    Then, on December 15, 2010, the PaDEP and Cabot entered into a global Consent Order and Agreement, which Dinges also signed (the "December 2010 Consent Order"). According to the PaDEP, Cabot had not stopped the methane migration to the groundwater aquifers (as it had promised in the November 2009 Consent Order) and the contamination was ongoing. Though the Company did not admit its responsibility for the water pollution, Cabot agreed to "take all actions necessary . . . to comply with all applicable environmental laws and regulations, including all applicable provisions" of Pennsylvania's Clean Streams Law, Oil and Gas Act, and related regulations.

50.    Among other things, the December 2010 Consent Order forced the Company to shut down its operations within a nine-square mile area in Dimock (the "Dimock Box") and established certain obligations, including that the Company must restore or replace impacted drinking water supplies and remediate its gas wells to prevent further methane migration. Moreover, to complete existing wells and drill any new wells in Dimock, the Company was

required to submit a written request to renew drilling, which would prompt the PaDEP to confirm that Cabot complied with its obligations under the order before the PaDEP would authorize the additional wells.

**B.     The Individual Defendants Cause the Company to Issue Misleading Statements**

51.     On October 23, 2015, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2015 (the "3Q15 10-Q"). With respect to environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

52.     Attached to the 3Q15 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.

53.     The above statements in ¶¶ 51–52 were materially misleading because they failed to disclose: (i) that Cabot did not have adequate environmental controls and procedures, as required by law, with respect to the wells in Susquehanna County, Pennsylvania; (ii) that Cabot had failed to remedy known faulty gas wells in violation of the December 2010 Consent Order, thereby knowingly polluting water supplies in the area through stray gas migration; (iii) that, as a result of the foregoing, the Company was reasonably likely to face regulatory and government scrutiny; (iv) that Cabot was reasonably likely to suffer reputational and financial harm due to the scrutiny, including criminal charges due to the continued failure to address the known faulty gas wells; and (v) as a result, the Company's business model was unsustainable to achieve the promised growth.

54.     On February 22, 2016, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its annual report on Form 10-K with the SEC for the period ended December 31, 2015 (the "2015 10-K"), representing that the Company "substantially compl[ies] with the Clean Water Act and related federal and state regulations."  Regarding environmental matters, the 2015 10-K stated:

> On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.*** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.
>
> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

55.     Attached to the 2015 10-K were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.

56.     On May 3, 2016, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2016 (the "1Q16 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts,

and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report

stated, in relevant part:

> On November 12, 2015, we received a proposed Consent Order and Agreement
> from the Pennsylvania Department of Environmental Protection (PaDEP) relating
> to gas migration allegations in an area surrounding several wells owned and
> operated by us in Susquehanna County, Pennsylvania. The allegations relating to
> these wells were initially raised by residents in the area in August 2011. We
> received a Notice of Violation from the PaDEP in September 2011 for failure to
> prevent the migration of gas into fresh groundwater sources in the area surrounding
> these wells. Since then, we have been engaged with the PaDEP in investigating the
> incident and have performed appropriate remediation efforts, including the
> provision of alternative sources of drinking water to affected residents. ***We believe
> the source of methane has been remediated and are working with the PaDEP to
> reach agreement on the disposition of this matter.*** The proposed Consent Order
> and Agreement is the culmination of this effort and, if finalized, would result in the
> payment of a civil monetary penalty in an amount likely to exceed $100,000, up to
> approximately $300,000. We will continue to work with the PaDEP to finalize the
> Consent Order and Agreement and bring this matter to a close.

> From time to time we receive notices of violation from governmental and
> regulatory authorities in areas in which we operate relating to alleged violations of
> environmental statutes or the rules and regulations promulgated thereunder. While
> we cannot predict with certainty whether these notices of violation will result in
> fines and/or penalties, if fines and/or penalties are imposed, they may result in
> monetary sanctions individually or in the aggregate in excess of $100,000.

57.    On July 29, 2016, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and

Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended

June 30, 2016 (the "2Q16 10-Q").  Attached were SOX certifications signed by defendants Dinges

and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the

effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report stated,

in relevant part:

> On November 12, 2015, we received a proposed Consent Order and Agreement
> from the Pennsylvania Department of Environmental Protection (PaDEP) relating
> to gas migration allegations in an area surrounding several wells owned and
> operated by us in Susquehanna County, Pennsylvania. The allegations relating to
> these wells were initially raised by residents in the area in August 2011. We
> received a Notice of Violation from the PaDEP in September 2011 for failure to
> prevent the migration of gas into fresh groundwater sources in the area surrounding

these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.*** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

58.     On October 28, 2016, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2016 (the "3Q16 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report stated:

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.*** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

18

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

59.    On February 27, 2017, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls signed and caused Cabot to file its annual report on Form 10-K with the SEC for the period ended December 31, 2016 (the "2016 10-K"), representing that the Company "substantially compl[ies] with the Clean Water Act and related federal and state regulations."   Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls. Regarding environmental matters, the Company stated, in relevant part:

> On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016. We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored.*** Further, the related gas well is being permanently plugged. Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close.
>
> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

19

60.     The above statements in ¶¶ 54–59 were materially misleading because they failed to disclose: (i) that, despite assurances that the Company had remediated the faulty gas wells in Susquehanna County, Pennsylvania, Cabot's activities continued to pollute water supplies in the area through stray gas migration (ii) that, as a result of the foregoing, the Company was reasonably likely to face regulatory and government scrutiny; (iii) that Cabot was reasonably likely to suffer reputational and financial harm due to the scrutiny, including criminal charges due to the continued failure to address the known faulty gas wells; and (iv) as a result, the Company's business model was unsustainable to achieve the promised growth..

61.     On or about March 15, 2017, the Individual Defendants caused Cabot to publish its own document called the 2016 Annual Report. The 2016 Annual Report contained within it a letter from defendant Dinges to Cabot's shareholders which stated: "First and foremost, Cabot's objective is to deliver profitable results and to conduct our operations in a safe and prudent manner for the protection of our employees and contractors with an ***unwavering commitment to comply with or exceed all regulations to enhance the environment and the communities where we operate***."

62.     On April 28, 2017, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2017 (the "1Q17 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in

fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

63.     On July 28, 2017, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017 (the "2Q17 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

64.     On October 30, 2017, defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2017 (the "3Q17 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

65.     On March 1, 2018, defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts signed and caused Cabot to file its annual report on Form 10-K with the SEC for the period ended December 31, 2017 (the "2017 10-K"), representing that the Company "substantially compl[ies] with the Clean Water Act and related federal and state regulations."

21

Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the Company stated, in relevant part:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

66.     On April 27, 2018, defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 (the "1Q18 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.   Regarding environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

67.     On July 27, 2018, defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 (the "2Q18 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.   Regarding environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While

we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

68.     On August 20, 2018 at the EnerCome Oil & Gas Conference, defendant Schroeder

even went so far as to call the Company's well drilling "environmentally friendly," stating:

We have more wells that we're completing right now in the Upper Marcellus. And look to the February year-end reserve report for data on that. Question you might ask is, "Okay, why -- if you're doing them now, why don't you tell us sooner?" **Because of the way we complete our wells in the field to be environmentally friendly, green, however you want to say it**, a long time ago, several years ago, we changed our completion technique.

69.     On October 26, 2018, the Individual Defendants caused Cabot to file its quarterly

report on Form 10-Q with the SEC for the period ended September 30, 2018 (the "3Q18 10-Q").

Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the

accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's

disclosure controls.  Regarding environmental matters, the report stated:

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

70.     On February 26, 2019, defendants Dinges, Schroeder, Ables, Best, Boswell, Brock,

Kelley, Ralls, and Watts signed and caused Cabot to file its annual report on Form 10-K with the

SEC for the period ended December 31, 2018 (the "2018 10-K"), representing that the Company

"substantially compl[ies] with the Clean Water Act and related federal and state regulations."

Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the

accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's

disclosure controls.  Regarding environmental matters, the Company stated, in relevant part:

23

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

71.    On April 26, 2019, the Individual Defendants caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 (the "1Q19 10-Q"). Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

72.    The above statements in ¶¶ 61-71 were materially misleading because they failed to disclose: (i) that, despite assurances that the Company had remediated the faulty gas wells in Susquehanna County, Pennsylvania, Cabot's activities continued to pollute water supplies in the area through stray gas migration; (ii) that, since shortly after the Company entered into a Consent Order with PaDEP, Cabot had been engaged in discussions with PaDEP to investigate complaints about contaminated water supply; (iii) that, within months of the December 2016 Consent Order, Cabot received notices of violation with respect to the same misconduct, i.e. faulty gas wells; (iv) that Cabot was reasonably likely to suffer reputational and financial harm due to the scrutiny, including criminal charges due to the continued failure to address the faulty gas wells; and (v) as a result, the Company's business model was unsustainable to achieve the promised growth.

**C.      The Truth Begins to Emerge While the Individual Defendants Continue to Issue Materially Misleading Statements**

73.      On July 26, 2019, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2Q19 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report stated:

> On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. ***The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents.*** We received Notices of Violation ("NOV") from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.  With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, The proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.
>
> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

74.     On this news, the Company's stock price fell $2.63, or 12%, to close at $19.16 per share on July 26, 2019.

75.     On October 25, 2019, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019 (the "3Q19 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls. Regarding environmental matters, the report stated:

> On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. ***The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents.*** We received Notices of Violation ("NOV") from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.  With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, The proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.
>
> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

76.     On or around March 13, 2020, the Individual Defendants caused Cabot to publish its 2019 "Annual Report" to shareholders which contained a letter from defendant Dinges to Cabot's shareholders which stated that Cabot "***make[s] every effort to reduce and limit [its] impact on air, water and the environment*** with the best technologies currently available." Dinges' letter further emphasized that Cabot's "commitment to free cash flow, return on capital, and return of capital back to shareholders ***with the least possible impact to the environment*** remains paramount in importance to us."

77.     Elsewhere, the Company's 2019 Annual Report states that "***Cabot embraces environmental innovation*** and is a leader in utilizing new technology to ***reduce our overall impact on the environment.***" The 2019 Annual Report continued that "[i]t is from this platform that we will continue ***our efforts to improve the environment***, ***being a beacon of light by doing the right thing.***"

78.     The above statements in ¶¶ 73, 75–77 were materially misleading because they failed to disclose: (i) that, despite assurances that the Company had remediated the faulty gas wells in Susquehanna County, Pennsylvania, Cabot's activities continued to pollute water supplies in the area through stray gas migration; (ii) that Cabot was reasonably likely to suffer reputational and financial harm due to the scrutiny, including criminal charges due to the continued failure to address the faulty gas wells; and (iii) as a result, the Company's business model was unsustainable to achieve the promised growth.

**D.     The Truth Fully Emerges**

79.     On March 3, 2020, just prior to the Company releasing the 2019 Annual Report, media reported that Pennsylvania Attorney General Josh Shapiro was conducting "more than a dozen ongoing criminal investigations into fracking and pipeline companies" and that "criminal charges" were expected "in the near future."

27

80.     On June 15, 2020, the Pennsylvania Attorney General's office charged Cabot with 15 criminal counts following a grand jury investigation that found the Company failed to fix faulty gas wells that are leaking methane into residential water supplies.  Specifically, as reported in an article by *The Seattle Times*:

> "We find that, over a period of many years, and despite mounting evidence, ***Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration,***" the grand jury wrote, criticizing Cabot's "***long-term indifference to the damage it caused*** to the environment and citizens of Susquehanna County."
>
> ***The Pennsylvania attorney general's office charged Cabot with a total of 15 criminal counts, including illegal discharge of industrial wastes and unlawful conduct under the state's Clean Streams Law.*** Maximum fines are $50,000 or $25,000, depending on the count.
>
> "***Cabot took shortcuts that broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians.*** They put their bottom line ahead of the health and safety of our neighbors," Attorney General Josh Shapiro said in a video statement.

81.     On this news, the Company's stock price fell $0.67, or 3.3%, to close at $19.40 per share on June 15, 2020.

**1.     Grand Jury Proceedings**

82.     Testimony and evidence presented to the grand jury sought to show that Cabot had not implemented the requisite measures to comply with the December 2010 Consent Order and that Cabot's drilling activity continued to contaminate Dimock's waters.

83.     For example, Pennsylvania's Attorney General stated that Cabot deliberately did not test residential water wells in Dimock for methane before it began drilling operations to maintain plausible deniability.  Without the prior testing, the Company did not have a baseline to "promptly assess[] and address[] the problem of stray gas."  According to the Attorney General, Cabot "didn't test their samples so that there would be no proof that they were contaminating nearby water supplies."

28

84.     To establish that Cabot's drilling activities polluted the water, the PaDEP used data from over ten thousand water samples collected by other organizations to establish baseline methane levels and the origin of methane gas in Dimock's groundwater.  The PaDEP also reviewed twelve post-drilling samples of drinking water supplies in Dimock dating back to 2009, which exhibited extremely high and hazardous levels of methane (at least 10 mg/l, the warning range for dangerous methane concentration) which far exceeded the baseline levels in the area at large (0.5 mg /l).

85.     PaDEP Program Manger Seth Pelepko ("Pelepko") testified that it was Cabot's defective wells which caused these elevated methane levels. Pelepko further testified that the PaDEP's review revealed other substances in the tested Dimock well water and explained that these substances were likely lying at the bottom of the wells but became disturbed as methane bubbles passed through the water, further evidencing methane contamination from Cabot's fracking.

86.     Moreover, Ken Kennedy, an Oil and Gas Inspector Supervisor for the PaDEP, testified that the department had raised questions in 2011 about the integrity of additional wells and in 2015, he identified 11 wells needing further evaluation.  Though the Company subsequently completed its own testing, Cabot reportedly did not undertake remedial efforts until 2018.

87.     Thus, despite the December 2010 Consent Order, the PaDEP raising concerns in 2011, Ken Kennedy's 2015 evaluation, the Company's subsequent testing, and the Company's numerous public statements regarding its compliance efforts and environmentally-friendly practices, the Company did not begin taking remedial action on certain wells already known to be suffering from defects until *2018*.  Moreover, most of this remedial work, according to evidence

presented to the Grand Jury, began in August 2018, i.e., **after** the grand jury began investigating

Cabot.

88.     Dimock area residents also testified regarding the effects Cabot's wells had had on

their health and their properties.  For example, Nolan Scott Ely ("Ely"), himself a Cabot employee,

testified that Cabot drilled six natural gas wells on his property starting in 2008.  Ely testified that,

subsequently, water from his water well became brown and that he was able to turn on his kitchen

faucet and light the running water on fire.  After reporting this incident to Cabot, he was told to

evacuate his house since it might explode.  Testing of his well water later found "astronomical"

levels of methane, ethane, and propane, as well as elevated sodium and magnesium levels.  Ely

further testified that he and his family, who had been drinking the water before they knew the

extent of the contamination, suffered numerous health problems including vision problems,

dizziness, difficulty breathing, and rashes. Moreover, the value of his property declined by a

massive 87%.

89.     Ely expressed his surprise that Cabot seemed so indifferent to his experience, given

that they were both a local business and his employer, testifying that:

> I spent a lot of time with them. I knew them, I knew them, and I worked with them
> to try to get them to help us out with[] our situation. And they just – ***they didn't
> care*** . . .  they weren't really doing anything other than just bringing me water,
> which didn't last very long.

90.     Another resident who testified was Eric Roos ("Roos"), who allowed natural gas

wells to be drilled on his land only after the agent told Roos that even if he did not agree to the

drilling that Cabot would still legally take whatever it wanted from beneath his property.  He was

not informed of the risk Cabot's well posed to his drinking water.  Roos and his wife began

experiencing powerful blasts of gas and water emanating from their faucet when his wife washed

dishes.  When Cabot was informed, they agreed to install a vent in his house to mitigate the risk

of asphyxiation or of his home exploding from built up methane.  Eventually, Roos and his wife discovered that their water contained elevated levels of methane, lithium, barium, manganese, and other chemicals.  As Cabot failed to remediate these conditions, the Rooses subsequently had to acquire their water from a public well fourteen miles away.

91.     Other residents described similar experiences, including finding discolored water in their faucets and household appliances which often smelled and tasted different than before and sometimes appeared oily, slimy, or foamy like "Alka-Seltzer."  Residents who tested their water found all manner of elevated contaminant levels, including ethylene glycol, propylene glycol, manganese, arsenic, lead, sodium, uranium, lithium, and propane.  Others, like the Ely family, suffered from skin conditions after using their water to bathe.

92.     Despite these experiences, many of which were reported to Cabot, the Company did nothing or very little to remediate the issues, sometimes even blaming others for the contamination.

93.     As a result of its investigation, the grand jury found (in February 2020, which was not publicly reported until June 15, 2020) that "criminal charges are appropriate."  Specifically, the grand jury concluded:

> [*O]ver a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration.* Indeed, some of these gas wells have been in place for more than a decade, yet *Cabot has only recently taken steps to remediate them.* In light of Cabot's long-term indifference to the damage it caused to the environment and citizens of Susquehanna County, *these were not merely technical violations.*

### 2.      June 15, 2020 Presentment of Charges

94.     Based on the grand jury's recommendation, the Pennsylvania Attorney General charged Cabot with fifteen criminal counts, including nine felonies for knowing violations of Pennsylvania law.  The charges encompassed (i) problems covered by the December 2010 Consent

Order that were not remediated as of 2015; and (ii) problems regarding more recently drilled wells in Susquehanna County.

95.     The presentment revealed previously unknown facts, including that the PaDEP had sent a letter dated June 11, 2018 (the "June 2018 Letter") to Cabot "that documents the history of problems associated with many of the[] wells."  The June 2018 Letter had been issued in response to the Company's request to drill new wells in Dimock Box, which was denied due to the following outstanding compliance issues:

(a)     On October 20, 2011, the PaDEP issued a Notice of Violation ("NOV") for stray gas migration and pollution of a water supply, citing failure to prevent gas migration to fresh groundwater sources, failure to remediate defective casing or cementing, and the discharge of polluting substances.  The Company installed a treatment system on the water supply and conducted water sampling but had not issued a final report demonstrating satisfactory water quality.  When the PaDEP issued a follow-up letter on January 28, 2013, the Company failed to provide a full and complete response.

(b)     On June 16, 2014, the PaDEP issued an NOV because another water supply had been polluted by gas migration from Cabot's wells.  The Company drilled a new water well for the impacted resident, but did not permanently restore or replace the impacted water supply.

(c)     On December 19, 2014, the PaDEP issued an NOV because two more water supplies had been affected.

(d)     On March 21, 2018, the PaDEP issued an NOV because yet another water supply was polluted by gas migration from Cabot's wells.

96.     Among other violations, the Attorney General contended that Cabot "knowingly discharge[d], permit[ted] to flow or continue[d] to discharge or permit[ted] to flow, methane into groundwater."  The criminal violations occurred at the following wells in Dimock:

- On or about August 14, 2009 through at least June 11, 2018 from gas wells G Shields 1V, G Shields 2H, G Shields 4H, and G Shields 5H;

- On or about July 16, 2008 through at least June 11, 2018 from gas wells Costello 1V, Costello 2V, Gesford 4H, and Gesford 8H;

- On or about October 31, 2008 through at least June 11, 2018 from gas wells Ratzel 1H, Ratzel 2H, and Ratzel 3V; and

- On or about March 27, 2008 through at least June 11, 2018 from gas wells Ely 4H and Ely 6H.

97.     Each of the above four violations constitutes a felony for knowingly violating the Clean Streams Law's prohibition against the discharge of industrial waste and a felony under the Clean Streams Law for knowingly polluting Pennsylvania waters.

98.     Based on the foregoing conduct, the Attorney General also charged Cabot with "knowingly fail[ing] to comply with orders of the [PaDEP], including but not limited to the December 15, 2010 Consent Order and Settlement Agreement, when it failed to remediate its gas wells to eliminate the discharge of natural gas, which allowed contamination to continue unabated."  This is also a felony under the Clean Streams Law.

99.     In addition to wells in Dimock, Cabot drilled wells in other parts of Susquehanna County that suffered similar problems, often mere months after installation.  Specifically, the Company drilled wells on the Howell well pad in Auburn Township in 2016, drilled the Jeffers

Farm wells in Harford Township in 2017, and drilled the POWERS M wells in Auburn Township in 2019.  The following issues remained outstanding at those wells as of the June 2018 Letter:

> (a)      On March 15, 2017 and June 20, 2017, the PaDEP issued NOVs for stray gas migration and pollution of at least two water supplies from wells at Howell pad in Auburn Township.

> (b)      On November 16, 2017, the PaDEP issued an NOV for stray gas migration and pollution of at least two water supplies at Jeffers Farm.

> (c)      On October 18, 2019, the PaDEP issued an NOV for stray gas migration and pollution of at least one water supply due to the POWERS M gas wells.

100.    Though the Company disclosed proposed consent orders related to the Howell and Jeffers Farm wells, the remaining details in the NOVs were not revealed until the presentment of charges.  These outstanding issues formed the basis for additional criminal charges for violations of the Clean Streams Law.

### 3.    Cabot's Own Former Geologist Confirms Statements at Issue are False and Misleading

101.    The complaint in the Securities Class Action contains statements from a geologist employed by Cabot from 2011 to 2018, in the Company's Pittsburgh office, which buttress the conclusion that Cabot was aware of the defects in its wells and yet did nothing, even as it issued false and misleading statements emphasizing how seriously the Company took its compliance and environmental efforts.

102.     While at Cabot, the geologist was responsible for assisting Cabot's engineers in drilling wells.  The geologist was thus well-placed to confirm the problems that existed in the well-drilling process, causing the migration of methane into groundwater.

103.   The geologist described how, when filling the space around a well casing with cement, a "micro-annular space" can sometimes be created which allows gases to escape, including into groundwater.   The geologist explained also that cementing might otherwise be done improperly, failing to fill the required spaces with cement and thus creating a pathway for gases, like methane, to escape into nearby groundwater.

104.   The geologist stated that Cabot would test the integrity of its wells by creating a "cement bond log." This involved putting a rod with sensors down the gas well; the sensors then emit soundwaves which bounce off the walls of the well casing and in the process can detect these micro-annular spaces where there is no cement.   The geologist further stated that these cement bond logs regularly revealed the absence of sufficient cement in Cabot well casing.   Moreover, the problem was often present in the "surface casing string," which was a secondary string of cement casing specifically intended to prevent gas from entering surrounding groundwater.   The geologist stated that this specific problem was "the number one issue for gas migration at the Company's drill sites."

105.   The geologist stated that problems in well casings were so prevalent at Cabot that "when you saw a good [cement bond] log you were surprised."   Moreover, according to the geologist, this issue was not localized to the wells around Dimock, but were found in numerous Cabot wells.

106.   According to the geologist, cement bond log reports were circulated among Cabot's engineers and geologists.   The geologist believed that defendant Stalnaker also reviewed copies of the cement bond log reports, given that the geologist had seen the reports in Stalnaker's office.

107.   These problems with well casings often went unrepaired, due to the cost.   Once the surface casing string had set, it would take at least a day to repair and would cost the Company as

much as $35,000 per day in downtime alone.  According to the geologist, Cabot was "all about doing things fast and as cost effectively as possible." Therefore, according to the geologist, Cabot did not repair the known issues in its well casings.

108.    In addition to knowing about the problems with its wells' casings and doing nothing, the Company intentionally avoided testing surrounding groundwater to maintain plausible deniability in the event that its wells, with known problems in their casings, did in fact leak gas. The geologist stated that the Company only tested water when it had to in response to complaints, because the Company knew that once it did test well water it was "attached" and "responsible" for that well.  The geologist further described the Company's "no new is good news" stance when it came to not testing groundwater, and opined that this was due to the Company's desire to avoid financial obligations for any damage they caused to water wells.

109.    These statements by a geologist formerly employed by Cabot provide additional support for the grand jury's findings, following its investigation, that Cabot demonstrated "long-term indifference" "over a period of many years, and despite mounting evidence" and "failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration."

**E.    Defendant Dinges Sold Nearly $2 Million in Cabot Stock While in Possession of Material Non-Public Information**

110.    Defendant Dinges was CEO and a director and, as set forth herein, possessed material non-public information regarding Cabot's business condition and model.  Defendant Dinges consciously acted to exploit his knowledge by selling over $1.8 million of Cabot stock in a single day to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/02/2017 | 66,610 | $27.92 | $1,859,751 |

111.    Defendant Dinges thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth about the business condition.

**F.     The Director Defendants Caused Cabot to Expend Significant Funds to Repurchase Its Stock**

112.    The Director Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.  In total, Cabot spent an aggregate amount of over $1.15 billion to repurchase approximately 48.6 million shares of its own common stock at artificially inflated prices from May 2017 through June 2019.

113.    According to the 2Q17 10-Q, Cabot purchased 750,000 shares of its common stock for approximately $17 million at an average price of $22.65 per share during May 2017, and purchased 2,293,246 shares of its common stock for approximately $51 million at an average price of $22.33 per share during June 2017. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $9.1 million for stock repurchases during May and June 2017.

114.    According to the 2017 10-K, Cabot purchased 117,900 shares of its common stock for approximately $4.9 million at an average price of $27.81 per share during November 2017, and purchased 1,822,100 shares of its common stock for approximately $50.5 million at an average price of $27.71 per share during December 2017. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $16.6 million for stock repurchases during November and December 2017.

115.    According to the 1Q18 10-Q, Cabot purchased 8,327,781 shares of its common stock for approximately $206.9 million at an average price of $24.85 per share during March 2018.

As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $45.4 million for these stock repurchases.

116.     According to the 2Q18 10-Q, Cabot purchased 1,645,998 shares of its common stock for approximately $38.5 million at an average price of $23.40 per share during April 2018, and purchased 10 million shares of its common stock for approximately $235.6 million at an average price of $23.56 per share during June 2018. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $48.2 million for stock repurchases during April and June 2018.

117.     According to the 3Q18 10-Q, Cabot purchased 39,037 shares of its common stock for approximately $892,776 at an average price of $22.87 per share during August 2018, and purchased 7,131,508 shares of its common stock for approximately $161.7 million at an average price of $22.67 per share during September 2018. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $23.4 million for stock repurchases during August and September 2018.

118.     According to the 2018 10-K, Cabot purchased 2,829,455 shares of its common stock for approximately $65.5 million at an average price of $23.17 per share during October 2018, and purchased 8.5 million shares of its common stock for approximately $194.1 million at an average price of $22.84 per share during December 2018. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $40 million for stock repurchases during October and December 2018.

119.     According to the 2Q19 10-Q, Cabot purchased 80,933 shares of its common stock for approximately $2 million at an average price of $25.47 per share during April 2019; purchased 2.25 million shares of its common stock for approximately $57.2 million at an average price of

$25.44 per share during May 2019; and purchased 2.75 million shares of its common stock for approximately $65.8 million at an average price of $23.95 per share during June 2019. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $26.6 million for stock repurchases during April, May, and June 2019.

120.    In sum, the Company overpaid for repurchases of its own stock by over $209 million.

## VI.    DAMAGES TO THE COMPANY

121.    As a direct and proximate result of the Individual Defendants' conduct, Cabot has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

      a)    Legal and professional fees in connection with the criminal investigation and criminal charges brought by the Pennsylvania Attorney General;

      b)    Civil penalties paid to regulators for violations of applicable environmental regulations;

      c)    Expenses incurred in connection with remedial efforts;

      d)    Excess funds expended for the stock repurchases;

      e)    Legal fees incurred in connection with the Securities Class Action;

      f)    Any funds paid to settle the Securities Class Action; and

      g)    Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Cabot.

122.    In addition, Cabot's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

123.    The actions complained of herein have irreparably damaged Cabot's corporate image and goodwill.  For at least the foreseeable future, Cabot will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Cabot's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

124.    Plaintiffs bring this action derivatively in the right and for the benefit of Cabot to redress injuries suffered, and to be suffered, by Cabot as a direct result of breaches of fiduciary duty by the Individual Defendants, insider trading (i.e. *Brophy* claim), waste of corporate assets, and unjust enrichment, as well as for contribution for violations of Section 10(b) of the Exchange Act.  Cabot is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

125.    Plaintiffs will adequately and fairly represent the interests of Cabot in enforcing and prosecuting its rights.

126.    Plaintiffs have continuously been shareholders of Cabot at times relevant to the wrongdoing complained of and are current Cabot shareholders.

127.    When this action was filed, Cabot's Board of Directors consisted of defendants Dinges, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts.  Plaintiffs did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Defendant Dinges**

128.    Dinges serves as Cabot's CEO, and therefore is not independent under NYSE listing rules.  As an employee, Dinges derives substantially all of his income from his employment with Cabot, thus could not disinterestedly consider a demand for action that might require him to

40

sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis. As a result, Dinges would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

129. Moreover, Dinges personally issued the misleading statements alleged herein and is named as a defendant in the Securities Class Action. He signed the Consent Orders, thus he was aware of the Company's obligations yet knowingly or recklessly failed to ensure that Cabot complied with the same. As a result, Dinges faces a substantial risk of liability for his breach of fiduciary duty to the Company.

**The Audit Committee Directors**

130. Ables, Boswell, Brock, Delaney, and Kelley served as members of the Audit Committee at relevant times. As such, they were responsible for overseeing the integrity of the Company's Forms 10-K and 10-Q and the Company's compliance with legal and regulatory requirements. In fact, according to the Company's proxy statements, "[t]he function of the Audit Committee is to assist the Board in overseeing…. The compliance by the Company with legal and regulatory requirements." The proxy statements further represent in the section titled "Audit Committee Report," that The function of the Audit Committee is to review and report to the Board of Directors with respect to various auditing and accounting matters, including overseeing the integrity of the financial statements of the Company, the compliance by the Company with legal and regulatory requirements…"

131. In their capacities as Audit Committee members, Ables, Boswell, Brock, Delaney, and Kelley were required to oversee and inform themselves regarding the Company's regulatory obligations, especially including the Consent Orders. The Audit Committee members either utterly failed to implement any reporting or information system or controls regarding the Company's compliance with the consent orders or, having implemented a system or controls to

inform them regarding the Company's compliance, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems regarding compliance with the Consent Orders.

132.    As alleged herein, Ables, Boswell, Brock, Delaney, and Kelley knew or should have known that the Company's faulty gas wells in Pennsylvania had not been remediated (including due to the multiple notices of violations from the PaDEP and the June 2018 Letter detailing outstanding issues and the Company's noncompliance with the December 2010 Consent Order) yet still allowed materially misleading statements to be disseminated in Cabot's SEC filings and other disclosures.  Thus, Ables, Boswell, Brock, Delaney, and Kelley breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**The Environmental, Health and Safety Committee Directors**

133.    Boswell, Brock, Delaney, and Watts served as the members of the Environmental, Health and Safety Committee at relevant times.  As such, they are responsible for the effectiveness of the Company's policies with respect to environmental safety and the policies' compliance with applicable federal and state environmental regulations, including the Consent Orders.  In their capacities as Environmental, Health and Safety Committee members, Boswell, Brock, Delaney, and Watts reviewed and approved the Company's compliance with respect to environmental regulations.  According to the Company's proxy statements, "The function of the Environment, Health & Safety ("EHS") Committee is to assist the Board in providing risk oversight and support of the Company's policies, programs and initiatives on the environment, health and safety. Among other things, the EHS Committee… Reviews the Company's compliance with environmental, health and safety laws and regulations, including…

management and responses to environmental releases… the Company's assessment of and responses to pending legislative and regulatory efforts."

134.    As alleged herein, Boswell, Brock, Delaney, and Watts knew or should have known that the Company's faulty gas wells in Pennsylvania had not been remediated (including due to the multiple notices of violations from the PaDEP and the June 2018 Letter detailing outstanding issues and the Company's noncompliance with the December 2010 Consent Order), yet still allowed the Company's failure to comply and misleading concealment of same.  Thus, Boswell, Brock, Delaney, and Watts either utterly failed to implement any reporting or information system or controls regarding the Company's compliance with the consent orders or, having implemented a system or controls to inform them regarding the Company's compliance, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems regarding  compliance with the Consent Orders.  Boswell, Brock, Delaney, and Watts breached their fiduciary duties and are not disinterested, and demand is excused as to them.

135.    For the foregoing reasons, defendants Dinges, Ables, Boswell, Brock, Delaney, Kelley, and Watts, seven of the nine directors on the Board at the time this action was filed, could not disinterestedly and independently consider a demand to take action in connection with the wrongdoing alleged herein. As a result, demand is excused as to the entire Board.

## COUNT I
### Against Defendants Dinges, Schroeder, and Stalnaker for Breach of Fiduciary Duty

136.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

137.    Defendants Dinges, Schroeder, and Stalnaker each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of

Cabot's business and affairs, particularly with respect to issues as fundamental as public disclosures.

138.     Defendants Dinges's, Schroeder's, and Stalnaker's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. Defendants Dinges, Schroeder, and Stalnaker intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Cabot.

139.     In breach of their fiduciary duties owed to Cabot, defendants Dinges, Schroeder, and Stalnaker willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

140.     In particular, defendants Dinges, Schroeder, and Stalnaker knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

141.     As a direct and proximate result of the Defendants Dinges's, Schroeder's, and Stalnaker's breaches of their fiduciary obligations, Cabot has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

<u>**COUNT II**</u>
**Against Dinges, Schroeder, and Stalnaker for Contribution**
**For Violations of Sections 10(b) and 21D of the Exchange Act**

142.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

143.     Defendants Dinges, Schroeder, and Stalnaker are named as defendants in the related Securities Class Action. The conduct of these defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

144.     Cabot is named as a defendant in related securities class actions that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Cabot is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of defendants Dinges, Schroeder, and Stalnaker as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from defendants Dinges, Schroeder, and Stalnaker in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

145.     As officers, directors and otherwise, defendants Dinges, Schroeder, and Stalnaker had the power or ability to, and did, control or influence, either directly or indirectly, Cabot's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

146.     Defendants Dinges, Schroeder, and Stalnaker are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

147.     Defendants Dinges, Schroeder, and Stalnaker have damaged the Company and are liable to the Company for contribution.

148.     No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

**COUNT III**

**Against Defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts for Breach of Fiduciary Duty**

149.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

150.     Defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Cabot's business and affairs, particularly with respect to issues as fundamental as public disclosures.

151.     The conduct of defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Cabot.

152.     In breach of their fiduciary duties owed to Cabot, defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

153.     In particular, defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

154.    As a direct and proximate result of the breaches of their fiduciary obligations by defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts, Cabot has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

<u>**COUNT IV**</u>
**Against Defendant Dinges – *Brophy* Claim**

155.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

156.    As alleged above, defendant Dinges is a fiduciary of Cabot, possessed material, non-public information of Cabot, and used that information to improperly profit from the sale of Cabot stock.  When Dinges directed the stock sale set forth above, he was motivated to do so, in whole or in part, by the substance of the material, non-public information he possessed, and he acted with scienter.

157.    When Dinges sold his Cabot stock, he knew that the investing public was unaware of the negative material information that they possessed.  He also knew that if the information were disclosed, the market price of Cabot stock would be significantly lower. Dinges timed his stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock he sold.  He thereby benefitted by misappropriating Cabot's non-public information.

158.    Plaintiff, on behalf of Cabot, has no adequate remedy at law.

## COUNT V
### Against the Director Defendants for Waste of Corporate Assets

159.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

160.    The Director Defendants breached their fiduciary duties and, thereby, caused Cabot to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which the Company has been and continues to be substantially damaged.

161.    In addition, the Director Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

162.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT VI
### Against the Individual Defendants for Unjust Enrichment

163.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

164.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Cabot.

165.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Cabot that was tied to the

performance or artificially inflated valuation of Cabot, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

166.    Plaintiffs, as shareholders and representatives of Cabot, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

167.    Plaintiffs on behalf of Cabot have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of Cabot, demand judgment as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of Cabot and that Plaintiffs are adequate representatives of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Declaring that defendants have breached and/or aided and abetted the breach of their fiduciary duties to Cabot;

D.    Directing Cabot to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Cabot and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

      2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

      3.      a proposal to strengthen Cabot's oversight of its disclosure procedures;

      4.      a provision to control insider transactions; and

      5.      a provision to permit the stockholders of Cabot to nominate at least four candidates for election to the Board;

      E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of Cabot has an effective remedy;

      F.      Awarding to Cabot restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

      G.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      H.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiffs demand a trial by jury.

Dated: July 12, 2021                Respectfully submitted,

                        */s/ Stuart L. Cochran*
                        **STECKLER WAYNE COCHRAN CHERRY**
                        Stuart L. Cochran
                        Texas Bar No. 24027936
                        Braden M. Wayne
                        Texas Bar No. 24075247
                        12720 Hillcrest Rd, Suite 1045
                        Dallas, Texas 75230

Telephone: (972) 387-4040
Email: stuart@swclaw.com
Email: braden@swclaw.com

*Liaison Counsel for Plaintiffs*


**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Co-Lead Counsel for Plaintiffs*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2021, a true and correct copy of this document was served on all counsel of record via the court's CM/ECF system.


*/s/ Stuart L. Cochran*
Stuart L. Cochran

## <u>CABOT OIL & GAS CORPORATION VERIFICATION</u>

I, Jody Ezell, hereby verify that I am familiar with the allegations in the Verified Consolidated Amended Shareholder Derivative Complaint (the "Amended Complaint"), and that I have authorized the filing of the Amended Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: _7/7/2021_____

_____
Jody Ezell