United States District Court
Southern District of Texas
**ENTERED**
April 01, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| IN RE CABOT OIL & GAS | § | |
| CORPORATION DERIVATIVE | § | CIVIL ACTION NO. H-21-2046 |
| LITIGATION | § | |
|  | § | |

**MEMORADUM AND OPINION**

Jody Ezell, Leon Fischer, John Hudson, and the Treppel Family Trust have been stockholders in Cabot Oil & Gas Corporation since at least 2015. (Docket Entry No. 39 at ¶¶ 14–16; Docket Entry No. 48 at ¶ 19). They allege that during that period, certain Cabot executive officers and members of its Board of Directors knew about repeated violations of environmental laws, regulations, and consent orders, but failed to address the violations and made statements about compliance that, when shown to be false, caused harm to Cabot.

Ezell and Fischer filed similar actions, which were consolidated, and in which Hudson moved to intervene. In their second amended complaint, Ezell, Fischer, and Hudson assert claims for breaches of fiduciary duties, insider trading, waste of corporate assets, unjust enrichment, and contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 against three of Cabot's executive officers and eight of its directors. The Treppel Family Trust moved to consolidate its similar action with this action, asking the court to appoint Treppel as Lead Plaintiff and its counsel as Lead Counsel, and to designate its complaint as the operative pleading. (Docket Entry Nos. 41, 42).

The court granted the motion to consolidate. After a hearing, the parties submitted an agreed proposed order, (Docket Entry No. 83), which the court now enters, appointing Treppel's counsel as co-lead counsel with the current co-lead counsel, and designating the Second Amended

Shareholder Derivative Complaint filed by Ezell, Fischer, and Hudson, as the operative complaint. Treppel's motion to appoint lead counsel and designate the operative complaint, (Docket Entry Nos. 41, 42), is now moot.

The corporate defendants have moved to dismiss, the shareholders have responded, and the corporate defendants have replied. (Docket Entry Nos. 56, 59, 63, 72, 84). Based on the pleadings, the motion, the response, the record, the arguments of counsel, and the applicable law, the court grants the motion to dismiss as to all claims against all defendants, without prejudice and with leave to amend. The amended complaint must be filed by **May 2, 2022**.

The reasons are set out below.

## I.    Background

Cabot Oil & Gas Corporation is a publicly traded oil and gas company. (Docket Entry No. 39 at ¶ 17). Like many in its business, Cabot fracks. Cabot's fracking is concentrated in the Marcellus Shale Deposit in Susquehanna County, Pennsylvania. (*Id.* at ¶ 1). In 2015, the area accounted for 90% of Cabot's total equivalent production, a standardized measure of oil and gas production. By 2019, Marcellus Shale accounted for "substantially all" of Cabot's annual total equivalent production. (*Id.* at ¶ 39).

In 2010, the Pennsylvania Department of Environmental Protection concluded that Cabot's Susquehanna County drilling activities had caused a water well explosion in Dimock Township, resulting in stray methane gas migrating into the residential water supply. (*Id.* at ¶¶ 2, 46). Cabot and the Pennsylvania Department entered a Consent Order in December 2010, requiring Cabot to restore and replace water supplies and prevent further gas migration. (*Id.* at ¶¶ 2, 51). The December 2010 Consent Order also required Cabot to shut down its operations within a nine square-mile area in Dimock Township, an area the parties refer to as "the box." (*Id.* at ¶ 52).

Problems with Cabot's Susquehanna County drilling activities persisted for the next decade.  In November 2015, Cabot received a proposed Consent Order addressing faulty gas wells and polluted water supplies.  (*Id.* at ¶ 3).  In December 2016, Cabot agreed to pay a civil penalty of $300,000 and Cabot issued statements that "the source of methane has been remediated."  (*Id.*).  In June 2018, Cabot received a Notice of Violation outlining outstanding compliance issues under the December 2010 Consent Order, as well as additional instances of methane migration that had not been resolved for several years.  (*Id.* at ¶ 6).  A year later, in July 2019, Cabot disclosed that it had received two Notices of Violation, one in June and one in November 2017, from the Pennsylvania Department of Environmental Protection, identifying continued gas migration into the Susquehanna County water supply.  (*Id.* at ¶ 4).  Cabot also disclosed that it received two new Consent Orders, resulting in civil penalties of up to $570,000.  (*Id.* at ¶ 4).  On June 15, 2020, the Pennsylvania attorney general's office charged Cabot with 15 criminal counts, after a grand jury found that Cabot had failed to fix faulty gas wells leaking methane into the residential water supply.  (*Id.* at ¶ 6).

During this time, Cabot had a Safety and Environmental Affairs (SEA) Committee that advised the Board on Cabot's compliance with environmental laws and regulations and that received and reviewed Notices of Violation and reports of civil environmental proceedings, remediation requirements, and remediation work.  (*Id.* at ¶ 37–38).

The shareholders allege that starting in at least 2015, a majority of the Board and certain Cabot executive officers knew of Cabot's environmental violations and failed to take action to remediate them, causing harm to the company.  (*Id.* at ¶ 10).  The shareholders also allege that although Cabot knew of the ongoing and unaddressed environmental law and Consent Order

violations, the company's statements about the violations and compliance issues were misleading, inadequate, or deceptive by omission.

The alleged individual wrongdoers include: (1) Dan O. Dinges, President, CEO, and Chairman of Cabot's Board since May 2002; (2) Scott C. Schroeder, CFO since February 2014; (3) Phillip L. Stalnaker, Senior Vice President, Operations and serving in executive capacities since 2009; (4) Dorothy M. Ables, Cabot Director since 2015 and Chairman of the Audit Committee; (5) Rhys J. Best, Cabot Director since 2008; (6) Robert S. Bowell, Cabot Director since 2015, Chairman of the SEA Committee, and member of the Audit Committee;  (7) Amanda M. Brock, Cabot Director since 2017 and member of the Audit and SEA Committees; (8) Peter B. Delaney, Cabot Director since 2018 and member of the Audit and SEA Committees; (9) Robert Kelley, Cabot Director from 2003 to April 2021 and member of the Audit Committee; (10) W. Matt Ralls, Cabot Director since 2011; and (11) Marcus A. Watts, Cabot Director since 2017 and member of the SEA Committee.  (*Id.* at ¶¶ 18–28).

Allegations regarding what Cabot and its officers and directors knew and what they disclosed are detailed below.

## A.     What Cabot, its Officers, and its Directors Allegedly Knew

Relying on information collected from Section 220 documents, the shareholders allege that Cabot, its officers, and its directors began receiving material information about Cabot's compliance with environmental law, regulations, and Consent Orders starting on February 12, 2015.  Directors Kelley and Ralls received preparatory materials for an SEA Committee meeting, which included: (1) October 2014 draft meeting minutes in which Gordon Ganaway, Cabot's then Director of Corporate Safety and Environmental Compliance, gave an update to defendants Dinges, Schroeder, Kelley, and Ralls on the allegations of methane gas migration at the Ratzel,

4

Costello 1V, and Ely well sites; (2) a memorandum providing a history of the allegations to date, including Notices of Violation issued; and (3) a statistical report of Notices of Violation and associated civil penalties, showing 86 violations in the 2014 calendar year and approximately $253,547 in penalties.  (Docket Entry No. 39 at ¶¶ 54–57).

At the July 2015 meeting, Kelley, Ralls, Dinges, Schroeder, Stalnaker, and Best received an update from Ganaway that several closure reports concerning contamination allegations at well sites were put on hold due to continuing issues.  This meeting also informed the participants that final remediation of the Costello 1V water complaint had been delayed.  (*Id.* at ¶ 58).

In October 2015, Kelley and Ralls received preparatory materials for an SEA Committee meeting, and Dinges and Schroeder received copies.  These materials included an internal memorandum outlining the past and continuing allegations of gas migration into well sites, including sites known as the G Shields, Ratzel, Costello, Powers, and Dimock wells.  (*Id.* at ¶ 59).

In February 2016, at an SEA Committee meeting, Kelley, Ralls, Dinges, Schroeder, and Stalnaker received a report that the Pennsylvania Department of Environmental Protection sent Cabot a proposed Consent Order and Agreement related to gas migration into the Stalter #8V well. This Order and Agreement would require Cabot to pay a civil penalty of $294,421.  Kelley, Ralls, Dinges, Schroeder, and Stalnaker received updates on the Costello well gas migration case, the Ely water supply settlement, and on the Powers well site.  (*Id.* at ¶ 63).

At the Board's February 2016 meeting, Dinges, Schroeder and Stalnaker (as management attendees), Ables, Best, Boswell, and Ralls received an update from Cabot's general counsel, G. Kevin Cunningham, on the history between Cabot and the Pennsylvania Department of Environmental Protection dating back to 2009, the Pennsylvania political and regulatory environment, and an upcoming Ely well site case going to trial, as well as a recent legal matter

5

referred to as "the Shanti Temple case," which other documents indicated concerned a contamination complaint. (*Id.* at ¶ 64 & n.6). The Board also received a report from the SEA Committee that it had "reviewed seven open gas migration cases and heard a report about Pennsylvania's implementation of the EPA methane challenge regulations." (*Id.* at ¶ 65). In March 2016, the Ely litigation referred to in the February 2016 Board meeting resulted in a jury verdict requiring Cabot to pay $ 4.2 million in damages to families due to fracking operations that contaminated the ground water in northeastern Pennsylvania. (*Id.* at ¶ 68).

In May 2016, Dinges, Schroeder, Stalnaker, Ables, Best, Boswell, and Ralls attended a Board meeting during which they received an update on the Ely verdict and on the Shanti Temple case. (*Id.* at ¶ 70). The SEA Committee also met. Ralls, Boswell, Dinges, Schroeder, Stalnaker, and Ables received updates on the Costello investigation, the Powers case, and the Dimock gas migration case. (*Id.* at ¶ 71). The Committee was also advised that an "increase in inspections has resulted in an increase in violations, year over year to-date." (*Id.* at ¶ 72).

The Committee met again in July 2016, this time with Best in attendance. (*Id.* at ¶ 73). The meeting minutes state:

> Mr. Ganaway gave an environmental and operational update. Mr. Ganaway discussed the status of the Stalter #8V Consent Order and Agreement and results of testing on the related water wells, all but one of which were showing improvement. Discussion followed regarding next steps. No response has been received from the PADEP on the request to meet regarding the closure report for the Ratzel Pad. Mr. Ganaway updated the Committee on the status of the Costello #1 V, the Manzer #3H and #4H gas migration cases and the Dimock case.

(*Id.*). The meeting minutes also noted that a recent Pennsylvania Department of Environmental Protection inspection had discovered a "possible off-site migration" of water from a Cabot site and that a large number of inspections had occurred in the first half of 2016. (*Id.*). Ganaway also

6

reported that the Shanti Temple case had been resolved, with the Pennsylvania Department issuing a letter of "no impact."  (*Id.*).

In October 2016, Ralls, Boswell, and Kelley received an "Environmental/Operational Update" in preparation for another SEA Committee meeting.  Dinges and Schroeder received copies.  (*Id.* at ¶¶ 75–76).  The update concerned alleged gas migration at well sites, including the G. Shields, Ratzel, Costello 1V, Manzer, and Powers wells.  The update indicated that methane levels remained elevated at several sites, including Costello 1V and Canfield Well 2.  (*Id.*).  The update also reported that Cabot had not been in compliance with emission standards requirements since the "phase in period" ending in October 2013, and had been incorrectly reporting its emission standards to the Pennsylvania Department of Environmental Protection.  (*Id.* at ¶ 77).

In October 2017, Ralls, Boswell, Kelley, Dinges, Schroeder, Stalnaker, Ables, Best, Brock, and Watts attended an SEA Committee meeting.  Ganaway discussed the Stalter #8V well investigation, settlement negotiations with residents, and the Greenwood, Costello 1V, and Manzer wells.  He also discussed allegations of gas migration affecting the Howell, Jeffers Farms, and Foltz locations, and actions to remediate the effects.  Ganaway also noted a new water complaint for the Ely K well site.  (*Id.* at ¶ 84).

On November 2, 2017, Dinges sold 66,610 of his own Cabot shares, recovering over $1.8 million in proceeds.  (*Id.* at ¶ 145).

In February 2018, Cabot's Vice President and Company Secretary, Deidre Shearer, sent Boswell, Brock, and Watts agendas and related materials for an upcoming SEA Committee meeting.  Dinges and Schroeder were copied.  (*Id.* at ¶ 89).  The materials included a chart summarizing year-to-year Notices of Violation against Cabot.  The chart showed 86 total violations in 2017, compared to 48 in 2016, and 55 in 2015.  The chart also showed that Cabot had

7

paid $111,228 in civil penalties in 2017; $282,689 in 2016; and $30,750 in 2015.  Environmental regulatory inspections had jumped from 390 in 2013 to 1,564 in 2017, with a high of 1,716 in 2016.  (*Id.* at ¶ 90).

Boswell, Brock, Watts, Ables, Best, Kelley, Ralls, Dinges, Schroeder, and Stalnaker all attended the February 2018 meeting.  Ganaway noted that "as Cabot's hours worked and employee count goes down, the incident rate tends to go up."  Ganaway also reported that there had been no new allegations of gas migration into water wells since the last meeting.  (*Id.* at ¶ 91).

In February 2019, Boswell, Brock, Delaney, and Watts received an executive summary memorandum notifying them that the Pennsylvania Department of Environmental Protection had recently informed Cabot about the status of 18 different residential water sources involved with the December 2010 Consent Order.  Dinges and Schroeder received copies.  Of the 18 water sources, 6 were confirmed to have met the requirements of the December 2010 Consent Order; the Pennsylvania Department could not assess 5 more but was requiring no further action; and 7 had failed the December 2010 Consent Order.  (*Id.* at ¶ 97).

In May 2019, Dinges, Schroeder, Stalnaker, Ables, Best, Boswell, Brock, Delaney, Ralls, and Watts were present for a Board meeting at which Cole Delancey, Cabot's Assistant General Counsel, "presented a Pennsylvania legal and political risk update."  The Cabot Board members and officers learned that the Pennsylvania attorney general had opened an investigation into the industry.  (*Id.* at ¶ 102).

The SEA Committee met in February 2020.  Dinges, Schroeder, Stalnaker, Ables, Best, Kelley, Ralls, Boswell, Brock, Delaney, and Watts were present.  During the meeting, Ganaway reported that the Pennsylvania Department of Environmental Protection had performed 1,976 inspections of Cabot sites and had issued Cabot 41 Notices of Violation.  (*Id.* at ¶ 106).

At Board meetings also held in February 2020, Dinges, Schroeder, Stalnaker, Ables, Best, Boswell, Brock, Delaney, Ralls, and Watts were present.  They received an update on an active investigation by a Pennsylvania grand jury targeting Cabot.  (*Id.* at ¶ 107).

On June 15, 2020, the Pennsylvania attorney general announced charges against Cabot. (*Id.* at ¶ 115).  The grand jury had found the following:

- Cabot deliberately did not test residential water wells in Dimock Township for methane before it began drilling operations in order to maintain plausible deniability.

- The Pennsylvania Department of Environmental Protection had examined 12 post-drilling samples of drinking water supplies in Dimock Township, dating back to 2009.  The samples exhibited high and hazardous levels of methane (at least 10 mg/l, the warning range for dangerous methane concentration).  These levels far exceeded the baseline levels in the area at large (0.5 mg /l).  The Pennsylvania Department's Program Manager, Seth Pelepko, testified that Cabot's defective wells caused these elevated methane levels.

- Ken Kennedy, an Oil and Gas Inspector Supervisor for the Pennsylvania Department, testified that the Department had raised questions in 2011 about the integrity of additional wells.  In 2015, Kennedy had identified 11 wells needing further evaluation.  Though Cabot subsequently completed its own testing, it reportedly did not undertake remedial efforts until 2018.

- Dimock Township residents reported ongoing issues with their water supply to Cabot.

(*Id.* at ¶¶ 117–28).

The June 15, 2020, charges also revealed that Cabot had received a June 2018 letter from the Pennsylvania Department of Environmental Protection denying the company's request to drill

new wells in the Dimock box.  The letter blamed the denial on Cabot's unaddressed compliance problems with well sites.  (*Id.* at ¶ 130).

The charges encompassed well sites covered by the December 2010 Consent Order that were not remediated as of 2015, as well as more recently drilled wells in Susquehanna County.  As to the December 2010 Consent Order, the attorney general charged that Cabot "knowingly discharge[d], permit[ted] to flow or continue[d] to discharge or permit[ted] to flow, methane into groundwater," on the following dates and in the following wells:

- from August 14, 2009, through at least June 11, 2018, from gas wells G Shields 1V, G Shields 2H, G Shields 4H, and G Shields 5H;

- from July 16, 2008, through at least June 11, 2018, from gas wells Costello 1V, Costello 2V, Gesford 4H, and Gesford 8H;

- from October 31, 2008, through at least June 11, 2018, from gas wells Ratzel 1H, Ratzel 2H, and Ratzel 3V; and

- from March 27, 2008, through at least June 11, 2018, from gas wells Ely 4H and Ely 6H.

(*Id.* at ¶ 131).

In addition to wells in Dimock Township, Cabot drilled wells in other parts of Susquehanna County.  The Company drilled wells on the Howell well pad in Auburn Township in 2016, drilled the Jeffers Farm wells in Harford Township in 2017, and drilled the POWERS M wells in Auburn Township in 2019.  (*Id.* at ¶ 134).  These suffered problems similar to those in the Dimock Township wells.

- In March 2017 and June 2017, the Pennsylvania Department of Environmental Protection issued Notices of Violation for stray gas migration and pollution of at least two water supplies from wells at the Howell pad in Auburn Township.

- In November 2017, the Pennsylvania Department issued a Notice of Violation for stray gas migration and pollution of at least two water supplies at Jeffers Farm.

- In October 2019, the Pennsylvania Department issued a Notice of Violation for stray gas migration and pollution of at least one water supply from the POWERS M gas wells.

(*Id.*).   For the Howell pad and the Jeffers Farm sites, issues remained outstanding as of the June 2018 letter.  (*Id.*).

A geologist who worked at Cabot in its Pittsburgh office from 2011 to 2018 confirmed the ongoing issues with Cabot's Susquehanna County wells, both in and outside Dimock Township. The geologist stated that the well casings could create pathways for gases like methane to escape into nearby groundwater, and that these problems in Cabot's well casings were so prevalent that "when you saw a good [cement bond] log[,] you were surprised."  According to the geologist, Cabot tested well water only in response to specific complaints, because it knew that once it did test water in a well, it was "responsible" for that well.  (*Id.* at ¶¶ 136–44).

### B.    What Cabot, its Officers, and its Directors Allegedly Disclosed

The shareholders' allegations are based on public disclosures made by Cabot and its officers from 2015 to 2019.  The disclosures are categorized below.

1. ***Statements About Notices of Violation in Form 10-Qs and Form 10-Ks***.  On October 23, 2015, Cabot filed its quarterly report with the Securities and Exchange Commission.  The Form 10-Q stated in part that:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder.  While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

(*Id.* at ¶ 60).  Dinges and Schroeder attested to the accuracy of the filing, the disclosure of

all material facts, and the effectiveness of Cabot's disclosure controls.  (*Id.* at ¶ 61).  Cabot

repeated this statement in its 2015, 2016, 2017, and 2018 Form 10-Ks filed with the

Securities and Exchange Commission.  (*Id.* at ¶¶ 66, 79, 92, 99).  It also repeated the

statement in its Form 10-Qs filed in May 2016, July 2016, October 2016, April 2017, July

2017, October 2017, April 2018, July 2018, October 2018, April 2019, July 2019, and

October 2019.  (*Id.* at ¶¶ 69, 74, 78, 82–83, 87, 93–94, 96, 100, 103, 105).

2. ***Statements About Cabot's Substantial Compliance in Form 10-Ks***.  Cabot's 2015, 2016,

2017, and 2018 Form 10-Ks included the statement that Cabot "substantially compl[ies]

with the Clean Water Act and related federal and state regulations."  (*Id.* at ¶¶ 66, 79, 92,

99).  These Form 10-Ks were filed in February 2016, February 2017, March 2018, and

February 2019.  (*Id.* at ¶¶ 65, 79, 92, 99).

3. ***Statements About Remediation Related to the 2011 Notice of Violation in Form 10-Qs***

***and Form 10-Ks***.  On February 22, 2016, Cabot filed its Form 10-K, which represented:

> On November 12, 2015, we received a proposed Consent Order and
> Agreement from the Pennsylvania Department of Environmental
> Protection (PaDEP) relating to gas migration allegations in an area
> surrounding several wells owned and operated by us in Susquehanna
> County, Pennsylvania.  The allegations relating to these wells were
> initially raised by residents in the area in August 2011.  We received
> a Notice of Violation from the PaDEP in September 2011 for failure
> to prevent the migration of gas into fresh groundwater sources in the
> area surrounding these wells.  Since then, we have been engaged
> with the PaDEP in investigating the incident and have performed
> appropriate remediation efforts, including the provision of
> alternative sources of drinking water to affected residents.  ***We***
> ***believe the source of methane has been remediated and are***
> ***working with the PaDEP to reach agreement on the disposition of***
> ***this matter.***  The proposed Consent Order and Agreement is the
> culmination of this effort and, if finalized, would result in the
> payment of a civil monetary penalty in an amount likely to exceed
> $100,000, up to approximately $300,000.  We will continue to work

with the PaDEP to finalize the Consent Order and Agreement and
bring this matter to a close.

(*Id.* at ¶ 66).  Similar statements were made in Cabot's Form 10-Qs filed in May 2016, July

2016, and October 2016.  (*Id.* at ¶¶ 69, 74, 78).

4.  ***Notification of the 2016 Consent Order in the 2016 Form 10-K.***  In its 2016 Form 10-K,

Cabot notified investors that it had finalized a new Consent Order and Agreement with the

Pennsylvania Department of Environmental Protection:

> On November 12, 2015, we received a proposed Consent Order and
> Agreement from the Pennsylvania Department of Environmental
> Protection (PaDEP) relating to gas migration allegations in an area
> surrounding several wells owned and operated by us in Susquehanna
> County, Pennsylvania.  The allegations relating to these wells were
> initially raised by residents in the area in August 2011.  We received
> a Notice of Violation from the PaDEP in September 2011 for failure
> to prevent the migration of gas into fresh groundwater sources in the
> area surrounding these wells.  Since then, we have been engaged
> with the PaDEP in investigating the incident and have performed
> appropriate remediation efforts, including the provision of
> alternative sources of drinking water to affected residents.  ***We
> believe the source of methane has been remediated and we entered
> into a Consent Order and Agreement with the PaDEP on
> December 30, 2016.  We agreed to pay a civil monetary penalty in
> the amount of approximately $0.3 million and to continue to
> provide alternative sources of drinking water to affected residents
> until the affected water supplies are permanently restored.***
> Further, the related gas well is being permanently plugged.
> Following the plugging of the gas well, additional monitoring will
> be required to ensure the source of methane has been remediated.
> Cabot continues to work with the PaDEP to bring this matter to a
> close.

(*Id.* at ¶ 79 (emphasis in original)).

5.  ***The 2016 Annual Report***.  In March 2017, Cabot published its 2016 Annual Report.  CEO

Dinges signed a letter to shareholders stating that "Cabot's objective is to deliver profitable

results and to conduct our operations in a safe and prudent manner for the protection of our

employees and contractors with ***an unwavering commitment to comply with or exceed all***

13

*regulations to enhance the environment and the communities where we operate*."  (*Id.* at

¶ 81 (emphasis in original)).

6. ***The October 2017 Press Release***.   On October 27, 2017, Cabot issued a press release

describing its 2017 third-quarter results and discussing its 2018 operating plan for the

Marcellus Shale.  The press release did not mention ongoing gas migration complaints or

water quality complaints.  (*Id.* at ¶ 85).

7. ***The 2018 Schroeder Presentation***.   In August 2018, Schroeder told investors at an

EnerCome Oil & Gas conference that:

> [w]e have more wells that we're completing right now in the Upper
> Marcellus.  And look to the February year-end reserve report for
> data on that.  Question you might ask is, "Okay, why -- if you're
> doing them now, why don't you tell us sooner?"  ***Because of the
> way we complete our wells in the field to be environmentally
> friendly, green, however you want to say it***, a long time ago, several
> years ago, we changed our completion technique.

(*Id.* at ¶ 95 (emphasis in original)).

8. ***July and October 2019 Form 10-Q Disclosures***.  Cabot's Form 10-Qs, filed on July 26,

2019, and October 25, 2019, reported the following:

> On June 17, 2019, we received two proposed Consent Order and
> Agreements ("CO&A") from the Pennsylvania Department of
> Environmental Protection (PaDEP) relating to gas migration
> allegations in areas surrounding several wells owned and operated
> by us in Susquehanna County, Pennsylvania.  ***The allegations
> relating to these wells were initially raised by residents in the area
> in March and June 2017, respectively, in the form of complaints
> about their drinking water supply.  Since then, we have been
> engaged with the PaDEP in investigating the incidents and have
> performed appropriate remediation efforts, including the
> provision of alternative sources of drinking water to the affected
> residents.***  We received Notices of Violation ("NOV") from the
> PaDEP in June and November, 2017, respectively, for failure to
> prevent the migration of gas into fresh groundwater sources in the
> area surrounding these wells.  With regard to the June 2017 NOV,
> we believe these water quality complaints have been resolved, and

> we are working with the PaDEP to reach agreement on the
> disposition of this matter.  The proposed CO&A is the culmination
> of this effort and, if finalized, would result in the payment of a civil
> monetary penalty in an amount likely to exceed $100,000, up to
> approximately $215,000.  We will continue to work with the PaDEP
> to finalize the CO&A, and to bring this matter to a close.  With
> regard to the November 2017 NOV, the proposed CO&A, if
> finalized as drafted, would require Cabot to submit a detailed written
> remediation plan, continue water sampling and other investigative
> measures and restore or replace affected water supplies and would
> result in the payment of a civil monetary penalty in an amount likely
> to exceed $100,000, up to approximately $355,000.  We will
> continue to work with the PaDEP to finalize the CO&A, and to
> complete the ongoing investigation and remediation.

(*Id.* at ¶¶ 103, 105 (emphasis in original)).

9. ***2019 Legal Matters and Risk Disclosures***.  Cabot's 2019 Form 10-K, filed on February

25, 2020, described certain legal matters but did not provide specific information about the

ongoing Pennsylvania grand jury investigation.  The Form 10-K stated:

> ***We are subject to complex laws and regulations, including
> environmental and safety regulations, which can adversely affect
> the cost, manner or feasibility of doing business.***
>
> Our operations are subject to extensive federal, state and local laws
> and regulations, including drilling, permitting and safety laws and
> regulations and those relating to the generation, storage, handling,
> emission, transportation and discharge of materials into the
> environment. These laws and regulations can adversely affect the
> cost, manner or feasibility of doing business. Many laws and
> regulations require permits for the operation of various facilities,
> and these permits are subject to revocation, modification and
> renewal. Governmental authorities have the power to enforce
> compliance with their regulations, and violations could subject us to
> fines, injunctions or both.  These laws and regulations have
> increased the costs of planning, designing, drilling, installing and
> operating natural gas and oil facilities, and new laws and regulations
> or revisions or reinterpretations of existing laws and regulations
> could further increase these costs.  In addition, we may be liable for
> environmental damages caused by previous owners or operators of
> property we purchase or lease.  Risks of substantial costs and
> liabilities related to environmental compliance issues are inherent in
> natural gas and oil operations.  For example, we could be required

15

to install expensive pollution control measures or limit or cease activities on lands located within wilderness, wetlands or other environmentally or politically sensitive areas. Failure to comply with these laws also may result in the suspension or termination of our operations and subject us to administrative, civil and criminal penalties as well as the imposition of corrective action orders.  It is possible that other developments, such as stricter environmental laws and regulations, and claims for damages to property or persons resulting from natural gas and oil production, would result in substantial costs and liabilities.

. . .

The Company is a defendant in various legal proceedings arising in the normal course of business.  All known liabilities are accrued when management determines they are probable based on its best estimate of the potential loss.  While the outcome and impact of these legal proceedings on the Company cannot be predicted with certainty, management believes that the resolution of these proceedings will not have a material effect on the Company's financial position, results of operations or cash flows.

(*Id.* at ¶¶ 108–110 (emphasis in original)).

10. ***The 2019 Annual Report***.  On March 13, 2020, Cabot published its 2019 Annual Report. CEO Dinges signed a letter to shareholders stating that Cabot "make[s] every effort to reduce and limit [its] impact on air, water and the environment with the best technologies currently available."  Dinges's letter emphasized that Cabot's "commitment to free cash flow, return on capital, and return of capital back to shareholders with the least possible impact to the environment remains paramount in importance to us." (*Id.* at ¶ 111 (emphasis omitted)).  Other parts of the 2019 Annual Report stated that "Cabot embraces environmental innovation and is a leader in utilizing new technology to reduce our overall impact on the environment." The 2019 Annual Report continued: "[i]t is from this platform that we will continue our efforts to improve the environment, being a beacon of light by doing the right thing." (*Id.* at ¶ 112 (emphasis omitted)).

16

C.      **The Stock Price and Alleged Harm to Cabot**

On the day of the October 27, 2017, press release reporting positive third quarter results, the price of Cabot's stock climbed to $26.75 per share, an increase of $2.10 (8.52%) over the previous day's close of $24.65.  (*Id.* at ¶¶ 85–86).  After the October 2017 publication of Cabot's third quarterly report on Form 10-Q, Cabot's stock price continued to climb, closing at $27.19 on October 30, 2017, an increase of $0.44 per share (1.64%) over October 27, 2017.   While the stock prices were allegedly inflated from May 2017 to June 2019, the Board caused Cabot to repurchase 48.6 million shares, for over $1.15 billion.  (*Id.* at ¶¶ 147–55).

The shareholders allege that when Cabot began disclosing continued violations of the 2010 Consent Order and ongoing gas migration issues, the stock price began to drop.  Starting with the second quarterly report for 2019, filed on July 26, 2019, when Cabot reported that it received two Consent Orders from the Pennsylvania Department of Environmental Protection related to 2017 gas migration allegations, Cabot's stock price fell $2.63, or 12%, to close at $19.16 per share on July 26, 2019.  (*Id.* at ¶¶ 103–04).

When the Pennsylvania attorney general announced criminal charges on June 15, 2020, the stock price fell $0.67, or 3.3%, closing at $19.40 per share on that day.  (*Id.* at ¶ 116).  Because the stock was worth at most $19.40 during the relevant periods, as the shareholders allege, Cabot allegedly overpaid repurchases of its own stock by over $209 million.  (*Id.* at ¶ 155).

The shareholders also allege that as a result of the conduct of the directors and officers, Cabot has suffered and will continue to suffer legal and professional fees associated with the Pennsylvania charges and related class actions, civil penalties, remediation expenses, compensation and benefits costs, as well as harm to Cabot's business, goodwill, and reputation. (*Id.* at ¶¶ 156–58).

## II.     The Rule 12(b)(6) Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial

notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

### III.    Pre-Suit Demand Futility

The shareholders have brought all claims derivatively on behalf of Cabot and have admitted that they did not make a demand on Cabot's Board before filing suit.  (Docket Entry No. 39 at ¶ 162).  The officers and directors argue that the shareholders have not pleaded particularized facts to excuse demand.  The shareholders argue that at least half of the Board could not independently respond to a litigation demand, because seven of the nine directors knew of the Cabot's outstanding issues and lack of compliance for years, had failed to require compliance, and could not disinterestedly investigate the allegations in this action.  (*Id.* at ¶ 11).

"The decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors." *In re Citigroup Inc., S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009).   "Unless the board of directors permits the stockholder to proceed, a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation." *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021) (citation omitted)).

Rule 23.1 of the Federal Rules of Civil Procedure provides:

> (**a**) **Prerequisites.**  This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce.  The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of

> shareholders or members who are similarly situated in enforcing the right of the corporation or association.
>
> **(b) Pleading Requirements.**  The complaint must be verified and must . . . state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort.

"[A]lthough Rule 23.1 clearly contemplates both the demand requirement and the possibility that demand may be excused, it does not create a demand requirement of any particular dimension.  On its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991) (emphasis omitted).  Rule 23.1 provides the procedural standard for the demand requirement in a shareholder's derivative complaint in federal court.  The law of the nominal defendant's state of incorporation determines the substantive elements of the demand requirement.  *Kamen I*, 500 U.S. at 100 n. 6, 108–109.  Rule 23.1 requires that the plaintiff plead with particularity facts sufficient to satisfy the applicable demand requirement.

Cabot, the nominal defendant, is incorporated in Delaware.  (Docket Entry No. 39 at ¶ 17). Under Delaware law, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability."  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (overruled on other grounds).  "[T]he demand futility analysis asks whether the board of directors as constituted when the lawsuit was filed could exercise disinterested and independent judgment regarding a demand."  *Zuckerberg*, 250 A.3d at 877 (citation omitted).  "The question is whether the constellation of allegations, viewed holistically, creates a reasonable doubt about the director's ability to consider a demand objectively."  *Id.* (citing *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *18 (Del. Ch. Mar. 19, 2018)).  The court "counts heads among the individual members of the board to assess whether a majority of its members are, or are not,

conflicted." *Wenske v Blue Bell Creameries, Inc.*, 214 A.3d 958, 965 (Del Ch. 2019) (citations and internal quotation marks omitted).

Historically, the Delaware Supreme Court has followed two tests for determining whether directors can exercise impartial judgment when faced with litigation demands—the *Aronson* test and the *Rales* test.   In the case of "claims involving a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties," courts applied the *Aronson* test to determine whether demand was futile.  *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).   "Under this test, the trial court is confronted with two related but distinct questions: (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment." *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 170 (D. Del. 2009) (citing *Levine v. Smith*, 591 A.2d 194, 205 (Del. 1991) (overruled on other grounds)).

When the board that would be considering demand "did not make a business decision which is being challenged in the derivative suit," the *Rales* test applies.  *Rales v. Blasband*, 634 A.2d 927, 933–34 (Del. 1993).   Under *Rales*, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934.

Recognizing that *Rales* established a more general demand futility test than *Aronson*, the Delaware Supreme Court recently announced one test to determine demand futility.  *United Food & Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034, 1058 (Del. 2021).   Now, courts proceed "on a director-by-director basis," asking for each director: "(i) whether the director

received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director faces a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Id.* at 1059.  If the answer to any of the questions is "yes" for at least a majority of the board members, demand is excused as futile.  *Id*. Although the Delaware Supreme Court has consolidated *Rales* and *Aronson*, both tests remain authoritative, and courts may still look to pre-*Zuckerberg* precedent for guidance.  *Id.*

The shareholders argue that demand was futile because a majority of the Board faces a substantial likelihood of liability on the complaint allegations.  The shareholders do not argue another *Zuckerberg* basis for demand futility.  (Docket Entry No. 63 at 22).  When this action was filed, there were nine directors on Cabot's Board: Dinges, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts.  Demand is futile if, for each claim alleged, there were five directors who could not act independently and impartially based on the misconduct alleged because they each face a substantial likelihood of liability.

The shareholders have asserted the following claims:

1. against Dinges, Schroeder, and Stalnaker, for breach of fiduciary duty, because they knowingly or recklessly made untrue statements or permitted Cabot's public filings, disclosures, and statements to misleadingly report revenue and overall prospects, (Docket Entry No. 39 at 62–63);

2. against Dinges, Schroeder, and Stalnaker, for contribution for violations of Sections 10(b) and 21D of the Exchange Act, (*Id.* at 64–65);

3. against Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts, for breach of fiduciary duty, because they knowingly or recklessly made untrue statements or permitted Cabot's public filings, disclosures, and statements to misleadingly report revenue and overall prospects, (*Id.* at 65–66);

4. against Dinges, for a *Brophy* claim, (*Id.* at 66–67);

5. against Dinges, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts for waste of corporate assets, due to breaches of their fiduciary duties and repurchases of company stock at artificially inflated prices, (*Id.* at 67); and

6. against Dinges, Schroeder, Stalnaker, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts, for unjust enrichment for benefits received due to false and misleading statements, (*Id.* at 67–68).

To assess whether demand would have been futile on the basis that each board member faces a substantial likelihood of liability, the court must determine whether the shareholders have alleged facts supporting each claim at the motion to dismiss stage, under the heightened pleading standard required by Rule 23.1, as to at least five Board members.

## A.    *Caremark* Breach of Fiduciary Duty

Claims 1, 3, and 5 depend in part on whether the directors and officers breached their fiduciary duties because they consciously disregarded alleged conduct that was known to be illegal and failed to bring Cabot into compliance.  The shareholders allege breaches of the duties of loyalty and good faith.[1]  To the extent that claims 1, 3, and 5 depend on breaches of fiduciary duty based

---

[1]  Under Delaware law, "[w]here directors are contractually or otherwise exculpated from liability for certain conduct, 'then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts.'"  *Wood*, 953 A.2d at 141 (citing *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003)) (emphasis omitted).  The corporate defendants have pointed out that the directors are exculpated from personal liability for duty of care claims, which are not at issue here.

23

on allegations that the directors and officers knowingly or recklessly made untrue statements, or permitted misleading public filings, disclosures, and statements about Cabot's revenue and prospects, those claims are analytically distinct and addressed separately. *See Genworth Fin., Inc. Consol. Deriv. Litig.*, No. 11901-VCS, 2021 WL 4452338, *14–16 (Del. Ch. Sept. 29, 2021) (allegations that the board knew of false and misleading disclosures and participated in making them was the basis of the plaintiff's claim that the "[d]efendants acted in bad faith in breach of their duty of loyalty by causing the Company to engage in fraud in violation of positive [federal public disclosure law]," which was distinct from breach of fiduciary duty claims based on a conscious disregard for corporate misconduct).

Under Delaware law, to successfully plead demand futility for failing to remediate environmental violations, the shareholders "must allege with particularity facts that imply that the directors utterly failed to provide a corporate reporting system to permit board-level review of compliance with law, or that the directors were provided sufficient notice of corporate non-compliance with law such that their failure to remediate amounts to bad faith." *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, No. 19-0816, 2020 WL 5028065, at *1 (Del Ch. Aug. 24, 2020).  These are known as *Caremark* claims.  *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A. 2d 959 (Del. Ch. 1996).

As the Delaware Chancery Court has explained:

> [u]nder *Caremark* and its progeny, "a director must make a good faith effort to oversee the company's operations." *Marchand v. Barnhill*, 212 A.3d 805, 820 (Del. 2019) (citing *Caremark*, 698 A.2d at 970).  "A *Caremark* claim contends that the directors set in motion or 'allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in doing so they violated a duty to be active monitors of corporate performance.'" *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012) (quoting *Caremark*, 698 A.2d at 967).  Such a claim "'is rooted in concepts of bad faith; indeed, a showing of bad faith is a necessary condition to director

oversight liability.'" *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) (quoting *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009)).  Because a *Caremark* claim must plead bad faith, "a plaintiff must allege facts that allow a reasonable inference that the directors acted with scienter which, in turn, requires not only proof that a director acted inconsistently with his fiduciary duties, but also most importantly, that the director knew he was so acting." . . .  A *Caremark* claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 372 (Del. 2006).

*Caremark* claims can take two forms.  A so-called "prong one" claim arises where "the directors utterly failed to implement any reporting or information system or controls." *Id.* at 370.  Under "prong one," "a director may be held liable if she acts in bad faith in the sense that she made no good faith effort to ensure that the company had in place any system of controls." *Hughes v. Hu*, 2020 WL 1987029, at *14 (Del. Ch. Apr. 27, 2020) (quoting *Marchand v. Barnhill*, 212 A.3d 805, 822 (Del. 2019)).  A "prong two" claim, on the other hand, arises where "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370 (Del. 2006).  To state a "prong two" *Caremark* claim, the Plaintiffs must "plead [particularized facts] that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct." *Horman*, 2017 WL 242571, at *10 (quoting *Reiter on Behalf of Capital One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016)).  "[A] plaintiff asserting a *Caremark* oversight claim must plead with particularity 'a sufficient connection between the corporate trauma and the board.'" *Reiter*, 2016 WL 6081823, at *8 (quoting *Louisiana Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013)).

*Teamsters*, 2020 WL 5028065, at *16–17.

"Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007).  Under Delaware law, red flags "are only useful when they are either waved in one's face or displayed so that they are visible to the

25

careful observer." *Wood*, 953 A.2d at 143 (citation omitted).   With regard to regulatory

investigations:

> [t]he issuance of a subpoena or the launch of a regulatory
> investigation does not necessarily demonstrate that a corporation's
> directors knew or should have known that the corporation was
> violating the law.  When such events become a red flag depends on
> the circumstances.  If a plaintiff is able to present[ ] strong factual
> allegations of board knowledge of ongoing legal violations in the
> wake of federal government enforcement proceedings, for example,
> then the mere fact of a regulatory investigation would take on more
> significance at the pleading stage.

*Fisher on behalf of LendingClub Corp. v. Sanborn*, C.A. No. 2019-0631-AGB, 2021 WL 1197577,

at *12 (Del. Ch. Mar. 30, 2021) (citations, emphasis, and internal quotation marks omitted).

The shareholders argue that their complaint allegations meet the second *Caremark* prong,

as follows:

> (i) compliance with Pennsylvania's environmental laws and
> regulations was mission critical to Cabot; (ii) the Board was
> presented with *hundreds* of red flags over several years alerting it
> that the Company was not complying with those laws and
> regulations; and (iii) the Board failed to take action to implement a
> system that brought Cabot into legal and regulatory compliance, as
> demonstrated by the fact that the Company was ultimately indicted
> for its failure to comply with Pennsylvania laws and regulations for
> years after the Board was on notice of problems.

(Docket Entry No. 63 at 22–23).

Based on the complaint, the court has prepared the following chart summarizing the alleged

"red flags" before the Board during the relevant periods:

| Issue | Dinges | Ables | Best | Boswell | Brock | Delaney | Kelley | Ralls | Watts |
|---|---|---|---|---|---|---|---|---|---|
| **February 2015:** allegations of methane gas migration from sites in Pennsylvania including Ratzel, Costello 1V, and Ely (Docket Entry No. 39 at ¶¶ 54–56) | cc | | | | | | X | X | |
| **Feb 2015** | cc | | | | | | X | X | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| statistics report on Notices of Violation received to date (86 violations in 2014; $253,547 paid in total penalties) (*Id.* at ¶ 57) | | | | | | | | |
| **July 2015** updates on gas migration allegations, including that: (i) a water well had "shown a spike in dissolved gases, putting the close report on hold"; (ii) a closure report regarding pollution and contamination allegations had been rejected by the Pennsylvania Department of Environmental Protection putting the closure on hold; (iii) final remediation of the Costello 1V water complaint had been delayed; and (iv) a "significant" release of diesel-based drilling mud had occurred in the North Region, "due to a failure in lockout/tagout procedures" with estimated remediation costs of $100,000 (*Id.* at ¶ 58) | X | | X | | | | X | X |
| **July 2015** update about ongoing discussions regarding the December 2010 Consent Order and that the Pennsylvania Department of Environmental Protection "does not seem to be making efforts to resolve the matter" (*Id.* at ¶ 58) | X | | X | | | | X | X |
| **October 2015** updates about ongoing gas migration allegations for G. Shields, Ratzel, Costello, Powers, and Dimock sites (*Id.* at ¶ 59) | X | | | | | | X | X |
| **February 2016** proposed Consent Order from the Pennsylvania Department of Environmental Protection related to gas migration for the Stalter #8V well (*Id.* at ¶ 63) | X | | | | | | X | X |
| **February 2016** updates on "the status of the Costello well gas migration case and the Ely water supply | X | | | | | | X | X |

27

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| settlement," in addition to an update on the Powers well (*Id.* at ¶ 63) | | | | | | | | | |
| **February 2016** legal update on the Shanti Temple case, which involved another contamination complaint, and an update on the Ely case set to go to trial (*Id.* at ¶ 64) | X | X | X | X | | | | X | |
| **February 2016** an update on an SEA Committee report that it had "reviewed seven open gas migration cases and heard a report about Pennsylvania's implementation of the EPA methane challenge regulations" (*Id.* at ¶ 65) | X | X | X | X | | | | X | |
| **March 2016** jury ruled in Ely litigation that Cabot must pay more than $4.2 million in damages for groundwater contamination (*Id.* at ¶ 68) | X | X | X | X | X | X | X | X | X |
| **May 2016** legal update on Ely verdict and Shanti Temple Case (*Id.* at ¶ 70) | X | X | X | X | | | | X | |
| **May 2016** update on "recent activity on the . . . Costello investigation," noting that it was one of two cases preventing drilling "in the box," the Powers case, and the Dimock gas migration case (*Id.* at ¶ 71) | X | X | | X | | | X | X | |
| **May 2016** update that an "increase in inspections has resulted in an increase in violations, year over year-to-date" (*Id.* at ¶ 72) | X | X | | X | | | X | X | |
| **July 2016** updates on the following: the status of the Stalter #8V Consent Order and Agreement and results of testing on the related water wells, all but one of which were showing improvement; that no response had been received from the Pennsylvania Department of Environmental Protection on the request to meet regarding | X | X | X | X | | | X | X | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| the closure report for the Ratzel Pad; the status of the Costello 1V, the Manzer #3H and #4H gas migration cases, and the Dimock case; a possible off-site migration from a tank pad and performed remediation; resolution of the Shanti Temple litigation; and a large number of agency inspections in the North Region (*Id.* at ¶ 73) | | | | | | | | | |
| **October 2016** updates concerning the gas migration allegations related to various well sites, including but not limited to those at G. Shields, Ratzel, Costello 1V, Manzer, and Powers and that methane levels remained elevated at several sites, including Costello 1V and Canfield Well 2 (*Id.* at ¶¶ 75–76) | Cc | | | X | | | X | X | |
| **October 2016** an update that contrary to what Cabot had reported to the Pennsylvania Department on Environmental Protection, Cabot had been using the Wllmark6900 device to control emissions, and had not been in compliance with emission standards (*Id.* at ¶ 77) | Cc | | | X | | | X | X | |
| **October 2017** updates on the following: the status of the gas migration investigations, including the Stalter #8V; the status of settlement negotiations with affected residents; status of the Greenwood wells, the Costello 1V and the Manzer wells; gas migration allegations related to the Howell, Jeffers Farms and Foltz pads; potential similarities in the wells and actions being taken to remediate the conditions that may be contributing to gas migration; a new water quality complaint relating to the Ely K Pad 2 that was expected to | X | X | X | X | X | | X | X | X |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| become a gas migration; and the final remediation of the Friedland Farms Tank Pad site (*Id.* at ¶ 84) | | | | | | | | | |
| **February 2018** a chart summarizing Notices of Violation against Cabot from year to year, penalties paid, and increased inspections (*Id.* at ¶¶ 89–90) | cc | | | X | X | | | | X |
| **February 2018** an update that there was an inverse relationship between certain cost-cutting measures and incident rates, that "as Cabot's hours worked and employee counts go down, the incident rates will tend to go up," and that "there had been no new gas migration allegations since the last meeting" (*Id.* at ¶ 91) | X | X | X | X | X | | X | X | X |
| **February 2019** updates on correspondence from the Pennsylvania Department of Environmental Protection addressing the status of 18 different residential water supplies associated with the December 2010 Consent Order, stating: (1) 6 such supplies met the Consent Order requirements; (2) the Pennsylvania Department did not require action on 5; and (3) 7 failed the mandated criteria (*Id.* at ¶ 97) | cc | | | X | X | X | | | X |
| **May 2019** a Pennsylvania legal and political risk update that there was a "hostile" political environment, and that the Pennsylvania attorney general had opened an investigation into the industry (*Id.* at ¶ 102) | X | X | X | X | X | X | | X | X |
| **February 2020** an update that the Pennsylvania Department of Environmental Protection had performed 1,976 inspections of Cabot sites and had issued 41 Notices of Violation (*Id.* at ¶ 106) | X | X | X | X | X | X | X | X | X |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **February 2020**<br>an update that a Pennsylvania grand jury was now actively investigating Cabot<br>(*Id.* at ¶ 107) | X | X | X | X | X | X | | X | X |
| **June 2020**<br>the Pennsylvania attorney general's office announces charges against Cabot, including that: (1) Cabot failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration; (2) Cabot deliberately did not test residential water wells in Dimock for methane before it began drilling operations in order to maintain plausible deniability; (3) Cabot "knowingly discharge[d], permit[ted] to flow or continue[d] to discharge or permit[ted] to flow," methane into groundwater beginning in 2008 and lasting until at least June 2018 due to issues with well sites that included G Shields 1V, G Shields 2H, G Shields 4H, G Shields 5H, Costello 1V, Costello 2V, Gesford 4H, Gesford 8H, Ratzel 1H, Ratzel 2H, Ratzel 3V, Ely 4H, Ely 6H, Howell pad, Jeffers farm, and Powers M<br>(*Id.* at ¶¶ 115–131, 134) | X | X | X | X | X | X | X | X | X |

Several reported cases on *Caremark* claims are instructive. In *Richardson on behalf of MoneyGram Int'l, Inc. v. Clark*, C.A. No. 2019-1015-SG, 2020 WL 7861335 (Del Ch. Dec. 31, 2020), the nominal defendant, MoneyGram, was a money transfer company. *Id.* at *2. The MoneyGram board maintained multiple committees, including an audit committee, a human resources and nominating committee, and an independent compliance and ethics committee. *Id.* In 2012, after MoneyGram allegedly failed to comply with anti-money-laundering requirements, it entered into a deferred prosecution agreement, which required future payments and compliance obligations. *Id.* at *1. After failing to meet the obligations under the deferred prosecution

31

agreement by 2017, MoneyGram entered an amended agreement requiring a larger payout and enhanced compliance obligations. *Id.* at *6. Shareholders brought a *Caremark* claim, arguing that there were red flags about compliance with the deferred prosecution agreement, the board misrepresented its compliance, and the board did not correct the deficiencies that it knew about. *Id.* at *9. But the *MoneyGram* complaint also alleged that "MoneyGram took numerous actions to improve anti-fraud and AML controls and to reduce the number of fraud complaints." *Id.* The deferred prosecution agreement "left it up to the company to devise methods to prevent agent fraud; on the Defendant Directors' watch the company implemented such actions, but with insufficient speed and skill." *Id.* In other words, "the [b]oard did a poor job," but that does not "reasonably imply bad faith." *Id.* Because "[a] failed attempt is not itself indicative of a bad-faith attempt," the Delaware Chancery held that nothing in the complaint facts "implie[d] scienter on the part of the Director Defendants." *Id.* at *9–10.

In *Fisher on behalf of LendingClub Corp. v. Sanborn*, C.A. No. 2019-0631-AGB, 2021 WL 1197577 (Del. Ch. Mar. 30, 2021), shareholders sued LendingClub, an online lending marketplace platform, without making a demand on the board. *Id.* at *2. The shareholders argued in part that demand would have been futile because a majority of the board members faced a substantial likelihood of liability under a second prong *Caremark* claim. In 2016, after LendingClub publicly announced material weaknesses in its internal controls over financial reporting, the Department of Justice, the Securities and Exchange Commission, and the Federal Trade Commission opened investigations into LendingClub. *Id.* at *2–3. In 2018, the Federal Trade Commission filed a complaint against LendingClub alleging unfair and deceptive trade practices. The shareholders filed suit soon after. *Id.* at *5. The shareholders alleged two red flags: "(i) that the FTC initiated an investigation of LendingClub in May 2016, which the Board routinely

discussed, and (ii) that the Demand Board received presentations showing an increasing number of Origination Complaints from customers." *Id.* at *12 (internal quotations omitted).  The Delaware Chancery held that the combination of the board having notice of the FTC investigation and the increased consumer complaints did not support a reasonable inference that the board acted with scienter.  Although consumer complaints were presented to the LendingClub board, the complaints were not presented as alleged violations of consumer protection laws.  *Id.* at 16.

The question is whether at least five Cabot Board members during the relevant period knew of evidence of corporate misconduct and consciously disregarded their duty to address the misconduct, knowing that the misconduct was illegal.  The second amended complaint includes allegations that at least five Board members—Ables, Best, Boswell, Kelley, and Ralls—received multiple, repeated "updates" about gas migration at various well sites from February 2015 to June 2020.

These five Board directors were each on notice of at least five of the following events:

1) the February 2015 incidents of gas migration from the Ratzel, Costello, and Ely well sites (Kelley, Ralls);

2) a July 2015 update on gas migration problems that had been put on hold, and that the final remediation at the Costello well site was being delayed (Kelley, Ralls, Best);

3) the allegations in October 2015 of ongoing gas migration problems at the G. Shields, Ratzel, Powers, Costello, and Dimock well sites (Kelley, Ralls);

4) a February 2016 update on seven additional open gas migration cases (Kelley, Ralls, Best, Ables, Boswell);

5) a March 2016 jury verdict requiring Cabot to pay more than $4.2 million in damages for groundwater contamination relating to the Ely well site (Kelley, Ralls, Best, Ables, Boswell);

6) the May 2016 updates on gas migration at the Costello, Powers, and Dimock well sites (Kelley, Ralls, Ables, Boswell);

7) the July 2016 updates on gas migration at Ratzel, Costello, Dimock, and Manzer #2H and #4H sites (Kelley, Ralls, Best, Ables, Boswell);

8) the October 2016 updates concerning ongoing gas migration allegations at well sites including but not limited to G. Shields, Ratzel, Costello, Manzer, and Powers, along with elevated methane levels at Costello and Canfield well sites, and that Cabot had been using a noncompliant device to control emissions (Kelley, Ralls, Boswell);

9) the October 2017 updates on gas migration investigations including Stalter #8V, the status of the Greenwood, Costello, and Manzer sites, gas migration allegations at Howell, Jeffers Farms and Foltz pads, and a new water supply complaint relating to the Ely sites (Kelley, Ralls, Best, Ables, Boswell);

10) a February 2019 notice from the Pennsylvania Department of Environmental Protection stating that 7 of 18 different residential water supplies associated with the 2010 Consent Order failed mandated criteria (Boswell); and

11) a February 2020 update that the Pennsylvania Department had issued 41 Notices of Violation (Kelley, Ralls, Best, Ables, Boswell).

The shareholders' allegations show that a majority of the Board was aware of repeated allegations of gas migration. Taken alone, the allegations may support a claim for demand futility. But, as the defendants point out, the shareholders have relied on Section 220 documents to make their allegations. To the extent the shareholders rely on the Section 220 documents and incorporate them by reference to make the above allegations, the court may consider them in their entirety if the court continues to draw any competing reasonable inferences in favor of the shareholders. *E.g., Rojas v. Ellison*, 2019 WL 3408812, at *1 & n.3 (Del. Ch. July 29, 2019) (citing *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013)).

The Section 220 documents taken in their entirety show that although the Board was aware of gas migration allegations, it was frequently updated about the actions Cabot was taking to address the gas migration allegations. For example, although the February 2015 materials put some directors on notice about gas migration from the Ratzel, Costello, and Ely well sites, the meeting minutes also discuss data showing that the Ratzel well pad was not impacting water

34

quality; that Cabot was investigating gas migration from these well sites; and that "levels of all other gas migration allegation cases are trending downward." (Docket Entry No. 55-4). The October 2015 Board update included the statement that Cabot had "retained the consulting firm Stantec to assist in closing out the alleged gas migration issue around the Greenwood/Ratzel Well Pads." (Docket Entry No. 55-11 at 21). The update also included a four-page description of the actions Cabot was taking on each well presenting gas migration issues. (*Id.* at 6–9). The May 2016 Board minutes state that the directors were informed that only the Greenwood and Costello investigations were open and prevented drilling in the Dimock box, that Manzer well tests were "trending downward," that the Powers case was "expected to be closed out in June or July." (Docket Entry No. 55-17). The minutes also state that the Board was advised of the "next steps in the Dimock gas migration case." (*Id.*). In July 2016, the Board received updates on the test results of the Stalter #8V gas well and related water wells, showing that "all but one were showing improvement" and stating that Cabot was waiting for a response from the Pennsylvania Department of Environmental Protection on the closure of the Ratzel well pad. (Docket Entry No. 55-20).

In October 2016, directors were informed that tests suggested that methane at the Manzer #3H and #4H well sites was naturally occurring and had "no relationship with the Manzer gas wells." (Docket Entry No. 55-23). Directors Kelley, Ralls, and Boswell also received a detailed update on gas migration allegations. The update included information that a closure report for the Ratel well pad had been submitted to the Pennsylvania Department of Environmental Protection, that the Costello IV well remained plugged, that sampling of the Manzer wells continued to show a downward trend, and that closure for the Powers wells was in draft form. (Docket Entry No. 55-24 at 6–8). And in October 2017, although the directors received updates about several additional

gas migration allegations, the directors were also told about "actions being taken to remediate conditions that may be contributing to gas migration." (Docket Entry No. 55-34 at 3). "The status of investigations and remediations of water sources at each of the [affected] residences was [also] discussed." (*Id.*).

In February 2019, the directors discussed a notice that Cabot had received from the Pennsylvania Department of Environmental Protection stating that 7 of 18 identified water supplies required further action and that Cabot would conduct "continued screening and sampling on a quarterly basis at these seven water supplies." (Docket Entry No. 55-46 at 15). In October 2019, Board members continued to receive updates on active gas migration cases, including the steps Cabot was taking to address each case. (Docket Entry No. 55-53 at 16–19). For example, for the Howell, G Pad 1, Cabot had drafted a Consent Order and Agreement to be delivered to the Pennsylvania Department of Environmental Protection, and for the Powers M Pad 1, Cabot was undertaking evaluation and remedial work. (*Id.*).

The Section 220 documents that the shareholders rely on throughout their second amended complaint show that Cabot's directors received frequent updates about environmental issues at Cabot's well sites. Those updates included information about what actions Cabot was taking to address environmental issues or allegations, or, if there were no actions, why. Unlike the board in *LendingClub*, which did not know that the company was violating consumer protection laws, the shareholders here have alleged that Cabot's Board was aware of ongoing violations of environmental law. The shareholders cite the Pennsylvania Department of Environmental Protection's Notices of Violation reported to the Board. But the Section 220 documents on which the shareholders rely do not support a reasonable inference that the Board's updates on the gas migration allegations and related issues showed that Cabot was not taking active steps to address,

36

monitor, or engage in discussions with the Pennsylvania Department of Environmental Protection about those violations. The updates showed the opposite.

The Pennsylvania grand jury charges support a reasonable inference that despite the actions that Cabot informed its Board it was taking at various well sites, those actions were unsuccessful as to the well sites subject to the charges. But as *Moneygram* illustrates, good faith attempts to address compliance issues, even if unsuccessful, cannot serve as the basis for *Caremark* claims. *See Moneygram*, 2020 WL 7861335, at *11 ("The facts pled here suggest a failed effort, not one opposed to the interests of MoneyGram or otherwise in bad faith. It is conceivable that a purported attempt at remediation could constitute bad faith; for instance, a mere sham remediation or an insincere action to fool regulators may be actionable. The pleading bar for such an allegation must necessarily be high."); *cf. Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019) (after an ice cream company had a listeria outbreak, shareholders brought a *Caremark* claim alleging that the "board had no committee overseeing food safety, no full board-level process to address food safety issues, and no protocol by which the board was expected to be advised of food safety reports and developments"; the court held that the complaint pleaded particularized facts that the board "did not undertake good faith efforts to put a board-level system of monitoring and reporting in place" supporting a *Caremark* claim).

Pleading demand futility is a high burden. The shareholders must plead particularized allegations, showing instances in which at least five board members knew about gas migration noncompliance issues at specific well sites for extended periods; knew that Cabot was not taking action to address the noncompliance issues; and took no action to bring Cabot into compliance. *See Pettry on behalf of FedEx Corp. v. Smith*, C.A. No. 2019-0795-JRS, 2021 WL 2644475, at *8–12 (Del. Ch. June 28, 2021), *aff'd*, 2022 WL 569325 (Del. Feb. 25, 2022) (the board did not

act with bad faith when, in response to an internal report regarding illegal cigarette shipments, the board was repeatedly updated about ongoing enforcement actions and instituted actions to remedy noncompliance); *In Re General Motors Co. Deriv. Litig.*, C.A. No. 9627–VCG, 2015 WL 3958724, at *16–18 (Del. Ch. June 26, 2015), *aff'd*, 133 A.3d 971 (Del. 2016) (although the board's failures to oversee or review progress with regard to identified emerging risks may have created a reasonable inference of negligence, those actions did not create an inference of bad faith or that the board was "consciously acting in a manner inimical to" the company).

The shareholders have not pleaded facts that would show that a majority of Cabot Board members face a substantial likelihood of liability as to the *Caremark* prong two claims. The shareholders have failed to plead particularized facts that demand would have been futile as to these claims.

### B.    Failure-to-Disclose Breach of Fiduciary Duty

In addition to the shareholders' *Caremark* breach of fiduciary duty claims, the shareholders have also asserted claims based on allegations that Cabot's directors and officers knowingly or recklessly made untrue statements, or permitted the public filings, disclosures, and statements to contain untrue statements about Cabot's revenue and overall prospects.

When "directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty." *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998). A director breaches his or her duty of loyalty and good faith if he or she "knowingly disseminat[es] to the stockholders false information about the financial condition of the company." *Id.* "[A] shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors 'deliberately misinform[ed] shareholders about the business of the corporation, either directly or by a public statement.'" *In re Citigroup*, 964 A.2d at 132

(quoting *Malone*, 722 A.2d at 14).   "[A] plaintiff can demonstrate a substantial likelihood of liability that would excuse demand only by making 'particularized factual allegations that support the inference that the disclosure violation was made in bad faith, knowingly, or intentionally.'" *LendingClub*, 2021 WL 1197577, at *17 (citing *In re Citigroup*, 964 A.2d at 106).

In their response to the motion to dismiss, the shareholders clarify the categories of alleged misstatements that they claim a majority of the Board knowingly made, or permitted Cabot to make, excusing demand futility.   (Docket Entry No. 63 at 26–29).   The categories of statements are listed in detail below:

1. ***Statements About Cabot's Substantial Compliance in Form 10-Ks***.   Cabot's 2015, 2016, 2017, and 2018 Form 10-Ks included the statement that Cabot "substantially compl[ies] with the Clean Water Act and related federal and state regulations."   (*Id.* at ¶¶ 66, 79, 92, 99).   These Form 10-Ks were filed in February 2016, February 2017, March 2018, and February 2019.   (*Id.* at ¶¶ 65, 79, 92, 99).

2. ***Statements About Remediation Related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks***.   On February 22, 2016, Cabot filed its Form 10-K, which represented:

> On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania.   The allegations relating to these wells were initially raised by residents in the area in August 2011.   We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.   Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents.   ***We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.***   The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the

payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000.  We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

(*Id.* at ¶ 66).

3. ***Notification of the 2016 Consent Order in the 2016 Form 10-K.***  In its 2016 Form 10-K,

Cabot notified investors that it had finalized a new Consent Order and Agreement with the

Pennsylvania Department of Environmental Protection:

> On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania.  The allegations relating to these wells were initially raised by residents in the area in August 2011.  We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.  Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents.  ***We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016.  We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored.***  Further, the related gas well is being permanently plugged.  Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated.  Cabot continues to work with the PaDEP to bring this matter to a close.

(*Id.* at ¶ 79 (emphasis in original)).

The first category of alleged misstatements—substantial compliance statements in the

Form 10-Ks—fails to particularly plead a basis for a misstatement for the same reason the court

stated in its January 12, 2022, Memorandum and Opinion addressing a similar claim brought by

class action plaintiffs against Cabot.  The second amended complaint alleges that the Board was

aware that the Pennsylvania Department of Environmental Protection sent February 2019 notice

to Cabot identifying 7 of 18 water supplies that did not meet the December 2010 Consent Order,

and that the Board was informed of on-going issues at multiple well sites.  (Docket Entry No. 39

at ¶¶ 63–65, 71–73, 75–77, 97; Docket Entry No. 63 at 29).  As the defendant directors and officers

pointed out during oral argument, the shareholders have not alleged whether the well sites with

identified issues, or the well sites associated with the water supplies, were a substantial part of

Cabot's active well inventory or produced a substantial amount of Cabot's gas.  Without more, the

shareholders do not allege that it is actionably false for the Board to have acquiesced in publishing

corporate forms stating that Cabot was in substantial compliance with environmental laws and

regulations.  *See Police and Fire Retirement Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,

777 Fed. Appx. 726, 731 (5th Cir. 2019) ("substantial compliance" statements were not misleading

when the plaintiffs alleged failures in only a small portion of company's overall pipeline network);

*see also In re Univ. Health Servs., Inc. Deriv. Litig.*, C.A. No. 17-2187, 2019 WL 3886838, at *42

(E.D. Pa. Aug. 19, 2019) (a statement of substantial compliance was not an actionable

misstatement because "although a small number of [the defendant's] facilities experienced

compliance issues, it [did] not appear that these issues pervaded the entire company").

The shareholders argue that the following statement in the 2015 Form 10-K, published on

February 22, 2016, and the 2016 Form 10-K, published on October 20, 2016, was false: "[w]e

believe the source of methane has been remediated and are working with the PaDEP to reach

agreement on the disposition of this matter."   (Docket Entry No. 39 at ¶¶ 67, 80).  This statement,

read in context, refers to the source of methane that was identified in a 2011 Notice of Violation

from the Pennsylvania Department of Environmental Protection.  Although the shareholders point

to numerous statements in Section 220 documents that the Board was on notice of several wells

41

that had outstanding gas migration issues, the shareholders do not connect those statements to the gas migration that was at issue in the 2011 Notice of Violation.  Without more connecting the Board's knowledge of gas migration at some well sites and the well site that was the subject of the 2011 Notice of Violation, the shareholders have not sufficiently alleged that the remediation statements were actionably false.

The shareholders have not particularly pleaded that a majority of the Board is likely to face substantial liability on the ground that they breached their fiduciary duty by permitting Cabot to make knowing misstatements.  The shareholders have not alleged demand futility as to these categories of misstatements.[2]

### C.      The *Brophy* Claim

As to the shareholders' insider-trading *Brophy* claim against Dinges, the shareholders have not, and cannot, allege that the other eight board members face a substantial likelihood of liability, because the *Brophy* claim is not against them.  The shareholders have not pleaded demand futility as to the *Brophy* claim.  *See Guttman*, 823 A.2d at 502 (the court focuses on "whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition"); *see also In Re Clovis Oncology, Inc. Deriv. Litig.*, No. 2017-0222-JRS, 2019 WL 4850188, at *16 (Del. Ch. Oct. 1, 2019).

---

[2]  Because the same statements serve as the basis for the shareholders' second claim for contribution for violations of Sections 10(b) and 21D of the Exchange Act, (*see* Docket Entry No. 63 at 31–32), the shareholders have also failed to plead demand futility on this basis.

**IV.      Conclusion**

The court grants the parties' agreed proposed order, (Docket Entry No. 83), appointing Treppel's counsel as co-lead counsel with the current co-lead counsel, and designating the Second Amended Shareholder Derivative Complaint filed by Ezell, Fischer, and Hudson, as the operative one.   Treppel's motion to appoint lead counsel and designate an operative complaint, (Docket Entry Nos. 41, 42), is now moot.   A motion to dismiss, (Docket Entry No. 32), filed before the second amended complaint is moot.

The motion to dismiss, (Docket Entry No. 56), is granted.   The shareholders have requested leave to amend.   (Docket Entry No. 63 at 30 n.16).   The court will permit the shareholders to file an amended complaint, if, upon information and belief, the allegations will cure the deficiencies identified in this opinion.   The consolidated amended complaint must be filed no later than **May 2, 2022**.

SIGNED on March 31, 2022, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge