United States District Court
Southern District of Texas

**ENTERED**

January 02, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| IN RE CABOT OIL & GAS | § | |
| CORPORATION DERIVATIVE | § | CIVIL ACTION NO. H-21-2046 |
| LITIGATION | § | |
|  | § | |

### MEMORANDUM AND OPINION

This is one of two cases before this court arising from Cabot Oil & Gas Corporation's hydraulic fracturing in Susquehanna County, Pennsylvania. This case is a derivative action brought by stockholders on behalf of Cabot. The stockholders allege that Cabot's directors and officers[1] breached their fiduciary duties by failing to exercise oversight and by causing Cabot to issue material misrepresentations about whether its fracking complied with applicable environmental laws and regulations. The other case is a class action alleging that Cabot and three of its executive officers—also defendants here[2]—violated the Securities Exchange Act of 1934 and its implementing regulation, Rule 10b–5.

The plaintiff shareholders did not make a pre-suit demand on the Board of Directors before filing this action. The motion to dismiss, (Docket Entry No. 105), requires the court to decide whether the plaintiffs have pleaded with sufficient particularity facts showing that a pre-suit demand on the Board of Directors would have been futile, as required by Federal Rule of Civil Procedure 23.1. The court analyzed this question when ruling on the defendants' previous motion

---

[1] The defendant directors and officers are Dan O. Dinges, Scott C. Schroeder, Phillip L. Stalnaker, Dorothy M. Ables, Rhys J. Best, Robert S. Boswell, Amanda M. Brock, Peter B. Delaney, Robert Kelley, Robert L. Keiser, W. Matt Ralls, and Marcus A. Watts. (Docket Entry No. 93 at ¶¶ 25–36).

[2] The overlapping defendants are Dinges, Schroeder, and Stalnaker.

to dismiss and concluded that the plaintiffs had not satisfied Rule 23.1.  (Docket Entry No. 89).
The court gave the plaintiffs leave to file a third amended complaint.

The plaintiffs' third amended complaint fails to cure the deficiencies of the second
amended complaint.  The plaintiffs have either failed to state a claim or have failed to satisfy Rule
23.1 with respect to each claim.  The motion to dismiss is granted and all claims are dismissed
with prejudice.  The reasons are set out below.

I.      **Background**

A.      **The Notices of Violation and Consent Orders**

Cabot Oil & Gas Company fracks[3] in the Marcellus Shale underneath Pennsylvania's
Susquehanna County.  In 2009, Cabot's fracking caused the explosion of a residential water well.
(Docket Entry No. 93 at ¶ 91).  The Pennsylvania Department of Environmental Protection (the
"Department") investigated and concluded that Cabot's wells had been leaking methane gas into
residential water supplies, in violation of environmental laws and regulations.  (*Id.* at ¶ 93).  Over
the next decade, the Department issued hundreds of "notices of violation" to Cabot based on its
Susquehanna County drilling.  (*See id.* at ¶ 219).  The following notices of violation are relevant
here:

1.   **The September 2011 Notice of Violation.**  The Department found that three of Cabot's
     wells—the Stalter 1H Well, Stalter 2H Well, and Stalter 8V Well (the "Stalter Wells")—
     had contaminated nearby residential water supplies.  (Docket Entry No. 105-2 at 2).  The
     Department also found that the Stalter Wells had "defective, insufficient, or improperly

---

[3]  According to the complaint, "[m]odern fracking refers to a technique used to enable the extraction of
natural gas or oil from shale and other forms of impermeable rock formations that lock in oil and gas and
make fossil fuel production difficult.  Large quantities of water, chemicals, and sand are blasted into these
formations at pressures high enough to crack the rock, allowing the once-trapped oil and gas to flow to the
surface to be captured by oil and gas operators, like Cabot."  (Docket Entry No. 93 at ¶ 52).

cemented casing." (*Id.* at 3).   The Department concluded that Cabot had violated the Oil and Gas Act, 58 P.S. § 601.101 *et seq.*, the Clean Streams Law, 35 P.S. § 691.1 *et seq.*, "and the rules and regulations promulgated thereunder." (*Id.* at 2).

2. **The June 2017 Notice of Violation.**  The Department found that four of Cabot's wells— the Howell, G. 2H, Howell, G. 4H, Howell, G. 6H, and Howell, G. 8H (the "Howell Wells" or the "Howell, G Pad 1")—had contaminated nearby residential water supplies.  (Docket Entry No. 105-4 at 1).  The Department also found that the Howell Wells had defective cement casing.  (*Id.* at 3).  The Department concluded that Cabot had violated the Oil and Gas Act and the Clean Streams Law and its implementing regulations.  (*Id.* at 1).

3. **The November 2017 Notice of Violation.**  The Department found that at least some of the twelve wells on Cabot's Jeffers Farms Pad 2 (the "Jeffers Farms Wells") had contaminated nearby residential water supplies.  (Docket Entry No. 105-5 at 1–2).  The Department also found that some of the Jeffers Farms Wells had defective cement casing.  (*Id.* at 3–4).  The Department concluded that Cabot had violated the Oil and Gas Act and the Clean Streams Law and its implementing regulations.  (*Id.* at 2).

Cabot also entered into a series of "consent orders and agreements" with the Department. These required Cabot to remediate the water contamination and defective wells, provide affected residences with potable water, and cease operations in an area called the "Dimock Box" until the Department determined that the issues were resolved.  (Docket Entry No. 93 at ¶¶ 100, 113).  The orders also required Cabot to "take all actions necessary to maintain compliance with all applicable environmental laws and regulations[.]" (*Id.* at ¶ 99).

The plaintiffs allege that Cabot essentially disregarded its obligations under the consent orders and "undertook little to no remedial work on its gas wells . . . until 2018." (*Id.* at ¶ 114).

According to the plaintiffs, Cabot's Board of Directors "accepted as ordinary the idea that Cabot would regularly defy environmental regulations and treat the corresponding and continuous penalties as simply the cost of doing business." (*Id.* at ¶ 115).

In June 2018, the Department denied Cabot's request to drill new wells in the Dimock Box. (*Id.* at ¶ 162). The Department determined that "Cabot [had] failed to comply with its obligations under the 2010 Consent Order and 'cannot begin drilling new Gas Wells within the Dimock/Carter Road Area.'" (*Id.* at ¶ 163). The Department stated that Cabot's unresolved obligations included "(i) noncompliance with the applicable provisions of the Clean Streams Law, Oil and Gas Act, and the regulations under the Administrative Code; (ii) continuing defective, insufficient, or improperly cemented casing at certain gas wells; and (iii) inconsistent/insufficient water sampling at water supplies." (*Id.* at ¶ 164). Cabot contested the Department's findings in a response letter. (*Id.* at ¶ 172).

### B. The Grand Jury Presentment and Criminal Charges

In February 2020, a Pennsylvania grand jury recommended criminal charges against Cabot. The grand jury found that:

> over a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration. Indeed, some of these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them. In light of Cabot's long-term indifference to the damage it caused to the environment and citizens of Susquehanna County, these were not merely technical violations. We conclude that criminal charges are appropriate.

(*Id.* at ¶ 199).

In June 2020, the Pennsylvania Attorney General filed fifteen criminal charges against Cabot arising from violations of the consent orders between Cabot and the Department. (*Id.* at ¶ 209). The charges included nine felonies and "knowing violations of discharging industrial waste under the Clean Streams Law and for knowingly polluting waters in the state of Pennsylvania."

(*Id.*).  In November 2022, Cabot pleaded *nolo contendere* to the charges.  (Docket Entry No. 105-8).

### C.      What Cabot, its Officers, and its Directors Allegedly Knew

The defendants received regular updates about Cabot's efforts to comply with environmental laws and regulations in Susquehanna County, including the consent orders with the Department.  (Docket Entry No. 105 at 20–21).  These updates were provided primarily in meetings of the Board of Directors and meetings of its Environmental, Health & Safety Committee (the "Committee").  The Committee's purpose was "to provide assistance to the Board of Directors in providing oversight and support of the Company's policies, programs and initiatives on the environment, health, and safety."  (Docket Entry No. 93 at ¶ 51).  The defendants on the Committee were Boswell, Brock, Delaney, Kelley, Keiser, Ralls, and Watts.  (*Id.* at ¶¶ 30–36).

In meetings of both the Board of Directors and the Committee between 2015 and 2020, the defendants received updates about the following topics: notices of violation the Department issued to Cabot; penalties that Cabot had paid for environmental noncompliance; consent orders and agreements with the Department; Cabot's remediation efforts; results of tests conducted by Cabot's testing consultant, Stantec; the Department's positions on Cabot's compliance; and lawsuits against Cabot based on its Susquehanna County operations, including the criminal charges brought by the Pennsylvania Attorney General.  (*Id.* at ¶¶ 221–29, 285).  The plaintiffs summarize the defendants' alleged knowledge in the following chart:[4]

---

[4]  The chart refers to the "Department" as the "PaDEP."

| # | Director | Beginning of Board Service | Information Known to Defendant Directors |
|---|---|---|---|
| 1 | Dan O. Dinges | *May 2002* | the Company continued to rampantly violate Pennsylvania state law at an increasing rate from 2016 to 2018, with the following new violations each year: (1) 48 in 2016; (2) 86 in 2017; and (3) 104 in 2018; |
| 2 | Rhys J. Best | *July 2008* | Cabot's remediation efforts to prevent the gas migration allegations were continuously ineffective and failed to bring the Company under compliance with the 2010 Consent Order and multiple NOVs from May 4, 2016 to January 2020; the Company's testing consultant, Stantec, repeatedly issued testing data and closing reports, such as the closing report for Stalter wells, which were rejected by the PaDEP and failed to close out the PaDEP's investigation into such issues; and

the PaDEP continuously reported to Cabot that the Company was still in violation of the 2010 Consent Order and that the Dimock Box prohibition on new drilling would stay in effect. |
| 3 | W. Matt Ralls | *June 2011* | |
| 4 | Dorothy M. Ables | *December 2015* | |
| 5 | Robert S. Boswell | *December 2015* | |
| 6 | Amanda M. Brock | *August 2017* | the Company continued to rampantly violate Pennsylvania state law at an increasing rate from 2017 to 2018, with the following new violations each year: (1) 86 in 2017; and (2) 104 in 2018; and

the PaDEP continuously reported to Cabot that the Company was still in violation of the 2010 Consent Order and that the Dimock Box prohibition on new drilling would stay in effect. |
| 7 | Marcus A. Watts | *August 2017* | |
| 8 | Peter B. Delaney | *August 2018* | the Company continued to rampantly violate Pennsylvania state law at an increasing rate in 2018, 104 new violations in 2018. |

(*Id.* at ¶ 219).

These allegations are evaluated in light of the procedural history of this case and the applicable law.

**D.        The Procedural History**

In October 2020, the plaintiffs filed this derivative action on Cabot's behalf, without making a pre-suit demand on the board of directors.  (Docket Entry No. 1).  The plaintiffs allege six separate counts:

**Count 1:** Breach of fiduciary duty against Dinges, Schroeder, and Stalnaker for knowingly or recklessly making untrue statements or permitting Cabot's public filings, disclosures, and statements to misleadingly report revenue and overall prospects.

**Count 2:** Contribution for violations of Sections 10(b) and 21(D) of the Exchange Act against Dinges, Schroeder, and Stalnaker.

**Count 3:** Breach of fiduciary duty against Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts for knowingly or recklessly making untrue statements or permitting Cabot's public filings, disclosures, and statements to misleadingly report revenue and overall prospects.

**Count 4:** A *Brophy* claim against Dinges.

**Count 5:** Waste of corporate assets against Dinges, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts based on their alleged repurchases of company stock at artificially inflated prices.

**Count 6:** Unjust enrichment for benefits received due to false and misleading statements against Dinges, Schroeder, Stalnaker, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts.

(Docket Entry No. 93 at ¶¶ 345–78).

The parties agree that counts 1, 3, and 5 assert claims under the Delaware Court of Chancery's decision in *In re Caremark Intern. Inc. Derivative Litig.*, 698 A.2d 959, 962 (Del. Ch. 1996). These are referred to as the "*Caremark* claims." The same counts also assert the substantively distinct claims that the defendants made material misrepresentations or omissions in their public filings, referred to as the "disclosure claims."

### 1.    The Court's Ruling on the Previous Motion to Dismiss

In March 2022, the court granted the defendants' motion to dismiss the second amended complaint. (Docket Entry No. 89). The court determined that the plaintiffs had not pleaded with particularity facts showing that a pre-suit demand on the Board of Directors would have been futile, as required by Federal Rule of Civil Procedure 23.1. (*Id.*). The court analyzed and ruled on each claim separately.

The court ruled that the plaintiffs' allegations did not adequately plead demand futility as to the *Caremark* claims because the Section 220[5] documents on which they relied showed that Cabot had been "taking active steps to address, monitor, or engage in discussions with the Pennsylvania Department of Environmental Protection" about the allegations of gas migration from fracking in Susquehanna County. (*Id.* at 36–37). The court held that although "the Pennsylvania grand jury charges support a reasonable inference" that Cabot's remediation efforts

---

[5] Section 220 of the Delaware General Corporation Law, 8 DEL. C. § 220, permits "[a]ny stockholder . . . upon written demand under oath stating the purpose thereof," "to inspect for any proper purpose, and to make copies and extracts from[] [a] corporation's stock ledger, a list of its stockholders, and its other books and records[.]"

"were unsuccessful as to the well sites subject to the charges[,]" the Company's "good faith attempts to address compliance issues, even if unsuccessful, cannot serve as the basis for *Caremark* claims." (*Id.* at 37).

The court also determined that pre-suit demand was not excused as to the plaintiffs' disclosure claims. Based on the plaintiffs' response to the motion to dismiss, the court identified three categories of alleged misrepresentations:

1. ***Statements About Cabot's Substantial Compliance in Form 10-Ks***. Cabot's 2015, 2016, 2017, and 2018 Form 10-Ks included the statement that Cabot "substantially compl[ies] with the Clean Water Act and related federal and state regulations." These Form 10-Ks were filed in February 2016, February 2017, March 2018, and February 2019.

2. ***Statements About Remediation Related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks***. On February 22, 2016, Cabot filed its Form 10-K, which represented:

   > On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.*** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000. We will continue to work

with the PaDEP to finalize the Consent Order and Agreement and
bring this matter to a close.

3. ***Notification of the 2016 Consent Order in the 2016 Form 10-K.***  In its 2016

Form 10-K, Cabot notified investors that it had finalized a new Consent Order

and   Agreement   with   the   Pennsylvania   Department   of   Environmental

Protection:

> On November 12, 2015, we received a proposed Consent Order and
> Agreement from the Pennsylvania Department of Environmental
> Protection (PaDEP) relating to gas migration allegations in an area
> surrounding several wells owned and operated by us in Susquehanna
> County, Pennsylvania.  The allegations relating to these wells were
> initially raised by residents in the area in August 2011.  We received
> a Notice of Violation from the PaDEP in September 2011 for failure
> to prevent the migration of gas into fresh groundwater sources in the
> area surrounding these wells.  Since then, we have been engaged
> with the PaDEP in investigating the incident and have performed
> appropriate   remediation   efforts,   including   the   provision   of
> alternative sources of drinking water to affected residents.  ***We
> believe the source of methane has been remediated and we entered
> into a Consent Order and Agreement with the PaDEP on
> December 30, 2016.  We agreed to pay a civil monetary penalty in
> the amount of approximately $0.3 million and to continue to
> provide alternative sources of drinking water to affected residents
> until the affected water supplies are permanently restored.***
> Further, the related gas well is being permanently plugged.
> Following the plugging of the gas well, additional monitoring will
> be required to ensure the source of methane has been remediated.
> Cabot continues to work with the PaDEP to bring this matter to a
> close.

(*Id.* at 39–40) (citations omitted).

The court held that the first category "fails to particularly plead a basis for a misstatement"

because:

> the shareholders have not alleged whether the well sites with identified issues, or
> the well sites associated with the water supplies, were a substantial part of Cabot's
> active well inventory or produced a substantial amount of Cabot's gas.  Without
> more, the shareholders do not allege that it is actionably false for the Board to have
> acquiesced in publishing corporate forms stating that Cabot was in substantial
> compliance with environmental laws and regulations.

(*Id.* at 41).

The court also held that "the shareholders have not sufficiently alleged that the remediation statements [in the second and third categories] were actionably false" because those statements:

> refer[] to the source of methane that was identified in a 2011 Notice of Violation from the Pennsylvania Department of Environmental Protection. Although the shareholders point to numerous statements in Section 220 documents that the Board was on notice of several wells that had outstanding gas migration issues, the shareholders do not connect those statements to the gas migration that was at issue in the 2011 Notice of Violation. Without more connecting the Board's knowledge of gas migration at some well sites and the well site that was the subject of the 2011 Notice of Violation, the shareholders have not sufficiently alleged that the remediation statements were actionably false.

(*Id.* at 41–42).

The court determined that the plaintiffs' "claim for contribution for violations of Sections 10(b) and 21D of the Exchange Act" failed along with the disclosure claims "[b]ecause the same statements serve as the basis" for those claims. (*Id.* at 42, n.2).

Finally, the court held that "[t]he shareholders have not pleaded demand futility as to the *Brophy* claim" against Dinges because "the shareholders have not, and cannot, allege that the other eight board members face a substantial likelihood of liability, because the *Brophy* claim is not against them." (*Id.* at 42).

The court gave the plaintiffs leave to file a third amended complaint, "if, upon information and belief, the allegations will cure the deficiencies identified in this opinion." (*Id.* at 43).

In May 2022, the plaintiffs filed their third amended complaint, (Docket Entry No. 93), and the defendants moved to dismiss, (Docket Entry No. 94).

## 2. The Partial Dismissal in the Securities Class Action

In August 2022—before ruling on the motion to dismiss in this case—the court granted in part a motion to dismiss in the securities class action. The class action plaintiffs' Securities Exchange Act and Rule 10b–5 claims are based on the same alleged misrepresentations that are at

issue in this case.  However, in addition to the three categories of alleged misrepresentations listed above, the court analyzed a fourth category:

> 4.  ***The Report of 2017 Notices of Violation in the 2019 Form 10-Q***.  In July 2019, Cabot filed its 2019 Form 10-Q with the Securities and Exchange Commission, reporting that it had received two proposed Consent Orders and Agreements related to two Notices of Violation from the Pennsylvania Department of Environmental Protection.  Cabot stated:
>
>> We will continue to work with the PaDEP to finalize the [Consent Orders and Agreements], and to bring this matter to a close.  With regard to the November 2017 Notice of Violation, the proposed Consent Order and Agreement, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000.  We will continue to work with the PaDEP to finalize the Consent Order and Agreement, and to complete the ongoing investigation and remediation.

Cabot also addressed a June 2017 Notice of Violation, stating that it believed the water-quality complaints had been resolved through remediation and that it was working with the Pennsylvania Department of Environmental Protection.

(Case No. 21-2045, Docket Entry No. 118 at 8–9) (citations omitted).

The court ruled that the category 1 statements were "nonactionable opinions."  (*Id.* at 23). The court also ruled that the plaintiffs had failed to state a claim against Stalnaker because the plaintiffs had "failed to allege that Stalnaker himself made any misstatements or misrepresentations."  (*Id.* at 30).

However, the court ruled that the alleged misrepresentations in categories 2–4 were actionable and that the plaintiffs had adequately alleged the elements of a Rule 10b–5 claim. The court determined that the plaintiffs' allegations as to those statements:

> support an inference that Dinges and Schroder [*sic*] had knowledge that: (1) throughout 2016, Cabot had not actually remediated a gas methane leak identified in a 2011 Notice of Violation; (2) the source of methane identified in the 2016 Form 10-K had not been remediated; and (3) Cabot was taking steps as late as July 2019 to remediate the well sites that had been identified in two 2017 Notices of Violation. The alleged facts that Dinges and Schroeder received detailed quarterly reports six times a year describing the number of violations, larger spill cleanups, remediation cases with potential for private lawsuits, and all gas migration cases and their remediation status, is sufficient to support a strong inference that Dinges and Schroeder knew that many wells leaking contaminants had not been remediated years after the violations had been reported.

(*Id.* at 38).

### 3.      The Motion to Dismiss

Because of the court's intervening ruling in the class action, the court denied as moot the defendants' motion to dismiss the third amended complaint and ordered the defendants to file a renewed motion to dismiss addressing the following additional issues:

> 1)   What effect, if any, does the court's ruling on the motion to dismiss in the [class action] case have on the motion to dismiss in *Ezell*?
>
> 2)   What effect, if any, does the pending class certification motion in [the class action] have on the *Ezell* case?
>
> 3)   Should the two cases continue to proceed on a coordinated basis or should they be consolidated?

(Docket Entry No. 103 at 2).

In April 2023, the defendants filed their renewed motion to dismiss. (Docket Entry No. 105). The plaintiffs have filed a response. (Docket Entry No. 106).

In response to the court's first question, the parties agree that the class action ruling "may be considered as persuasive authority as to the disclosure issues here." (Docket Entry No. 105 at

10; Docket Entry No. 106 at 9).  The parties disagree, however, about how that ruling affects the analysis.  The defendants emphasize that the record in this case is more complete than the record in the class action.  (Docket Entry No. 105 at 10–11).  The defendants produced books and records in response to the plaintiffs' demands under Section 220 of the Delaware General Corporation Law, 8 DEL. C. § 220.  These books and records consist of meeting minutes and meeting materials of the Board of Directors and the Environmental, Health & Safety Committee.  The parties agree that the court may consider these books and records in ruling on the motion to dismiss.  According to the defendants, the books and records show that the defendants did not misrepresent Cabot's environmental remediation and compliance.  (Docket Entry No. 105 at 10–11).  The plaintiffs, by contrast, argue that the court's ruling that the class action plaintiffs stated a claim based on the statements in categories 2–4 supports finding demand futility as to the disclosure claims asserted here.  (Docket Entry No. 106 at 9–10).

As to the court's second question, the parties disagree about the effect that class certification would have on this case.  The defendants contend that "the pending class certification decision—regardless of the outcome—will [] provide no benefit to Plaintiffs' arguments against dismissal here[.]"  (Docket Entry No. 105 at 11).  The plaintiffs argue that "[i]f a class is certified in the Securities Action, Cabot's, Dinges' and Schroeder's exposure here will significantly increase."  (Docket Entry No. 106 at 10).  Since posing this question to the parties, the court, in September 2023, granted the motion for class certification.  (Case No. 21-2045, Docket Entry No. 173).

Finally, the parties agree that the two cases should remain coordinated instead of being consolidated.  (Docket Entry No. 105 at 11; Docket Entry No. 106 at 10–11).

The parties agree that this motion to dismiss presents the same question as the previous motion to dismiss in this case: have the plaintiffs sufficiently alleged particularized facts supporting a reasonable inference that a litigation demand on the Board would have been futile?

### 4.    The New Allegations in the Third Amended Complaint

The plaintiffs' third amended complaint attempts to correct the deficiencies of the second amended complaint with 66 new pages of allegations.  These allegations include:

1.  The addition of the plaintiff "Treppel Family Trust U/A 08/18/18 Lawrence A. Treppel and Geri D. Treppel for the Benefit of Geri D. Treppel and Larry A. Treppel," which has "continuously owned Cabot stock since January 2012."  (Docket Entry No. 93 at ¶ 20).

2.  Details on Cabot's merger with Cimarex Energy Co., which occurred after this lawsuit was filed.  (*Id.* at ¶ 24).

3.  Additional details on the 2009-2010 events leading to the consent orders and agreements with the Department.  (*Id.* at ¶¶ 88–96).

4.  An allegation that the Pennsylvania Attorney General's "charges against Cabot were based, in part, on Grand Jury testimony that Cabot 'undertook ***little to no remedial work*** on its gas wells, the source of the problem, until 18 months ago [mid-2018].'"  (*Id.* at ¶ 10).

5.  An allegation that, in January 2022, "counsel for the Company waived the preliminary criminal hearing, allowing the charges brought against Cabot to move forward and potentially go to trial.  A prosecutor on the criminal case stated on January 7, 2022, that Cabot's waiver is a 'recognition that the evidence against [Cabot] is sufficient to proceed in the criminal process.'"  (*Id.* at ¶ 12).

6.  An allegation that "[n]otwithstanding the [Department]'s June 11, 2018, letter and the pending criminal charges, Cabot's failure to adhere to environmental regulations continued

unabated.   On December 28, 2020, the [Department] and Cabot entered into two new consent orders and settlement agreements for continuing violations stemming from two 2017 NOVs.  Cabot was ordered to pay penalties of $180,000 and $300,000."  (*Id.* at ¶ 13).

7. Allegations about certain "Relevant Non-Parties," including "[t]he Company's current CEO, non-party Thomas E. Jordan," who, according to the plaintiffs, "is not independent of the wrongdoers because he is required to work with defendant Dinges, the current Executive Chairman, on a daily basis and Jorden's continued employment is reliant on the goodwill of Dinges, Ables, Boswell, Brock, and Watts, a majority of the directors who control Jorden's continued employment.  As a result, six of the ten current Board members face a substantial likelihood of liability on the claims in this action and/or could not impartially investigate whether their conduct constituted breaches of fiduciary duties under Delaware law, rendering demand futile because the Board lacks a disinterested and independent majority."  (*Id.* at ¶¶ 17, 38–42).

8. Allegations about the importance of the Marcellus Shale to Cabot's drilling operations. (*Id.* at ¶¶ 74–87).

9. Allegations that the defendants "failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations."  (*Id.* at ¶¶ 25–36).

10. Allegations about Cabot's "Corporate Governance Guidelines and Code of Business Conduct," including Cabot's policies to "comply fully with the letter and the spirit of all applicable federal, state, and local environmental protection laws and regulations" and "to insist upon full, fair, accurate, timely and understandable disclosure in reports and documents the Company filed with or submits to the SEC and in other public communications made by the Company."  (*Id.* at ¶¶ 46–49).

11. Allegations that "Fracking Is an Inherently Dangerous Activity," (*id.* at ¶¶ 52–56), and that "Cabot Operates in a Highly Regulated Industry," (*id.* at ¶¶ 57–62).

12. Allegations about Pennsylvanians' rights under its state constitution to "pure water." (*Id.* at ¶¶ 63–65).

13. Additional allegations about Cabot's "Fail[ure] to Live Up to the 2009 Consent Order." (*Id.* at ¶ 102).

14. Allegations about an "open letter" that Department Secretary John Hanger had written to the citizens of Susquehanna County who had been impacted by Cabot's fracking, which stated that Cabot "continues to deny responsibility for the contamination, despite overwhelming evidence of its responsibility" and discussed "overwhelming evidence that proves the Cabot wells are the source of the contamination." (*Id.* at ¶ 107).

15. Additional allegations about what the defendants knew about Cabot's environmental compliance and remediation efforts through meetings of the Committee. (*Id.* at ¶¶ 116–206).

16. Additional allegations about the Committee's responsibility to "receive management reports regarding the Company's management of and responses to pending legislative and regulatory efforts in the environmental, health and safety areas," and "report actions and recommendations to Board after each Committee meeting." (*Id.* at ¶ 123–124) (alterations adopted).

17. Allegations that, despite the Committee's responsibility to report environmental issues to the Board, "the [] Committee took a completely passive approach. None of the Board meeting minutes in the 220 Production indicate that the [] Committee made any

recommendations to the Board at all concerning Cabot's ongoing environmental compliance issues and violations of law." (*Id.* at ¶ 125).

18. Additional details about the June 11, 2018, letter that the Department sent Cabot denying Cabot's request to resume drilling in the Dimock Box. (*Id.* at ¶¶ 162–169).

19. Allegations about Cabot's response letters to the June 11, 2018, letter from the Department, including Cabot's choice "to contest the [Department]'s conclusions." (*Id.* at ¶ 172).

20. Additional allegations about the grand jury presentment, including that the grand jury heard testimony that:

   a. "[I]n Cabot's initial sampling of wells and groundwater in Susquehanna County," before drilling, "Cabot never tested the samples for methane," which "eliminated the ability to establish a baseline for assessing and addressing stray gas migration"; and

   b. "Cabot undertook little to no remedial work on its gas wells, the source of the problem, until 18 months ago, (shortly after [the grand jury] investigation began) when it started work on certain wells."

   (*Id.* at ¶¶ 190–200).

21. Allegations that, in Cabot's negotiations with the Department, "the Department was resistant to including language [in consent orders and agreements] refusing admission of fault or liability by the Company. . . . The [Department]'s resistance to include such boilerplate and typical language in a settlement agreement should have been a clear red flag to the Company that authorities intended to hold the Company to further account for these and other violations." (*Id.* at ¶¶ 201, 205).

22. Additional allegations about the Pennsylvania Attorney General's statements, including that Cabot "didn't test their samples so that there would be no proof that they were contaminating nearby water supplies" and that Cabot engaged in "repeated and systemic violations of Pennsylvania environmental law."  (*Id.* at ¶¶ 209–211) (alteration adopted).

23. Allegations that Cabot "formally waived" a preliminary hearing in the criminal case brought by the Attorney General.  (*Id.* at ¶ 215).

24. Allegations that, "[o]n December 28, 2020, the [Department] and the Company yet again entered into two new Consent Orders for violations of environmental laws stemming from multiple separate [notices of violation] issued in 2017 that Cabot failed to remediate."  (*Id.* at ¶ 218).  The notices of violation were for Cabot's allegedly "defective gas wells, located on the Howell Well Pad in Auburn Township and Jeffers Farm Pads in Harford Township."  (*Id.*).

25. Allegations that "[t]he Director Defendants breached their fiduciary duties by consciously ignoring (1) ***254 red flag warnings*** in the form of new [notices of violation] issued to Cabot between 2016 and 2018; (2) that its remediation efforts were insufficient to release Cabot from the 2010 Consent Order; and (3) that the Company continued to repeatedly violate the 2010 Consent Order and Pennsylvania state law. . . . [T]he Director Defendants knowingly caused Cabot to engage in serial non-compliance with mission critical regulatory requirements, despite receiving the following information at EHS Committee meetings."  (*Id.* at ¶ 219).

The plaintiffs have also altered their disclosure claims in response to the court's ruling on the class action motion to dismiss.  At the July 2023 hearing on this motion, the plaintiffs' counsel represented that the plaintiffs no longer pursue the category 1 statements—which were dismissed

in the class action as "nonactionable opinions"—as a basis for their disclosure claims. The plaintiffs also no longer pursue disclosure claims against Stalnaker or Schroeder. What remains are disclosure claims based on the statements in categories 2–4 against Dinges, Ables, Boswell, Brock, and Watts. (Docket Entry No. 106 at 30). Accordingly—and for the sake of consistency with the class action—the court renumbers the remaining categories and summarizes them as follows:

| | Date | Signatures | Representations |
|---|---|---|---|
| **Category 1** | February 22, 2016 (2015 Form 10-K)<br><br>May 3, 2016 (1Q16 Form 10-Q)<br><br>July 29, 2016 (2Q16 Form 10-Q)<br><br>October 28, 2016 (3Q16 Form 10-Q) | Dinges<br><br>Ables<br><br>Boswell | Regarding the 2011 Notice of Violation for the Stalter Wells:<br><br>1. Cabot received a notice of violation "for failure to prevent the migration of [methane] gas into fresh groundwater sources in [Susquehanna County]."<br><br>2. Cabot was "engaged with the [Department] in investigating the incident and ha[s] performed appropriate remediation efforts."<br><br>3. Cabot "believe[s] the source of methane has been remediated and [is] working with the [Department] to reach agreement on the disposition of this matter." |
| **Category 2** | February 27, 2017 (2016 Form 10-K) | Dinges<br><br>Ables<br><br>Boswell | Regarding the 2016 Consent Order for the Stalter Wells:<br><br>1. On December 30, 2016, Cabot entered into a consent order and agreement with the Department.<br><br>2. Cabot has "performed appropriate remediation efforts" and "believe[s] the source of methane has been remediated."<br><br>3. The gas wells related to the consent order were "being permanently plugged."<br><br>4. Cabot was going to perform additional monitoring "to ensure the source of methane has been remediated." |

| **Category 3** | July 26, 2019 (2Q19 Form 10-Q) October 25, 2019 (3Q19 Form 10-Q) | Dinges Ables Boswell Brock Watts | Regarding the 2017 Notices of Violation and proposed consent order and agreements for the Howell Wells and Jeffers Farms Wells: 1. Cabot received two consent order and agreements from the Department relating to gas migration allegations surrounding Susquehanna County wells. 2. Cabot "has been engaged with the Department in investigating the incidents." 3. Cabot "has performed appropriate remediation efforts." 4. Cabot "believes the[] water quality complaints [related to the Howell Wells] have been resolved." 5. The proposed consent order and agreement regarding the Jeffers Farms Wells "would require Cabot to submit a detailed remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies[.]" 6. Cabot will "continue to work with the [Department] to finalize the [consent order and agreement regarding the Jeffers Farms Wells], and to complete the ongoing investigation and remediation [of the Jeffers Farms Wells and affected water supplies]." |
|---|---|---|---|

### 5.    The Demand Board

The parties agree that the relevant Board of Directors in the demand futility analysis is the Board that existed when the plaintiffs filed their third amended complaint.  (Docket Entry No. 105 at 29, n.88; Docket Entry No. 106 at 21).  That ten-member board (the "Demand Board") consists of both defendants and non-defendants.  The defendants are Dinges, Ables, Boswell, Brock, and Watts (the "Director Defendants").  (Docket Entry No. 93 at ¶ 331).  The non-defendants are

Thomas E. Jorden, Lisa A. Stewart, Paul N. Eckley, Hans Helmerich, and Frances M. Vallejo. (*Id.*).

The plaintiffs allege that the Director Defendants could not fairly consider a litigation demand because they face a substantial likelihood of liability for their misconduct.  (*Id.* at ¶¶ 333–337).  As an additional basis for demand futility as to Dinges, the plaintiffs allege that he "lacks independence" from the other Director Defendants "due to his interest in maintaining his position as Executive Chairman."  (*Id.* at ¶ 342).  The plaintiffs also allege that Ables "lacks independence from defendant Dinges due to an external business relationship maintained between her husband and Dinges."  (*Id.* at ¶ 343).

The plaintiffs allege that Jorden could not fairly consider a litigation demand even though he is not a defendant because he is not independent from the Director Defendants.  (*Id.* at ¶ 338).  Specifically, the plaintiffs allege that Jorden "could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day-basis."  (*Id.*).  The plaintiffs also allege that "Jorden derives substantially all of his income from his employment with Cabot—approximately $11 million in 2021."  (*Id.*).

The plaintiffs do not allege that Stewart, Eckley, Helmerich, or Vallejo could not fairly consider a litigation demand.  (*Id.* at ¶ 344).

Based on the motion, the pleadings, the record, the arguments of counsel, and the applicable law, the court rules that the plaintiffs have either failed to state a claim under Rule 12(b)(6) or failed to establish demand futility as required by Rule 23.1.  The motion to dismiss is granted and all claims are dismissed with prejudice.  The reasons are set out below.

## II.  The Legal Standards

### A.  Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

 "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'"  *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555).  "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

## B.     Demand Futility

"The decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors." *In re Citigroup Inc., S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009).   "Unless the board of directors permits the stockholder to proceed, a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation." *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021) (citation omitted)).

Rule 23.1 of the Federal Rules of Civil Procedure provides:

> (**a) Prerequisites.**  This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce.   The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.

> **(b) Pleading Requirements.**  The complaint must be verified and must . . . state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort.

"[A]lthough Rule 23.1 clearly contemplates both the demand requirement and the possibility that demand may be excused, it does not create a demand requirement of any particular dimension.  On its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings."  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991) (emphasis omitted).  Rule 23.1 provides the procedural standard for the demand requirement in a shareholder's derivative complaint in federal court.  The law of the nominal defendant's state of incorporation determines the substantive elements of the demand requirement.  *Id.* at 100 n. 6, 108–109.  Rule 23.1 requires that the plaintiff plead with particularity facts sufficient to satisfy the applicable demand requirement.

Cabot, the nominal defendant, is incorporated in Delaware.  (Docket Entry No. 93 at ¶ 24).  Under Delaware law, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability."  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (overruled on other grounds).  "[T]he demand futility analysis asks whether the board of directors as constituted when the lawsuit was filed could exercise disinterested and independent judgment regarding a demand."  *Zuckerberg*, 250 A.3d at 877 (citation omitted).  "The question is whether the constellation of allegations, viewed holistically, creates a reasonable doubt about the director's ability to consider a demand objectively."  *Id.* (citing *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *18 (Del. Ch. Mar. 19, 2018)).  The court "counts heads among the individual members of the board to assess whether a majority of its members are, or are not, conflicted."  *Wenske v Blue Bell Creameries, Inc.*, 214 A.3d 958, 965 (Del. Ch. 2019) (citations and internal quotation marks omitted).

The Delaware Supreme Court has followed two tests for determining whether directors can exercise impartial judgment when faced with litigation demands.  These are the *Aronson* test and

the *Rales* test.   In the case of "claims involving a contested transaction *i.e.*, where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties," courts applied the *Aronson* test to determine whether demand was futile.  *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).  "Under this test, the trial court is confronted with two related but distinct questions: (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment."  *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 170 (D. Del. 2009) (citing *Levine v. Smith*, 591 A.2d 194, 205 (Del. 1991) (overruled on other grounds)).

When the board that would be considering the demand "did not make a business decision which is being challenged in the derivative suit," the *Rales* test applies*.  Rales v. Blasband*, 634 A.2d 927, 933–34 (Del. 1993).  Under *Rales*, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  *Id.* at 934.

Recognizing that *Rales* established a more general demand futility test than *Aronson*, the Delaware Supreme Court recently announced a single test to determine demand futility. *Zuckerberg*, 262 A.3d at 1058.  Now, courts proceed "on a director-by-director basis," asking for each director: "(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director faces a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face

26

a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Id.* at 1059.  If the answer to any of the questions is "yes" for at least a majority of the board members, demand is excused as futile.  *Id.*  Although the Delaware Supreme Court has consolidated *Rales* and *Aronson*, both tests remain authoritative, and courts may still look to pre-*Zuckerberg* precedent for guidance.  *Id.*

## III.  Analysis

### A.  Judicial Notice

As an initial matter, the defendants ask the court to take judicial notice of: (1) the Section 220 document production; and (2) the notices of violation issued by the Department and corresponding consent orders.  (Docket Entry No. 105 at 13).  The third amended complaint relies on the notices of violation and consent orders that may be judicially noticed as public orders of a government agency.  *See, e.g.*, *U.S. ex rel. Jackson v. Ventavia Research Group, LLC*, --- F. Supp. 3d ----, 2023 WL 2744394, at *1 n. 4 (E.D. Tex. Mar. 31, 2023); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).  The plaintiffs do not oppose the defendants' request for judicial notice. The court takes judicial notice of these documents.

### B.  The *Caremark* Claims

Under Delaware law, to successfully plead demand futility for failing to remediate environmental violations, a company's shareholders "must allege with particularity facts that imply that the directors utterly failed to provide a corporate reporting system to permit board-level review of compliance with law, or that the directors were provided sufficient notice of corporate non-compliance with law such that their failure to remediate amounts to bad faith."  *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *1 (Del. Ch. Aug. 24, 2020). These claims are known as *Caremark* claims.  *See Caremark*, 698 A. 2d 959.

As the Delaware Chancery Court has explained:

> [u]nder *Caremark* and its progeny, "a director must make a good
> faith effort to oversee the company's operations." *Marchand v.
> Barnhill*, 212 A.3d 805, 820 (Del. 2019) (citing *Caremark*, 698 A.2d
> at 970). "A *Caremark* claim contends that the directors set in motion
> or 'allowed a situation to develop and continue which exposed the
> corporation to enormous legal liability and that in doing so they
> violated a duty to be active monitors of corporate performance.'"
> *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012) (quoting *Caremark*,
> 698 A.2d at 967). Such a claim "'is rooted in concepts of bad faith;
> indeed, a showing of bad faith is a necessary condition to director
> oversight liability.'" *City of Birmingham Ret. & Relief Sys. v. Good*,
> 177 A.3d 47, 55 (Del. 2017) (quoting *In re Citigroup Inc. S'holder
> Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009)). Because a
> *Caremark* claim must plead bad faith, "a plaintiff must allege facts
> that allow a reasonable inference that the directors acted with
> scienter which, in turn, requires not only proof that a director acted
> inconsistently with his fiduciary duties, but also most importantly,
> that the director knew he was so acting." . . . A *Caremark* claim is
> "possibly the most difficult theory in corporation law upon which a
> plaintiff might hope to win a judgment." *Stone ex rel. AmSouth
> Bancorporation v. Ritter*, 911 A.2d 362, 372 (Del. 2006).
>
> *Caremark* claims can take two forms. A so-called "prong one"
> claim arises where "the directors utterly failed to implement any
> reporting or information system or controls." *Id.* at 370. Under
> "prong one," "a director may be held liable if she acts in bad faith in
> the sense that she made no good faith effort to ensure that the
> company had in place any system of controls." *Hughes v. Hu*, 2020
> WL 1987029, at *14 (Del. Ch. Apr. 27, 2020) (quoting *Marchand
> v. Barnhill*, 212 A.3d 805, 822 (Del. 2019)). A "prong two" claim,
> on the other hand, arises where "having implemented such a system
> or controls, [the directors] consciously failed to monitor or oversee
> its operations thus disabling themselves from being informed of
> risks or problems requiring their attention." *Stone*, 911 A.2d at 370
> (Del. 2006). To state a "prong two" *Caremark* claim, the Plaintiffs
> must "plead [particularized facts] that the board knew of evidence
> of corporate misconduct—the proverbial 'red flag'—yet acted in
> bad faith by consciously disregarding its duty to address that
> misconduct." *Horman*, 2017 WL 242571, at *10 (quoting *Reiter on
> Behalf of Capital One Fin. Corp. v. Fairbank*, 2016 WL 6081823,
> at *8 (Del. Ch. Oct. 18, 2016)). "[A] plaintiff asserting a *Caremark*
> oversight claim must plead with particularity 'a sufficient
> connection between the corporate trauma and the board.'" *Reiter*,
> 2016 WL 6081823, at *8 (quoting *Louisiana Mun. Police Empls.'*

> *Ret. Sys. v. Pyott*, 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013)).

*Teamsters*, 2020 WL 5028065, at *16–17.

"Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007).  Under Delaware law, red flags "are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer."   *Wood*, 953 A.2d at 143 (citation omitted).   With respect to regulatory investigations:

> The issuance of a subpoena or the launch of a regulatory investigation does not necessarily demonstrate that a corporation's directors knew or should have known that the corporation was violating the law.  When such events become a red flag depends on the circumstances.  If a plaintiff is able to present[] strong factual allegations of board knowledge of ongoing legal violations in the wake of federal government enforcement proceedings, for example, then the mere fact of a regulatory investigation would take on more significance at the pleading stage.

*Fisher on behalf of LendingClub Corp. v. Sanborn*, C.A., 2021 WL 1197577, at *12 (Del. Ch. Mar. 30, 2021) (citations, emphasis, and internal quotation marks omitted).

The plaintiffs argue that their complaint allegations meet the second *Caremark* prong:

> The Director Defendants breached their fiduciary duties by consciously ignoring (1) ***254 red flag warnings*** in the form of new NOVs issued to Cabot between 2016 and 2018; (2) that its remediation efforts were insufficient to release Cabot from the 2010 Consent Order; and (3) that the Company continued to repeatedly violate the 2010 Consent Order and Pennsylvania state law. As discussed above, the Director Defendants knowingly caused Cabot to engage in serial non-compliance with mission critical regulatory requirements, despite receiving the following information at EHS Committee meetings:

| # | Director | Beginning of Board Service | Information Known to Defendant Directors |
|---|----------|---------------------------|------------------------------------------|
| 1 | Dan O. Dinges | *May 2002* | the Company continued to rampantly violate Pennsylvania state law at an increasing rate from 2016 to 2018, with the following new violations each year: (1) 48 in 2016; (2) 86 in 2017; and (3) 104 in 2018; |
| 2 | Rhys J. Best | *July 2008* | Cabot's remediation efforts to prevent the gas migration allegations were continuously ineffective and failed to bring the Company under compliance with the 2010 Consent Order and multiple NOVs from May 4, 2016 to January 2020; the Company's testing consultant, Stantec, repeatedly issued testing data and closing reports, such as the closing report for Stalter wells, which were rejected by the PaDEP and failed to close out the PaDEP's investigation into such issues; and |
| 3 | W. Matt Ralls | *June 2011* | |
| 4 | Dorothy M. Ables | *December 2015* | the PaDEP continuously reported to Cabot that the Company was still in violation of the 2010 Consent Order and that the Dimock Box prohibition on new drilling would stay in effect. |
| 5 | Robert S. Boswell | *December 2015* | |
| 6 | Amanda M. Brock | *August 2017* | the Company continued to rampantly violate Pennsylvania state law at an increasing rate from 2017 to 2018, with the following new violations each year: (1) 86 in 2017; and (2) 104 in 2018; and |
| 7 | Marcus A. Watts | *August 2017* | the PaDEP continuously reported to Cabot that the Company was still in violation of the 2010 Consent Order and that the Dimock Box prohibition on new drilling would stay in effect. |
| 8 | Peter B. Delaney | *August 2018* | the Company continued to rampantly violate Pennsylvania state law at an increasing rate in 2018, 104 new violations in 2018. |

(Docket Entry No. 93 at ¶ 219).

Relying on *In re Massey Energy Company*, 2011 WL 2176479, at *1 (Del. Ch. May 31, 2011), the plaintiffs also argue that any remedial efforts Cabot took amounted to "nothing of actual substance to change the direction of the company's real policy." (Docket Entry No. 106 at 23) (quoting *Massey*, 2011 WL 2176479, at *19). This is particularly true, the plaintiffs argue, because the environmental compliance issues in Susquehanna County were "a central compliance risk" to Cabot. (*Id.* at 24) (quoting *In re McDonald's Corp. Stockholder Deriv. Litig.*, 291 A.3d 652, 680 (Del. Ch. 2023). As evidence that the defendants knew that Cabot was just "going through the motions" rather than meaningfully remediating the issues, the plaintiffs rely on "the 15-count criminal indictment that references the June 11, 2018 letter sent to the Defendants." (*Id.* at 25). The plaintiffs also rely on Cabot's *nolo contendere* plea to "Clean Streams Law violations for discharging methane into groundwater from various gas wells within Susquehanna County, Pennsylvania between March 2008 and June 2018." (*Id.* at 25–26) (quoting Docket Entry No. 55-7) (quotation marks omitted and alterations adopted). Finally, the plaintiffs argue that the Committee meeting minutes and materials support the inference that the defendants knew that Cabot was not making meaningful progress toward remediation. (*Id.* at 27).

The defendants, on the other hand, argue that the Section 220 documents do not support the inference that the directors and officers acted in bad faith. (Docket Entry No. 105 at 32). According to the defendants, "[t]he directors were informed at every juncture that Cabot had plans in place to remediate the alleged violations, with testing confirming that most remediation efforts were successful or that no underlying violation existed in the first instance." (*Id.*). The defendants argue that "Cabot undertook remedial actions, hired outside consultants, and engaged in ongoing dialogue with [the Department] to resolve the alleged violations (even if some of these efforts were unsuccessful)." (Docket Entry No. 99 at 6).

31

The court agrees with the defendants.  The allegations and Section 220 documents, considered in total, do not allow the inference that the defendants are guilty of a "serious failure of oversight sufficient to support an inference of bad faith."  *McDonald's*, 291 A.3d at 661–62.  At most, the Section 220 documents support the conclusion that the defendants "responded in a weak, inadequate, or even grossly negligent manner" to the Department's regulatory actions, which is not enough for *Caremark* liability.  *Id.*

The parties agree that the Committee meetings provided the defendants regular updates about the gas migration issues in Susquehanna County and Cabot's efforts to resolve them.  There is also no dispute that Cabot took steps to resolve those issues.  The only dispute is whether it can be reasonably inferred that those steps fell short of a "good faith effort."  (Docket Entry No. 106 at 23) (citing *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019)).  The Section 220 documents do not allow that inference.

The defendants received numerous reports that the impact of Cabot's wells on residential water supplies was waning or had been eliminated because of Cabot's remediation efforts.

In February 2015, the Committee was informed of an analysis by Stantec concluding that certain residential water wells had either not been impacted by Cabot's "Ratzel" wells or were no longer being impacted after remediation efforts.  (Docket Entry No. 55-5 at 8).  The Committee meeting materials also stated that "the dissolved methane concentrations" in a residential water supply that had been contaminated by the Stalter 8V well "have continued to trend down . . . and have been at or remained near non-detect levels since early December 2014.  For the other four affected residents, concentrations are either non-detect or appear to have reached asymptotic conditions."  (*Id.* at 7).  Gordon Ganaway, Cabot's Director of Corporate Safety & Environmental Compliance, reported to the Committee that "levels in all other gas migration allegation cases are

trending downward" and that "a draft closure report on the Stalter 8V-related water complaints would be prepared and submitted in March." (Docket Entry No. 55-4 at 2–3).

In October 2015, it was reported to the Committee that "there is no indication that the Stalter 1H is contributing methane to the aquifer" and that "conditions have resolved" at four residences whose water supplies had been contaminated by Cabot's wells. (Docket Entry No. 55-11 at 6).

In February 2016, the Committee was informed that:

- "[T]he remaining residences relating to the Stalter #8V were showing lower levels of dissolved methane." (Docket Entry No. 55-15 at 5).

- "The Greenwood/Ratzel pad water quality investigation closure report is under review by the [Department]." (*Id.*).

- Cabot had submitted to the Department a "formal plugging plan for the 8V, mechanical integrity assessment of the Stalter 1H and 2H wells and plans for permanent restoration of the affected residential water supplies." (*Id.* at 8).

- "For all residences except the Chichura's, dissolved methane has steadily declined and remained below the [Department] action level of 7 mg/L for over 2 years." (*Id.*).

- The Chichura case "was verbally settled on October 2, 2015," and "the Chichuras verbally agreed to provide a letter to Cabot and the [Department] to the effect that the settlement satisfies the replacement and restoration obligations of Cabot." (*Id.*).

- "[T]he dissolved methane levels" at the Chichura residence "continue to follow an overall declining trend over time demonstrating that the source has been removed and conditions are returning to background." (*Id.*).

In May 2016, the Committee received a report that the "the Manzer tests were trending downward and that the Powers case is expected to be closed out in June or July." (Docket Entry No. 55-17 at 2).

In July 2016, the Committee was informed about "the results of testing on the related water wells [to Stalter #8V], all but one of which were showing improvement." (Docket Entry No. 55-20 at 2).

In February 2017, the Committee was informed that:

- The number of notices of violation decreased in 2016 despite an increase in the number of inspections. (Docket Entry No. 55-26 at 3).

- The Department "accepted that the Chichura water supply had been adequately restored," and that the Stalter 8V well had been permanently plugged. (Docket Entry No. 55-27 at 7).

- The results of testing on the Stalter Wells "continue to support the interpretation that the source of the impact has been stopped and that the remaining gas present in the aquifer is attenuating." (*Id.*).

In July 2017, the Committee was informed that:

- "[S]ampling" on the Howell Wells was "showing a positive trend." (Docket Entry No. 55-31 at 2).

- "[R]emedial work ha[d] been performed on the 2H, 4H, and 6H wells." (Docket Entry No. 55-32 at 10).

- "With ongoing monitoring, it appears that observed flowrates are continuing to diminish, indicating the squeeze work has been successful." (*Id.*).

In October 2017, the Committee was informed that:

- "[A]dditional workover activities were completed on the Howell 4H and 8H wells." (Docket Entry No. 55-33 at 9).

- "Workover activities have continued on the Howell 2H and 6H wells with additional squeeze work and bond log runs performed on the Howell 2H." (*Id.*).

- "Pressure testing and gas flow monitoring on the well annuli have shown improvement; however some pressure is still being observed on the 2H 13x9 annulus at this time and additional testing and remedial work may be necessary." (*Id.*).

- "The . . . dissolved gas concentrations have continued to decline over time . . . indicating the remedial efforts on the Howell well pad have been successful." (*Id.*).

- "Workover activities [] began on the Jeffers Farms Pad 2 during August 2017 following evaluation of the available well logs.  Efforts have been focused on the Jeffers 14H and 7H wells with squeeze work performed at various intervals within each well bore.  Pulse flow testing and logging is being conducted in concert with the squeeze work to evaluate effectiveness.  Remedial work is ongoing." (*Id.* at 10).

In February 2018, the Committee was informed that:

- A water supply effected by the Howell wells "has been permanently restored" and "[o]ngoing monitoring of the affected water supplies continues."  (Docket Entry No. 55-36 at 10).

- Bottled water and a permanent water treatment system had been provided to residents affected by Jeffers Farms wells.  (*Id.*).

35

- "[T]here had been no new gas migration allegations since the last meeting." (Docket Entry No. 55-37 at 3).

In May 2018, the Committee was informed that:

- "Currently, the Howell wells are on production and ongoing monitoring of the affected water supplies continues.  Sample results to date continue to indicate that remedial activities were successful."  (Docket Entry No. 55-38 at 14).

- "Workover activities at the [Jeffers Farms Pad 2] wellsite were completed during March 2018 and, with the Department's concurrence, the wells are currently being completed.  Monitoring of the affected water supplies continues.  The observed concentrations of dissolved methane in the Smith water well remains around 25 mg/L, while the dissolved methane results at the Paolucci water well have exhibited a decrease over the past two months."  (*Id.*).

In July 2018, the Committee was informed that:

- "Monitoring of the [water supplies affected by the Jeffers Farms Pad 2] continues and, based on the elevated dissolved methane levels observed at the George Hall water supply that was identified as a property of interest during the May 30, 2018 meeting [], another round of sampling of the residents in the vicinity of the well pad is currently being conducted to ensure that conditions are not changing.  The observed concentrations of dissolved methane in the Smith water well remains ~25 ppb and dissolved methane results at the Paolucci water well stabilized at ~2 ppm." (Docket Entry No. 55-40 at 13).

In October 2018, the Committee was informed that:

- "Woodard & Curran has prepared a draft Chapter 78a.89 Closure Report for [the Howell, G Pad 1].  Review by Cabot is ongoing."  (Docket Entry No. 55-43 at 13).

- "Additional sampling of the residents in the vicinity of the [Jeffers Farms Pad 2] was conducted during this period; elevated levels of dissolved methane were identified at an additional eight residences.  These have been incorporated into a routine sampling program to evaluate dissolved gas concentrations over time . . . . Additional remedial work on the Jeffers Farms Pad 2 wells is scheduled to begin during the 4th Quarter of 2018."  (*Id.*).

In February 2019, the Committee was informed that:

- "Additional remedial work is scheduled [for the Jeffers Farms Pad 2] during 2019. The observed concentrations of dissolved methane in the Smith water well appear to be trending downward with concentrations fluctuating between 13 and 28 ppm over the past six months."  (Docket Entry No. 55-46 at 15).

- "The dissolved methane results at the Paolucci water supply have remained low and typically are at or below 1 ppm."  (*Id.*).

- "Based on the data collected to date, the routine sampling at the remaining eight residences of interest around the Jeffers Farms Pad 2 has been reduced to quarterly."  (*Id.*)

In May 2019, the Committee was informed that:

- There was "[n]o change from prior period [with respect to the Howell, G Pad 1]. Woodard & Curran has prepared a draft Chapter 78a.89 Closure Report for this [gas migration issue].  Review by Cabot is ongoing."  (Docket Entry No. 55-48 at 14).

37

- As to the Jeffers Farms Pad 2, "[d]uring this period, the observed concentrations of dissolved methane in the Smith water well continued to trend downward with the most recent values obtained since the beginning of March 2019 being significantly lower (ranging between 1.3 ppm and 1.6 ppm)." (*Id.*).

- "The dissolved methane results at the Paolucci water supply have remained low and typically are at or below 1 ppm." (*Id.*).

- "Quarterly sampling was conducted at the remaining eight residences of interest around the Jeffers Farms Pad 2 during this period, with the exception of one residence where access was denied.  These results are pending." (*Id.* at 15).

In July 2019, the Committee was informed that:

- "The dissolved methane results at the Paoluccia water supply have remained low and typically are at or below 1 ppm." (Docket Entry No. 55-51 at 15).

- "Quarterly sampling conducted at the remaining eight residences of interest around the Jeffers Farms Pad 2 during April 2019 (with the exception of one residence where access was denied) were generally consistent with prior sampling events, with the exception of the George Hall water supply." (*Id.*).

In October 2019, the Committee was informed that:

- "During this period, Cabot had several discussions with the Smiths regarding possible settlement and/or permanent restoration of their water supply.  As of the time of this update, they have rejected reasonable offers to purchase their property – Cabot has offered $400k which is more than twice the appraised property value based on both Cabot's and the landowner's independent appraisals of the property. They have, however, agreed in principle to allow Cabot to attempt to drill another

water well as a permanent remedy. . . . Negotiations regarding this matter are ongoing." (Docket Entry No. 55-53 at 17).

- "The dissolved methane results at the Paolucci water supply have remained low and are approaching background (e.g., most recent sample result from September 2019 was 0.057 ppm)." (*Id.*).

- "Quarterly sampling conducted at the remaining eight residences of interest around the Jeffers Farms Pad 2 during July 2019 (with the exception of one residence where access was denied) were generally consistent with prior sampling events." (*Id.*).

The plaintiffs argue that these positive reports on Cabot's remediation efforts represent only a small portion of the gas migration issues, and that "the very same documents show numerous examples of on-going unremediated problems and that efforts to remediate certain wells were not successful." (Docket Entry No. 106 at 27).

The plaintiffs are correct that the Section 220 documents show some successes and some failures. But critically for the purpose of the *Caremark* claim, the documents show that Cabot was working in good faith to remediate the defective wells and restore contaminated water supplies. The plaintiffs have failed to state a *Caremark* claim, and, correspondingly, have failed to plead particularized allegations supporting a reasonable inference that a majority of the Demand Board faced a substantial likelihood of *Caremark* liability. *See Richardson on behalf of MoneyGram Int'l, Inc. v. Clark*, C.A., 2020 WL 7861335 (Del. Ch. Dec. 31, 2020) ("The facts pled here suggest a failed effort, not one opposed to the interests of MoneyGram or otherwise in bad faith. It is conceivable that a purported attempt at remediation could constitute bad faith; for instance, a mere sham remediation or an insincere action to fool regulators may be actionable. The pleading bar

for such an allegation must necessarily be high."); *Pettry on behalf of FedEx Corp. v. Smith*, C.A., 2021 WL 2644475, at *8–12 (Del. Ch. June 28, 2021), *aff'd*, 2022 WL 569325 (Del. Feb. 25, 2022) (the board did not act with bad faith when, in response to an internal report regarding illegal cigarette shipments, the board was repeatedly updated about ongoing enforcement actions and instituted actions to remedy noncompliance); *In re General Motors Co. Deriv. Litig.*, C.A., 2015 WL 3958724, at *16–18 (Del. Ch. June 26, 2015), *aff'd*, 133 A.3d 971 (Del. 2016) (although the board's failures to oversee or review progress with regard to identified emerging risks may have created a reasonable inference of negligence, those actions did not create an inference of bad faith or that the board was "consciously acting in a manner inimical to" the company).

This case is distinguishable from *Massey*, 2011 WL 2176479; *Marchand*, 212 A.3d 805; and *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at *16 (Del. Ch. Apr. 26, 2023), on which the plaintiffs rely.  In *Massey*, the shareholders of a coal mining company alleged that management had "knowingly flouted applicable miner safety laws" and "made the conscious choice to put miners at risk in order to cut cost-corners and up mining profits." *Massey*, 2011 WL 2176479, at *19.  Management was alleged to have continued flouting the law "[e]ven after [Massey's CEO] had already pled guilty to criminal charges for willful violations of mining safety laws and falsification of evidence, settled a claim with the Environmental Protection Agency for a record sum, and suffered a punitive damages award for firing a whistleblower[.]"  *Id.*  The shareholders alleged that a fatal mining disaster at a Massey mine "was caused not by a freak and unavoidable accident, but instead by a corporate culture premised on the view that the company's management knew better than the law about what was necessary to run safe mines."  *Id.*

In this case, unlike *Massey*, there is evidence that the defendants "ma[de] good faith efforts to ensure that [Cabot] cleaned up its act." *Id.* In *Massey*, the company's attitude of flouting the law and engaging "in adversarial tactics" toward regulatory agencies was alleged not to have changed at all, even after the guilty plea. Here, on the other hand, the Section 220 documents show that water supplies that had been polluted by Cabot's wells were cleaned up through Cabot's efforts.

*Marchand* is also distinguishable. That case involved an ice cream company production plant that had a listeria outbreak. 212 A.3d at 811. Shareholders brought a *Caremark* claim alleging that the "board had no committee overseeing food safety, no full board-level process to address food safety issues, and no protocol by which the board was expected to be advised of food safety reports and developments." *Id.* at 809. These allegations stated a *Caremark* claim because they allowed the inference that the board "did not undertake good faith efforts to put a board-level system of monitoring and reporting in place." *Id.* at 821. The allegations in *Marchand* stated a prong 1 *Caremark* claim, not a prong 2 claim. The plaintiffs here have not alleged that Cabot had no monitoring or compliance system at all. Rather, they allege that, despite Cabot's monitoring system—including regular Committee meetings with reports on environmental issues—the defendants did not do enough to ensure that Cabot was in compliance.

Finally, the plaintiffs' reliance on *Walton* is misplaced. In that case, Walmart shareholders alleged that Walmart's directors and officers knowingly caused Walmart to fail to comply with its legal obligations as a wholesale distributor of opioids in its retail pharmacies, including obligations imposed by a settlement agreement between Walmart and the Drug Enforcement Agency. *Walton*, 2023 WL 3093500, at *1. One of Walmart's "central" obligations under the settlement agreement was to have a system for "[m]onitoring and detecting drug diversion and suspicious activity." *Id.*

at 12–13.  The shareholders alleged that the directors and officers knew that Walmart had not installed a monitoring system and had taken "no action" to do so.  *Id.* at 13.  The court accordingly held that the shareholders had alleged demand futility.  *Id.* at 43.

*Walton* and *Massey* are distinguishable from this case for the same reason:  the defendants here, unlike the defendants in those cases, took good-faith, effective steps to bring Cabot into compliance.

The *Caremark* claims are dismissed, with prejudice, because further amendment would be futile.

### C.      The Disclosure Claims

When "directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty."  *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).  A director breaches the duty of loyalty and good faith by "knowingly disseminat[ing] to the stockholders false information about the financial condition of the company."  *Id.*  "[A] shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors 'deliberately misinform[ed] shareholders about the business of the corporation, either directly or by a public statement.'"  *Citigroup*, 964 A.2d at 132 (quoting *Malone*, 722 A.2d at 14).  "[A] plaintiff can demonstrate a substantial likelihood of liability that would excuse demand only by making 'particularized factual allegations that support the inference that the disclosure violation was made in bad faith, knowingly, or intentionally.'"  *LendingClub*, 2021 WL 1197577, at *17 (citing *Citigroup*, 964 A.2d at 106).

The plaintiffs argue that they have satisfied the demand futility standard as to the disclosure claims because "half of the Board Members . . . issued public statements they knew were false." (Docket Entry No. 106 at 29).  Specifically, the plaintiffs argue that Dinges, Ables, Boswell, Brock,

and Watts face a substantial likelihood of liability from causing Cabot to make the following alleged misrepresentations:

| | Date | Signatures | Representations |
|---|---|---|---|
| **Category 1** | February 22, 2016 (2015 Form 10-K)<br><br>May 3, 2016 (1Q16 Form 10-Q)<br><br>July 29, 2016 (2Q16 Form 10-Q)<br><br>October 28, 2016 (3Q16 Form 10-Q) | Dinges<br><br>Ables<br><br>Boswell | Regarding the 2011 Notice of Violation for the Stalter Wells:<br><br>1. Cabot received a notice of violation "for failure to prevent the migration of [methane] gas into fresh groundwater sources in [Susquehanna County]."<br><br>2. Cabot was "engaged with the [Department] in investigating the incident and ha[s] performed appropriate remediation efforts."<br><br>3. Cabot "believe[s] the source of methane has been remediated and [is] working with the [Department] to reach agreement on the disposition of this matter." |
| **Category 2** | February 27, 2017 (2016 Form 10-K) | Dinges<br><br>Ables<br><br>Boswell | Regarding the 2016 Consent Order for the Stalter Wells:<br><br>1. On December 30, 2016, Cabot entered into a consent order and agreement with the Department.<br><br>2. Cabot has "performed appropriate remediation efforts" and "believe[s] the source of methane has been remediated."<br><br>3. The gas wells related to the consent order were "being permanently plugged."<br><br>4. Cabot was going to perform additional monitoring "to ensure the source of methane has been remediated." |
| **Category 3** | July 26, 2019 (2Q19 Form 10-Q)<br><br>October 25, 2019 (3Q19 Form 10-Q) | Dinges<br><br>Ables<br><br>Boswell<br><br>Brock<br><br>Watts | Regarding the 2017 Notices of Violation and proposed consent order and agreements for the Howell Wells and Jeffers Farms Wells:<br><br>1. Cabot received two consent order and agreements from the Department relating to gas migration allegations surrounding Susquehanna County wells. |

| | | | 2. Cabot "has been engaged with the Department in investigating the incidents." |
| | | | 3. Cabot "has performed appropriate remediation efforts." |
| | | | 4. Cabot "believes the[] water quality complaints [related to the Howell Wells] have been resolved." |
| | | | 5. The proposed consent order and agreement regarding the Jeffers Farms Wells "would require Cabot to submit a detailed remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies[.]" |
| | | | 6. Cabot will "continue to work with the [Department] to finalize the [consent order and agreement regarding the Jeffers Farms Wells], and to complete the ongoing investigation and remediation [of the Jeffers Farms Wells and affected water supplies]." |

### 1. The Category 1 and 2 Statements

The Category 1 and 2 statements concern the Stalter Wells. Cabot's disclosures stated, in relevant part, that the company had "performed appropriate remediation efforts" and "believe[d] the source of methane ha[d] been remediated." The question is whether the allegations support the inference that at least half the Board caused Cabot to make these disclosures even though those Board members knew that the Stalter methane-migration issues had not been remediated.

As an initial matter, it does not appear that the plaintiffs have alleged that at least half of the Board sufficiently participated in causing Cabot to issue the Category 1 and 2 statements. "[C]orporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's

affairs is pleaded." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004).  There must be some "specific factual allegations link[ing] the individual to the statement at issue," such as "a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement." *Id.*

The plaintiffs are apparently pursuing the disclosure claims against Dinges, Ables, Boswell, Brock, and Watts.  (Docket Entry No. 106 at 30).  In their response brief, however, the plaintiffs contend that only Dinges, Ables, and Boswell signed the 2015 and 2016 Form 10-Ks.  (*Id.*).  The third amended complaint does not contain "specific factual allegations" linking Brock and Watts to the Form 10-Ks and Form 10-Qs.  Rather, the plaintiffs allege merely that "Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file" its 2015 and 2016 Form 10-Ks and 2016 Form-10Qs.  (Docket Entry No. 93 at ¶¶ 243, 247, 252, 256–57).  These allegations are insufficient to state a claim against Brock and Watts.  For this reason alone, demand futility is not established as to the Category 1 and 2 disclosure claims.

Demand futility is not established for the additional reason that the Section 220 documents preclude the inference that Dinges, Ables, Boswell, Brock, and Watts knew that the Category 1 and 2 statements were false at the time they were made.  Three relevant Committee meetings took place before Cabot issued its 2015 Form 10-K and 1Q16 Form 10-Q.  The defendants heard reports at each meeting that the Stalter Wells were being or had been successfully remediated.  At a February 18, 2015 meeting, the Committee heard that:

- "[T]he dissolved methane concentrations have continued to trend down at the Chichura residence and have been at or remained near non-detect levels since early December 2014.  For the other four [] residents [affected by the Stalter 8V well],

concentrations are either non-detect or appear to have reached asymptotic conditions." (Docket Entry No. 55-5 at 7).

- "[L]evels in all other gas migration allegation cases are trending downward" and "a draft closure report on the Stalter 8V-related water complaints would be prepared and submitted in March." (Docket Entry No. 55-4 at 2–3).

At an October 21, 2015, meeting, the Committee heard that:

- "The arbitration case with the Chichura's was settled on October 2, 2015. In that settlement the Chichura's agreed to provide a letter to Cabot and the [Department] to the effect that the settlement satisfies the replacement and restoration obligations of Cabot." (Docket Entry No. 55-11 at 6).

- "Since the last [Board] meeting, monitoring at the Chichura residence has continued to show elevated dissolved gas concentrations during the summer of 2015, peaking at 31 mg/L in July 2015 with a decreasing trend being observed moving into September 2015 (with concentrations now below 20 mg/L). The increase in methane observed this summer appears to be influenced by residential use of the well for water-intensive activities (e.g., pressure washing cars for sale at their used car lot). It should be noted that each period of increase observed since the initial incident has trended lower, demonstrating that the source has been removed and conditions are returning to background. The remaining four associated residences . . . continue to exhibit very low to non-detect levels of dissolved methane indicating that these have now returned to naturally occurring levels." (*Id.*).

- "Results of the pressure buildup test conducted on the Stalter 1H at the end of June 2015 did not indicate well integrity issues . . . . Further, all annuli are vented and no buildup of pressure is occurring."  (*Id.*).

- "[T]he [Department] expressed potential concerns with Stalter 1H due to the presence of Marcellus-sourced methane observed in the Chichura water well; however, the isotopic signature has not changed since the outset of the incident in August 2011 and there is no indication that the Stalter 1H is contributing methane to the aquifer."  (*Id.*).

- "While Cabot continues to monitor the Chichura's water supply and to work with the [Department], there are plans to prepare and submit an interim Chapter 78.89 report to demonstrate that conditions have resolved at the other four residences . . . and to close-out that portion of the gas migration investigation."  (*Id.*).

At a February 16, 2016 meeting, the Committee heard that:

- Cabot had submitted to the Department a "formal plugging plan for the [Stalter] 8V, mechanical integrity assessment of the Stalter 1H and 2H wells and plans for permanent restoration of the affected residential water supplies."  (Docket Entry No. 55-15 at 8).

- "For all residences except the Chichura's, dissolved methane has steadily declined and remained below the [Department] action level of 7 mg/L for over 2 years. Consequently, remaining low level constituents are proposed to be treated by commercially available filtration.  Further, except for the Chichura's, discussions with the affected landowners has been initiated by Cabot with final settlement to be determined."  (*Id.*).

47

- "The arbitration case with the Chichura's was verbally settled on October 2, 2015. In that settlement the Chichura's verbally agreed to provide a letter to Cabot and the [Department] to the effect that the settlement satisfies the replacement and restoration obligations of Cabot.  However, as of the date of this report, the written settlement agreement has not yet been finalized and executed." (*Id.*).

- "Dissolved methane levels at the Chichura residence continue to remain highly variable, ranging between 2.4 mg/L and 23 mg/L during the fourth quarter of 2015. However, consistent with previous observations, the dissolved methane levels continue to follow an overall declining trend over time demonstrating that the source has been removed and conditions are returning to background." (*Id.*).

The record does not reasonably support an inference that the defendants knowingly caused Cabot to make a misrepresentation in stating in its 2015 Form 10-K (February 22, 2016) and 1Q16 Form 10-Q (May 3, 2016) that it "ha[s] performed appropriate remediation efforts" and "believe[s] the source of methane has been remediated and [is] working with the [Department] to reach agreement on the disposition of this matter."  The Committee minutes and materials show that the defendants were informed of numerous appropriate remediation efforts that Cabot had performed. The defendants were also informed that these efforts had been successful at remediating the methane leaks in the Stalter Wells.  Although the Committee was informed that methane levels in the Chichura water well remained elevated, the reports consistently stated that the source of methane—the defects in the Stalter Wells—"ha[d] been removed and conditions [we]re returning to background."  (Docket Entry No. 55-15 at 18).  This conclusion was supported by data that methane levels in the Chichura well followed an "overall declining trend" and, for the other affected residences, "dissolved methane ha[d] steadily declined and remained below the

[Department] action level of 7 mg/L for over 2 years." (*Id.*). Further, the defendants were informed that a verbal settlement had been reached with the Chichuras and that the Chichuras "agreed to provide a letter to Cabot and the [Department] to the effect that the settlement satisfies the replacement and restoration obligations of Cabot." (*Id.*). There is no basis to infer that the defendants knowingly caused Cabot to issue false statements in the 2015 Form 10-K or 1Q16 Form 10-Q.

The defendants did receive some potentially negative news about the remediation of the Stalter Wells before Cabot issued its 2Q16 10-Q (July 29, 2016) and 3Q16 10-Q (October 28, 2016). At a July 27, 2016, Committee meeting, the defendants were informed that, on July 11, 2016, the Department had sent Cabot a revised consent order and agreement, including statements that the Department was "not convinced that the Stalter 1H and/or 2H are not a source of stray gas," and that the Department believed that "additional monitoring and/or remediation" was required. (Docket Entry No. 55-21 at 6). These allegations do not support the inference that the defendants knowingly caused Cabot to issue misrepresentations in its 2Q16 10-Q and 3Q16 10-Q. Rather, the allegations support the inference that Cabot and the Department disagreed about the efficacy of the remediation efforts. This disagreement does not make false Cabot's statements that it "ha[d] performed appropriate remediation efforts" and "believe[d] the source of methane ha[d] been remediated and [was] working with the [Department] to reach agreement on the disposition of this matter."

For these reasons, the plaintiffs have failed to plead particularized allegations sufficient to show demand futility as to the Category 1 disclosure claims.

The disclosure claims based on the Category 2 statements fail for the same reasons.  On February 21, 2017, just a few days before Cabot issued its 2016 Form 10-K, the Committee was informed that:

- "[T]he temporary plugging of the 8V was effective and [] no communication exists between the 1H and 8V wells."  (Docket Entry No. 55-27 at 7).

- "The results [of testing] continue to support the interpretation that the source of the impact has been stopped and that the remaining gas present in the aquifer is attenuating."  (*Id.*).

- "Following continued negotiations conducted during this period, the Consent Order and Agreement (COA) to address the Stalter Gas Migration incident was finalized, effective December 30, 2016.  As part of the COA, [the Department] agreed to allow the permanent plugging of the Stalter 8V without stipulating language regarding plugging of the 1H and 2H wells.  Further, they accepted that the Chichura water supply had been adequately restored and allowed the decoupling of their water supply from the remainder of the residents in the COA as pertains to water supply restoration."  (*Id.*).

- "The plugging plan was approved as part of the COA and the permanent plugging of the 8V was completed on 01/12/17.  Following plugging, quarterly sampling of the affected residents commenced with split sampling between the [Department] and Cabot being performed on 01/25/17.   No change in water quality was observed following the plugging activities."  (*Id.*).

The record precludes the inference that Dinges, Ables, Boswell, Brock, and Watts knowingly caused Cabot to misrepresent the status of the Stalter Wells remediation efforts.  On

the contrary, the information presented to the Committee supports the statements in the Category 1 and 2 disclosures.

### 2. The Category 3 Statements

To show demand futility with respect to the Category 3 statements, the plaintiffs must plead particularized allegations supporting the reasonable inference that, when Cabot issued its 2Q19 Form 10-Q and 3Q19 Form 10-Q, Dinges, Ables, Boswell, Brock, and Watts knew that the statements in the forms were false.

It is important to note that the 2Q19 and 3Q19 Form 10-Qs represented that Cabot believed that the water quality complaints had been resolved only with respect to the Howell Wells. Regarding the Jeffers Farms Wells, Cabot instead stated that it would "continue to work with the [Department] to finalize the [proposed consent order and agreement], and to complete the ongoing investigation and remediation." (Docket Entry No. 93 at ¶¶ 281, 283).

As with the Stalter Wells at issue in the Category 1 and 2 statements, the Committee received regular reports about the remediation efforts related to the Howell Wells and Jeffers Farms Wells.

On July 26, 2017, the Committee was informed that:

- "[S]ampling" on the Howell Wells was "showing a positive trend." (Docket Entry No. 55-31 at 2).

- "[R]emedial work ha[d] been performed on the [Howell] 2H, 4H, and 6H wells." (Docket Entry No. 55-32 at 10).

- "With ongoing monitoring, it appears that observed flowrates are continuing to diminish, indicating the squeeze work has been successful." (*Id.*).

On October 25, 2017, the Committee was informed that:

- "[A]dditional workover activities were completed on the Howell 4H and 8H wells." (Docket Entry No. 55-33 at 9).

- "Workover activities have continued on the Howell 2H and 6H wells with additional squeeze work and bond log runs performed on the Howell 2H." (*Id.*).

- "Pressure testing and gas flow monitoring on the well annuli have shown improvement; however some pressure is still being observed on the 2H 13x9 annulus at this time and additional testing and remedial work may be necessary." (*Id.*).

- "The . . . dissolved gas concentrations have continued to decline over time . . . indicating the remedial efforts on the Howell well pad have been successful." (*Id.*).

- "Workover activities [] began on the Jeffers Farms Pad 2 during August 2017 following evaluation of the available well logs.  Efforts have been focused on the Jeffers 14H and 7H wells with squeeze work performed at various intervals within each well bore.  Pulse flow testing and logging is being conducted in concert with the squeeze work to evaluate effectiveness.  Remedial work is ongoing." (*Id.* at 10).

On February 20, 2018, the Committee was informed that:

- A water supply affected by the Howell Wells "has been permanently restored" and "[o]ngoing monitoring of the affected water supplies continues." (Docket Entry No. 55-36 at 10).

- Bottled water and a permanent water treatment system had been provided to residents affected by the Jeffers Farms Wells. (*Id.*).

52

- "[T]here had been no new gas migration allegations since the last meeting." (Docket Entry No. 55-37 at 3).

On May 2, 2018, the Committee was informed that:

- "Currently, the Howell wells are on production and ongoing monitoring of the affected water supplies continues.  Sample results to date continue to indicate that remedial activities were successful."  (Docket Entry No. 55-38 at 14).

- "Workover activities at the [Jeffers Farms Pad 2] wellsite were completed during March 2018 and, with the Department's concurrence, the wells are currently being completed.  Monitoring of the affected water supplies continues.  The observed concentrations of dissolved methane in the Smith water well remains around 25 mg/L, while the dissolved methane results at the Paolucci water well have exhibited a decrease over the past two months."  (*Id.*).

On July 25, 2018, the Committee was informed that:

- "Monitoring of the [water supplies affected by the Jeffers Farms Pad 2] continues and, based on the elevated dissolved methane levels observed at the George Hall water supply that was identified as a property of interest during the May 30, 2018 meeting [], another round of sampling of the residents in the vicinity of the well pad is currently being conducted to ensure that conditions are not changing.  The observed concentrations of dissolved methane in the Smith water well remains ~25 ppb and dissolved methane results at the Paolucci water well stabilized at ~2 ppm." (Docket Entry No. 55-40 at 13).

On October 24, 2018, the Committee was informed that:

- "Woodard & Curran has prepared a draft Chapter 78a.89 Closure Report for [the Howell, G Pad 1].  Review by Cabot is ongoing."  (*Id.* at 13).

- "Additional sampling of the residents in the vicinity of the [Jeffers Farms Pad 2] was conducted during this period; elevated levels of dissolved methane were identified at an additional eight residences.  These have been incorporated into a routine sampling program to evaluate dissolved gas concentrations over time . . . . Additional remedial work on the Jeffers Farms Pad 2 wells is scheduled to begin during the 4th Quarter of 2018."  (*Id.*).

On February 19, 2019, the Committee was informed that:

- "Additional remedial work is scheduled [for the Jeffers Farms Pad 2] during 2019. The observed concentrations of dissolved methane in the Smith water well appear to be trending downward with concentrations fluctuating between 13 and 28 ppm over the past six months."  (Docket Entry No. 55-46 at 15).

- "The dissolved methane results at the Paolucci water supply have remained low and typically are at or below 1 ppm."  (*Id.*).

- "Based on the data collected to date, the routine sampling at the remaining eight residences of interest around the Jeffers Farms Pad 2 has been reduced to quarterly."  (*Id.*).

On May 1, 2019, the Committee was informed that:

- There was "[n]o change from prior period [with respect to the Howell, G Pad 1]. Woodard & Curran has prepared a draft Chapter 78a.89 Closure Report for this [gas migration issue].  Review by Cabot is ongoing."  (Docket Entry No. 55-48 at 14).

- As to the Jeffers Farms Pad 2: "[d]uring this period, the observed concentrations of dissolved methane in the Smith water well continued to trend downward with the most recent values obtained since the beginning of March 2019 being significantly lower (ranging between 1.3 ppm and 1.6 ppm)." (*Id.*).

- "The dissolved methane results at the Paolucci water supply have remained low and typically are at or below 1 ppm." (*Id.*).

- "Quarterly sampling was conducted at the remaining eight residences of interest around the Jeffers Farms Pad 2 during this period, with the exception of one residence where access was denied.  These results are pending." (*Id.* at 15).

On July 24, 2019—just before Cabot issued its 2Q19 Form 10-Q—the Committee was informed that:

- "During this period, Cabot received a draft Consent Order and Agreement (COA) from the Department regarding the Howell Well Pad 1 [gas migration issue]." (Docket Entry No. 55-51 at 15).

- Regarding the Jeffers Farms Pad 2: "During this period, due to issues observed with the original water well construction at the Smith residence (infiltration from shallow groundwater/surface water and biofouling), a new water well was installed approximately 100' to the north of the original location.  However, bacterial impact continues to be an issue in the new well, presumably due to local impact to the aquifer, and work to disinfect and develop this well continues.  Currently, the landowner stated they will not accept treatment as an option due to potential health concerns and have set a deadline of September 1, 2019, for demonstrating the

adequacy of the new water well as a replacement, prior to seeking legal recourse."
(*Id.*).

- "Notwithstanding the presence of bacteria within the new [Smith] water well, observed concentrations of dissolved methane at this location have ranged from approximately 4-8 ppm during well development activities."  (*Id.*).

- "The dissolved methane results at the Paoluccia water supply have remained low and typically are at or below 1 ppm."  (*Id.*).

- "Quarterly sampling conducted at the remaining eight residences of interest around the Jeffers Farms Pad 2 during April 2019 (with the exception of one residence where access was denied) were generally consistent with prior sampling events, with the exception of the George Hall water supply.  The Hall residence is adjacent to the Smith's to the South and has exhibited fluctuating concentrations over time (ranging from non-detect to 13 ppm) with the most recent values observed being 12 ppm (April 2019) and non-detect (May 2019)."  (*Id.*).

- "During this period, Cabot received a draft Consent Order and Agreement (COA) from the Department regarding the Jeffers Farms Pad 2 [gas migration issue]."
(*Id.*).

On October 22, 2019—after Cabot issued its 2Q19 Form 10-Q but just before it issued its 3Q19 10-Q—the Committee was informed that:

- "During this period, Cabot had several discussions with the Smiths regarding possible settlement and/or permanent restoration of their water supply.  As of the time of this update, they have rejected reasonable offers to purchase their property – Cabot has offered $400k which is more than twice the appraised property value

based on both Cabot's and the landowner's independent appraisals of the property. They have, however, agreed in principle to allow Cabot to attempt to drill another water well as a permanent remedy. . . . Negotiations regarding this matter are ongoing."  (Docket Entry No. 55-53 at 17).

- "The dissolved methane results at the Paolucci water supply have remained low and are approaching background (e.g., most recent sample result from September 2019 was 0.057 ppm)."  (*Id.*).

- "Quarterly sampling conducted at the remaining eight residences of interest around the Jeffers Farms Pad 2 during July 2019 (with the exception of one residence where access was denied) were generally consistent with prior sampling events."  (*Id.*).

- "[T]he George Hall residence, adjacent to the Smith's property to the South, continues to exhibit fluctuating concentrations over time (ranging from non-detect to 13 ppm) with the most recent value observed being 9.7 ppm (during July 2019); ethane [sic] also has been increasing at the Hall water supply over the past couple sampling events as well."  (*Id.*).

- The Pennsylvania grand jury had begun investing Cabot and other Pennsylvania operators.  (Docket Entry No. 55-54 at 3).

This evidence precludes the inference that Dinges, Ables, Boswell, Brock, and Watts knew that the 2Q19 and 3Q19 Form 10-Qs contained false statements when they were issued.  At that time, the testing consistently showed that the water supplies that were affected by the Howell Wells had been remediated.  The defendants were informed that the water wells did not show elevated levels of dissolved methane, and that Cabot was working on a final closure report for the notice of

violation relating to the Howell Wells.  This is consistent with the Department's findings in its December 2020 order that "Cabot concluded remedial actions on the [Howell Wells] in November 2017" and that "[e]valuation of pressure in the annuli of the [Howell Wells] since the remedial work indicated that the work was effective in eliminating the flow of gas in the cemented annuli." (Docket Entry No. 105-6 at 5).  The statement in the 2Q19 and 3Q19 Form 10-Qs that Cabot "believes the[] water quality complaints [related to the Howell Wells] have been resolved" is supported by the information known to the defendants at the time.

By contrast, the meeting minutes and materials show that the water quality complaints related to the Jeffers Farms Wells had not been remediated at the time the Category 3 statements were made.  At that time, the defendants knew that the Smith and Hall water wells were still testing at above-background levels of dissolved methane.  As of July 24, 2019, the defendants were informed that "observed concentrations of dissolved methane at [the Smith well] have ranged from approximately 4-8 ppm during well development activities."  (Docket Entry No. 55-15 at 51). They were also informed that the Hall well had "exhibited fluctuating concentrations over time (ranging from non-detect to 13 ppm) with the most recent values observed being 12 ppm (April 2019) and non-detect (May 2019)."  (*Id.*).  By October 22, 2019, the defendants were told that the Smith well had not improved and that dissolved methane in the Hall well had "been increasing . . . over the past couple sampling events," measuring most recently at 9.7 ppm.  (Docket Entry No. 55-53 at 17).

Nonetheless, there is no reasonable inference that the defendants knowingly caused Cabot to misrepresent the status of the Jeffers Farms Wells remediation.  The statement in the 2Q19 and 3Q19 Form 10-Qs that Cabot "believes these water quality complaints have been resolved" was limited to the complaints related to the Howell Wells.  The only statements about the Jeffers Farms

Wells were that (1) Cabot has "been engaged with the [Department] in investigating the incidents and ha[s] performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents"; (2) "[t]he proposed [consent order and agreement], if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000"; and (3) Cabot "will continue to work with the [Department] to finalize the [consent order and agreement], and to complete the ongoing investigation and remediation." (Docket Entry No. 93 at ¶¶ 281, 283). There is no reasonable inference that the defendants knew that any of these statements were false.

For these reasons, the plaintiffs have not pleaded particularized allegations supporting a reasonable inference that Dinges, Ables, Boswell, Brock, and Watts face a substantial likelihood of liability for knowingly causing Cabot to issue material misrepresentations. Demand futility is not established as to the disclosure claims. The claims are dismissed with prejudice because further amendment would be futile.

### D.     The Contribution Claim

The plaintiffs allege that Dinges, Schroeder, and Stalnaker caused Cabot to issue the alleged misstatements that are the subject of the securities class action. (Docket Entry No. 93 at ¶ 352). The plaintiffs accordingly seek, on behalf of Cabot, "contribution and indemnification from defendants Dinges, Schroeder, and Stalnaker in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing." (*Id.*). The plaintiffs have failed to establish demand futility as to this claim for two independent reasons.

First, as the court recognized in its opinion dismissing the second amended complaint, the plaintiffs' contribution claim is intertwined with their disclosure claims. (Docket Entry No. 89 at 42 n.2). The absence of demand futility on the contribution claim accordingly follows from the analysis on the disclosure claims.

Second, the plaintiffs no longer pursue the disclosure claims against Schroeder or Stalnaker, but only against Dinges, Ables, Boswell, Brock, and Watts. (Docket Entry No. 106 at 30). The plaintiffs cannot obtain contribution from Stalnaker or Schroeder without proving that Stalnaker or Schroeder caused Cabot to issue the alleged misstatements. The disclosure claim also fails as to Dinges, even assuming Dinges could not fairly consider a demand for Cabot to pursue claims against himself.

The plaintiffs' apparent theory is that other directors could not fairly consider a demand to sue Dinges because they lacked independence from him. The third amended complaint contains new allegations that non-defendant director Jorden is not independent from Dinges because "Jorden's ability to succeed in his role as CEO is reliant on his ability to work on a day-to-day basis with defendant Dinges, the Company's Executive Chairman." (Docket Entry No. 93 at ¶ 338). The plaintiffs also allege that Ables "lacks independence from defendant Dinges due to an external business relationship maintained between her husband and Dinges." (*Id.* at ¶ 343).

Even assuming these allegations support an inference that Jorden and Ables could not fairly consider a litigation demand against Dinges, which the court doubts,[6] demand futility would not follow because the plaintiffs must adequately plead that at least five of the ten directors could not

---

[6] *See Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("Plaintiffs plead no facts demonstrating a financial interest on the part of GM's directors. The only averment permitting such an inference is the allegation that all GM's directors are paid for their services as directors. However, such allegations, without more, do not establish any financial interest.").

fairly consider a demand.  *In re INFOUSA, Inc. Shareholders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007).

Demand futility is not established as to the contribution claim.  The claim is dismissed with prejudice because further amendment would be futile.

### E.      The *Brophy* Claim

The general rule in Delaware is that "corporate officers and directors may purchase and sell the corporation's stock at will, without any liability to the corporation." *Tuckman v. Aerosonic Corp.*, 1982 WL 17810, at *11 (Del. Ch. May 20, 1982).  An exception applies when (1) "the corporate fiduciary possessed material, nonpublic information," and (2) "the corporate fiduciary used that information improperly by making trades because []he was motivated, in whole or in part, by the substance of that information." *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005).

The plaintiffs allege that Dinges "possessed material, non-public information of Cabot, and used that information to improperly profit from the sale of Cabot stock." (Docket Entry No. 93 at ¶ 367).  The court previously dismissed the *Brophy* claim against Dinges, stating that "the shareholders have not, and cannot, allege that the other eight board members face a substantial likelihood of liability, because the *Brophy* claim is not against them."  (Docket Entry No. 89 at 42).

The plaintiffs argue that Dinges could not fairly consider a demand because he allegedly both received a "material personal benefit from the alleged misconduct" and "faces a substantial likelihood of liability" from the *Brophy* claim.  *Zuckerberg*, 262 A.3d at 1059.  However, the plaintiffs have failed to allege facts sufficient to support an inference that at least four other directors could not fairly consider a demand.

As with the contribution claim, the plaintiffs apparently rely on the theory that other directors lacked independence from Dinges and therefore could not fairly consider a demand to sue him. This theory fails as to the *Brophy* claim for the same reason that it fails as to the contribution claim.

Demand futility is not established as to the *Brophy* claim. This claim is dismissed with prejudice because further amendment would be futile.

## F.       The Corporate Waste and Unjust Enrichment Claims

Under Delaware law, a claim of corporate waste requires the plaintiffs to prove that the challenged exchange was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006) (quotation marks and quoting reference omitted). "A claim of waste will arise only in the rare, unconscionable case where directors irrationally squander or give away corporate assets. This onerous standard for waste is a corollary of the proposition that where business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be attributed to any rational business purpose." *Id.* (quotation marks and quoting reference omitted).

The Delaware Supreme Court has explained corporate waste, as follows:

> Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose, or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky. Any other rule would deter corporate boards from the optimal rational acceptance of risk, for reasons explained elsewhere. Courts are ill-fitted to attempt to weigh the "adequacy" of consideration under the waste standard or, ex post, to judge appropriate degrees of business risk.

*Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997)).

"[T]he size and structure of executive compensation are inherently matters of judgment." *Id.* at 263.  Delaware courts have allowed waste claims based on compensation to proceed only in the most extreme situations.  In *Vogelstein*, 699 A.2d 327, for instance, the Court of Chancery held that shareholders had stated a claim for waste based on allegations that directors had been granted one-time options, in addition to annual grants, that amounted to "a gift for which [the corporation] received no consideration." *Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 591 (Del. Ch. 2015) (discussing *Vogelstein*).

Delaware law permits waste claims based on stock repurchases only in "extreme" cases, in which the repurchases were "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Tilden v. Cunningham*, 2018 WL 5307706, at *19 (Del. Ch. Oct. 26, 2018) (quotation marks and quoting reference omitted).  "[I]f, when, and how much stock to repurchase are precisely the types of decisions that are subject to the business judgement rule and protected against judicial second-guessing." *Id.* (quotation marks and quoting reference omitted).

Delaware law defines "unjust enrichment" as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Schock v. Nash*, 732 A.2d 217, 232–33 (Del. 1999) (quotation marks and quoting reference omitted).  To obtain restitution for unjust enrichment, the plaintiffs must show (1) that the defendants were unjustly enriched, (2) that the defendants secured a benefit, and (3) that it would be unconscionable to allow them to retain that benefit. *Id.* at 232. "Restitution is permitted even when the defendant retaining the benefit is not a wrongdoer." *Id.*

"Restitution serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses."  *Id.* (quotation marks and quoting reference omitted).

The plaintiffs allege that the defendants wasted corporate assets and were unjustly enriched by the Board's decisions to: (1) repurchase Cabot stock while the stock price was allegedly artificially inflated, and (2) pay compensation to directors and officers who were allegedly breaching their fiduciary duties.  (Docket Entry No. 106 at 35, n.14).

As to the first category, the plaintiffs allege that "Cabot spent an aggregate amount of over $1.15 billion to repurchase approximately 48.6 million shares of its own common stock at artificially inflated prices from May 2017 through June 2019."  (Docket Entry No. 93 at ¶ 316). The plaintiffs do not allege the market price when Cabot repurchased the stock, or that Cabot paid above market price.  Instead, the plaintiffs allege that "the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, when the truth was revealed," and that Cabot paid between $22.65 and $27.81 per share between May 2017 and June 2019.  (*Id.* at ¶¶ 317–23).  The plaintiffs allege that in total, Cabot "overpaid for repurchases of its own stock by over $209 million."  (*Id.* at ¶ 324).

These allegations do not state a claim for corporate waste.  Without any allegation about how much the stock was worth at the time of the repurchases, the court cannot infer that the repurchases were "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."  *Tilden*, 2018 WL 5307706, at *19 (quotation marks and quoting reference omitted).

Even accepting as adequately alleged the plaintiffs' claim that the June 2020 stock price was indicative of the market price at the time of the repurchases, waste would still not be adequately pleaded.  *See Lewis v. Daum*, 1984 WL 8223, at *3 (Del. Ch. May 24, 1984) ("[T]he specific allegation in the complaint that a premium was paid to repurchase shares from [the company] does not automatically state a wrong in Delaware without more.").  The highest share price Cabot is alleged to have paid is $27.81.  Adopting plaintiffs' allegation that the stock was worth $19.40 per share at the time of the repurchases would mean that Cabot overpaid by $8.41, or 43%.  The plaintiffs have identified no case holding that repurchasing stock at this premium constitutes waste.  *Compare Avacus Partners, L.P. v. Brian*, 1990 WL 161909, at *8 (Del. Ch. Oct. 24, 1990) (the plaintiffs stated a claim for waste based on allegations that the company "paid over 10 times fair market value for a large block of stock and convertible notes of one company, and that [the company] paid 100 times the price paid a year earlier for control of a second company.").

The allegations underlying the waste claim based on the compensation of officers and directors are that "[t]he Individual Defendants . . . received bonuses, stock options, or similar compensation from Cabot that was tied to the performance or artificially inflated valuation of Cabot, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct."  (Docket Entry No. 93 at ¶ 376).  The plaintiffs have not cited authority for the proposition that corporate waste occurs when a company compensates officers and directors who are later found to have acted in bad faith.  The plaintiffs do not allege that officers or directors were compensated excessively or were given gifts that lacked any consideration to Cabot, as in *Vogelstein*.

The plaintiffs have failed to state a claim for corporate waste.  They have also failed to state a claim for unjust enrichment, which is premised on the same conduct.  These claims are dismissed with prejudice because further amendment would be futile.

## IV.     Conclusion

The motion to dismiss is granted.  (Docket Entry No. 105).  All claims are dismissed with prejudice.  A final judgment will be entered separately.


SIGNED on January 2, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge