United States Courts
Southern District of Texas
FILED
*June 04, 2025*
Nathan Ochsner, Clerk of Court

# 𝕌nited 𝕊tates 𝕔ourt of 𝔸ppeals
## for the 𝔽ifth 𝔠ircuit

United States Court of Appeals
Fifth Circuit
**FILED**
May 13, 2025
Lyle W. Cayce
Clerk

———————

No. 24-20050

———————

JODY EZELL, DERIVATIVELY *on Behalf of* NOMINAL DEFENDANT
CABOT OIL & GAS CORPORATION; TREPPEL FAMILY TRUST
U/A 08/18/18 LAWRENCE A. TREPPEL FOR THE BENEFIT OF
GERI D. TREPPEL AND LARRY A. TREPPEL; JOHN HUDSON,

*Plaintiffs—Appellants,*

*versus*

DAN O. DINGES; SCOTT C. SCHROEDER; DOROTHY M. ABLES;
RHYS J. BEST; ROBERT S. BOSWELL; AMANDA M. BROCK;
PETER B. DELANEY; ROBERT KELLY; W. MATT RALLS; MARCUS
A. WATTS; PHILLIP L. STALNAKER; ROBERT L. KEISER,

*Defendants—Appellees,*

—————————————————————

TREPPEL FAMILY TRUST U/A 08/18/18

*Plaintiff—Appellant,*

*versus*

DAN O. DINGES; SCOTT C. SCHROEDER; RHYS J. BEST; MATT
RALLS; DOROTHY M. ABLES; ROBERT S. BOSWELL; AMANDA M.
BROCK; MARCUS A. WATTS; PETER B. DELANEY; ROBERT
KELLEY; ROBERT L. KEISER; CABOT OIL AND GAS
CORPORATION,

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 4:21-CV-2046, 4:21-CV-3053

Before GRAVES, ENGELHARDT, and OLDHAM, *Circuit Judges*.

JAMES E. GRAVES, JR., *Circuit Judge*:

Jody Ezell and other shareholders of the Cabot Oil & Gas Company brought a shareholder derivative suit on behalf of Cabot against Cabot's directors, alleging that the directors breached their fiduciary duties. The district court dismissed all claims. We AFFIRM.

## I. Factual Background

In 2006, Cabot Oil & Gas Company, a Houston-based energy company, leased mineral rights from residents in Dimock Township in Susquehanna County, Pennsylvania, and began fracking in the hopes of extracting natural gas or oil from the Marcellus Shale. In 2009, Cabot's fracking caused the explosion of a residential water well.

The Pennsylvania Department of Environmental Protection investigated and concluded that Cabot's wells had been leaking methane gas into residential water supplies, in violation of environmental laws and regulations. The Department and Cabot entered the 2009 Consent Order, which found that Cabot failed to properly case and cement gas wells, Cabot's operations caused methane gas to migrate into residents' water wells, and Cabot failed to restore or replace affected water supplies, in violation of Pennsylvania's Clean Streams Law and Oil and Gas Act. The 2009 Consent Order mandated that Cabot pay a $120,000 civil penalty and take all actions necessary to maintain compliance with all applicable environmental laws and regulations.

By March 2010, Cabot violated the 2009 Consent Order, by, among other things, not fixing defective casings and failing to prevent unpermitted natural gas discharge into the groundwater. After Cabot had paid $570,000 in fines, the Department and Cabot entered another consent order—the 2010 Consent Order, at which point Cabot paid another half a million dollars in fines. The 2010 Consent Order mandated gas well pressure testing, once again required that Cabot undertake all actions necessary to comply with applicable environmental laws and regulations, and forbade Cabot from drilling new gas wells or fracking any wells that had yet to be fracked within a nine-square-mile area in Dimock Township (the Dimock box) until the Department gave Cabot written notice it had complied with the 2010 Consent Order. Over the next decade, due to Cabot's drilling operations, the Department issued hundreds of "notices of violations," which required that Cabot provide affected residences with potable water and remediate the water contamination and defective wells.

As early as January 2011, and for several years thereafter, the Cabot Board of Directors received regular updates about Cabot's ongoing, hit-or-miss attempts to remediate the issues. The Board and its Environmental, Health, & Safety Committee[1] (Committee) received regular updates during both general Board and Committee meetings. The Board learned of hundreds of notices of violations from the Department; the slew of penalties Cabot paid for environmental noncompliance; test results gathered by Cabot's consultant, Stantec; lawsuits against Cabot because of its Marcellus Shale fracking operation, including a jury verdict requiring Cabot to pay millions of

---

[1] Several defendants (Boswell, Brock, Delaney, Kelley, Keiser, Ralls, and Watts) were on the Environmental, Health & Safety Committee.

dollars in damages for groundwater contamination; and additional consent orders.

In February 2020, a Pennsylvania grand jury concluded that Cabot's failure to remediate the gas migration issues in the Dimock Box amounted to "long-term indifference," "not merely technical violations," and recommended that the State charge Cabot with criminal violations of Pennsylvania's Clean Streams Law based on testimony that Cabot "undertook little to no remedial work on its gas wells, the source of the problem, until 18 months ago [mid-2018]"—eight years after the 2010 Consent Order. The State "charged Cabot with fifteen criminal charges based on (1) violations of the Clean Streams Law for discharge of industrial waste at the gas wells in Dimock from 2009 to 2018; (2) failure to comply with the 2010 Consent Order; and (3) failure to remediate multiple [notices of violations] from December 2010 to January 2020." Cabot entered a *nolo contendere* plea.

## II. Procedural Background

In October 2020, without having made any demand on the Board, Jody Ezell and other Cabot shareholders filed this shareholder derivative action on Cabot's behalf against several Cabot Board members. The shareholders alleged that the directors breached their fiduciary duties in several ways, three of which are relevant here.

First, the shareholders say the Board failed to exercise oversight of the company. Specifically, Plaintiffs allege that "Cabot undertook little to no remedial work on its gas wells, the source of the gas migration problem, until 2018"—eight years after having entered the 2010 Consent Order with the Department. This is so, contend the stockholders, because the directors "accepted as ordinary the idea that Cabot would regularly defy environmental regulations and treat the corresponding and continuous

penalties as simply the cost of doing business." Second, they say that the directors caused Cabot to issue material misrepresentations about whether its fracking activities complied with applicable environmental laws and regulations. Third, they claim that a director engaged in insider trading. The Defendant Board members filed a motion to dismiss the suit.

Given its ruling in a securities class action based on the same alleged misrepresentations, the district court asked the defendants to explain whether the actions should proceed on a coordinated basis or be consolidated.[2] In April 2023, Defendants filed a renewed motion to dismiss.

In January 2024, the district court dismissed the operative complaint with prejudice, holding that the record did "not allow the inference that the defendants are guilty of a 'serious failure of oversight sufficient to support an inference of bad faith.'" *In re Cabot Oil & Gas Corp. Derivative Litig.*, 709 F. Supp. 3d 305, 333 (S. D. Tex. 2024) (citing *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 661–62 (Del. Ch. 2023)). Absent bad faith, plaintiffs could not make out a *Caremark* liability claim.[3] *Id.* Regarding the disclosure claims, the district court concluded that the plaintiffs did not plead "particularized allegations supporting a reasonable inference that Dinges, Ables, Boswell, Brock, and Watts face a substantial likelihood of liability for knowingly causing Cabot to issue material misrepresentations," and, as a result, "[d]emand futility is not established as to the disclosure claims." *Id.* at 349. The district court also found that plaintiffs failed to establish demand futility as to their *Brophy* insider trading claim.[4] The district court accordingly

---

[2] In May 2024, the parties to the securities action announced that they had reached a settlement in principle to resolve the action. *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp., et al.*, Case No. 4:21-cv-02045, ECF No. 205.

[3] *In re Caremark In'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[4] *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

dismissed all of plaintiffs' claims with prejudice.[5] This timely appeal followed.

## III. Standard of Review

Federal Rule of Civil Procedure 23.1 outlines the prerequisites and pleading requirements for shareholder derivative suits. *See* FED. R. CIV. P. 23.1. A verified complaint "must . . . state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." *Id.* at 23.1(b)(3).

We have not previously addressed the standard of review we ought to apply when a district court dismisses a shareholder derivative action for failure to plead demand futility under Rule 23.1. The First, Second, Third, Sixth, Seventh, Eighth, and Tenth Circuits, as well as the supreme courts of several states exercise *de novo* review in demand futility cases. *In re Cognizant Tech. Sols. Corp. Derivative Litig.*, 101 F.4th 250, 258–59 (3d Cir. 2024) (collecting authority). "Even in the Courts of Appeals for the Ninth and D.C. Circuits, which still apply abuse-of-discretion review, judges have voiced concerns about the practice." *Id.* at 259 (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. ex rel. Fed. Nat'l Mortg. Ass'n v. Raines*, 534 F.3d 779, 783 n.2 (D.C. Cir. 2008) ("We tend to agree with plaintiffs that an abuse-of-discretion standard may not be logical in this kind of case . . . ."); *Rosenbloom v. Pyott*, 765 F.3d 1137, 1159–60 (9th Cir. 2014) (Reinhardt, J., specially concurring) ("[A]ll relevant factors cut in favor of *de novo* review.")). The

---

[5] The district court also found that plaintiffs failed to state a claim for corporate waste and unjust enrichment. Plaintiffs do not address these holdings on appeal. Accordingly, neither do we.

Eleventh Circuit has also said it reviews for abuse of discretion but considers "whether a complaint meets the requisite pleading standard [to be] a question of law" that merits *de novo* review. *Whitten v. Clarke*, 41 F. 4th 1340, 1347–48 (11th Cir. 2022).

"Courts of Appeals ordinarily review the sufficiency of a complaint's allegations *de novo*, and there is no reason why that general rule is not fully applicable to motions to dismiss on the pleadings under Federal Rule of Civil Procedure 23.1." *Rosenbloom*, 765 F.3d at 1159–60 (Reinhardt, J., specially concurring). Seeing "no sound reason to apply a different standard of review to shareholder derivative actions than we would to any other type of case," *Cognizant Tech.*, 101 F.4th at 225, we join the chorus of authority and hold that a district court's decision to dismiss a derivative action for failure to plead demand futility is to be reviewed *de novo*.

## IV. Discussion

"[A]lthough Rule 23.1 clearly contemplates both the demand requirement and the possibility that demand may be excused, it does not create a demand requirement of any particular dimension. On its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991) (emphasis omitted). "[T]he first place one must look to determine the powers of corporate directors is in the relevant State's corporation law." *Burks v. Lasker*, 441 U.S. 471, 478 (1979). That is, the state of incorporation of the corporation whose "allocation of corporate governing powers between the directors and individual shareholders" is at issue, including the substantive elements of the demand requirement. *Kamen*, 500 U.S. at 108. Because Cabot is incorporated in Delaware, Plaintiffs must meet the elements required by Delaware law.

Under Delaware law, "[t]he decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009). "Unless the board of directors permits the stockholder to proceed, a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation." *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020) (citation omitted), *aff'd*, 262 A.3d 1034 (Del. 2021).

In Delaware, "the demand futility analysis asks whether the board of directors as constituted when the lawsuit was filed could exercise disinterested and independent judgment regarding a demand." *Id.* at 877 (citation omitted). "The question is whether the constellation of allegations, viewed holistically, creates a reasonable doubt about the director's ability to consider a demand objectively." *Id.* (citing *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331, at *18 (Del. Ch. Mar. 19, 2018)). The court "counts heads among the individual members of the board to assess whether a majority of its members are, or are not, conflicted." *Wenske v. Blue Bell Creameries, Inc.*, 214 A.3d 958, 965 (Del. Ch. 2019) (citations and internal quotation marks omitted).

The Delaware Supreme Court recently announced a single test to determine demand futility. *See Zuckerberg*, 262 A.3d at 1058. Now, courts proceed "on a director-by-director basis," asking for each:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director faces a substantial likelihood of liability on any of the claims that are the subject of the

litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Id.* at 1059. If the answer to any of the questions is "yes" for at least half of the board members, demand is excused as futile. *Id.*

Here, the shareholders did not demand that the directors pursue a corporate claim. Instead, they contend demand should be excused as futile because the directors are incapable of making an impartial decision regarding the litigation. To prove this futility, the stockholders assert that the directors could not be impartial about potential litigation since they would be implicated because (A) they violated their duty to properly oversee the corporation's operations, (B) they communicated misleading information, and (C) that one director, Dinges, engaged in insider trading.

## A. Director Oversight Liability

The stockholders' first claim is pursuant to *In re Caremark In'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

"A *Caremark* claim contends that the directors set in motion or allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in doing so they violated a duty to be active monitors of corporate performance." *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *16 (Del. Ch. Aug. 24, 2020) (cleaned up) (quoting *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012)).

"*Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus

disabling themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

Here, the parties agree that directors had reporting systems and controls. Necessarily, then, the shareholders bring the second kind of claim: an oversight claim. There is also evidence that the directors monitored the system. Thus, the shareholders here are tasked with proving the directors "consciously failed to . . . oversee." *Stone*, 911 A.2d at 370.

"The list of corporate traumas for which stockholders theoretically could seek to hold directors accountable is long and ever expanding: regulatory sanctions, criminal or civil fines, environmental disasters, accounting restatements, misconduct by officers or employees, massive business losses, and innumerable other potential calamities." *Louisiana Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

However, "a showing of bad faith is a *necessary condition* to director oversight liability." *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) (citation omitted). "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Stone*, 911 A.2d at 370 (footnotes omitted). A director "cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." *In re Massey Energy Co. Derivative & Class Action Litig.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011).

Accordingly, the shareholders "must plead facts that allow a reasonable inference that the directors acted with scienter, which, in turn, 'requires [not only] proof that a director acted inconsistently with his

fiduciary duties,' but also 'most importantly, that the director *knew* he was so acting.'" *Horman v. Abney*, 2017 WL 242571, at *7 (Del. Ch. Jan. 19, 2017) (cleaned up) (quoting *Massey*, 2011 WL 2176479, at *22). Put differently, the shareholders must plead particularized facts "that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct." *Id.* (quoting *Reiter ex rel. Capital One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016)).

The shareholders seem to claim the "red flags" here were that the 2009 and 2010 Consent Orders required "Cabot to, *inter alia*, 'take all actions necessary . . . to comply with all applicable environmental laws and regulations' of Pennsylvania's Clean Streams Law, Oil and Gas Act, and related regulations." Specifically, they claim that:

> These corrective actions restricted Cabot's ability to begin fracking any existing wells or complete drilling any new wells within the "Affected Area" covered by the 2009 Consent Order, required Cabot to identify and provide potable water to residents within the Affected Area, and required Cabot to submit a plan to the PaDEP that identified testing procedures to ensure the integrity of the casing and cement on Cabot's wells.

And yet, Plaintiffs claim, Cabot—under the board's supervision—failed to take meaningful action to comply.

"[A]s fiduciaries, corporate managers must be informed of, and oversee compliance with, the regulatory environments in which their businesses operate." *In re Clovis Oncology, Inc. Derivative Litig.*, 2019 WL 4850188, at *12 (Del. Ch. Oct. 1, 2019). "Delaware courts are more inclined to find *Caremark* oversight liability at the board level when the company operates in the midst of obligations imposed upon it by positive law yet fails to implement compliance systems, or fails to monitor existing compliance

systems, such that a violation of law, and resulting liability, occurs." *In re Facebook, Inc. Sec. 220 Litig.*, 2019 WL 2329842, at *14 (Del. Ch. May 31, 2019).

The Cabot Board, however, neither failed to implement a compliance system nor failed to monitor it. The Board's Environmental, Health & Safety Committee was tasked with assisting the Board in providing oversight and support of the Company's policies, programs, and initiatives. *Cabot*, 709 F. Supp. 3d at 315. The Committee and the Board "received regular updates about Cabot's efforts to comply with environmental laws and regulations in Susquehanna County, including the consent orders with the Department." *Id.* These updates covered:

> [N]otices of violation the Department issued to Cabot; penalties that Cabot had paid for environmental noncompliance; consent orders and agreements with the Department; Cabot's remediation efforts; results of tests conducted by Cabot's testing consultant, Stantec; the Department's positions on Cabot's compliance; and lawsuits against Cabot based on its Susquehanna County operations, including the criminal charges brought by the Pennsylvania Attorney General.

*Id.*

The district court concluded that "[t]he allegations and Section 220 documents, considered in total, do not allow the inference that the defendants are guilty of a 'serious failure of oversight sufficient to support an inference of bad faith.'" *Id.* at 333 (citing *McDonald's*, 291 A.3d at 661–62).

We agree. The Section 220 documents show Cabot had both successes and failures in its remediation of the gas migration and water contamination. The facts here "suggest a failed effort, not one opposed to the interests of [Cabot] or otherwise in bad faith." *Richardson ex rel. MoneyGram Int'l, Inc. v. Clark*, 2020 WL 7861335 (Del. Ch. Dec. 31, 2020);

*see Pettry ex rel. FedEx Corp. v. Smith*, 2021 WL 2644475, at *8–12 (Del. Ch. June 28, 2021) (concluding that the board did not act with bad faith when the board was repeatedly updated about ongoing enforcement actions and instituted actions to remedy noncompliance), *aff'd*, 2022 WL 569325 (Del. Feb. 25, 2022). Given the Cabot directors' remediation successes, and no evidence there was a "conscious disregard for their responsibilities," *Stone*, 911 A.2d at 370, we conclude they acted in good faith and did not breach their duty of loyalty. We therefore AFFIRM the district court's Rule 23.1 dismissal of the shareholder's *Caremark* claim because they failed to show demand futility.

## B. Director Disclosure Liability

Next, the shareholders contend that half of the Cabot directors— Dinges, Ables, Boswell, Brock, and Watts—violated their disclosure duties by issuing materially false and misleading statements in the Forms 10-Q that Cabot submitted to the United States Securities and Exchange Commission on July 26, 2019, and October 25, 2019. The shareholders say demand of the Board would have been futile because half of the directors faced a substantial likelihood of liability because of their alleged misrepresentation.

The directors retort that "Cabot made no assurance to investors that it had a perfect compliance record, and, instead provided sober cautionary language to the contrary." They maintain that they disclosed the notices of violations for the Stalter, Howell, and Jeffers Farms wells "and made clear the matters had not yet been closed."

"[W]hen a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression." *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018); *accord Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998)

("[W]hen directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.").

Accordingly, a director breaches the duty of loyalty and good faith if they "knowingly disseminat[e] to the stockholders false information about the financial condition of the company." *Malone*, 722 A.2d at 10. "Partial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations." *Appel*, 180 A.3d at 1064 (citation omitted).

"Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007). "Such violations are sufficient to subject directors to liability in a derivative claim." *Id.* But to excuse demand, the plaintiff "must plead particularized factual allegations that 'support the inference that the disclosure violation was made in bad faith, knowingly, or intentionally.'" *Citigroup*, 964 A.2d at 132 (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (Del. Ch. Aug. 20, 1999)).

"A determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants . . . ." *Id.* at 134. We "infer scienter for such claims where a plaintiff pleads with particularity that directors had knowledge that any disclosures or omissions were false or misleading or . . . acted in bad faith in not adequately informing themselves and were sufficiently . . . involved in the preparation of the disclosures or that the director defendants were otherwise responsible for the disclosures." *In*

*re Camping World Holdings, Inc. S'holder Derivative Litig.*, 2022 WL 288152, at *13 (Del. Ch. Jan. 31, 2022) (cleaned up), *aff'd sub nom. In re Camping World Holdings, Inc. S'holder Derivative Litig.*, 285 A.3d 1204 (Del. 2022).

On July 26, 2019, Cabot filed its quarterly Form 10-Q. Among other things, this report included a statement about Cabot's compliance issues:

> On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents. We received Notices of Violation ("NOV") from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, the proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan,

> continue water sampling and other investigative
> measures and restore or replace affected water supplies
> and would result in the payment of a civil monetary
> penalty in an amount likely to exceed $100,000, up to
> approximately $355,000. We will continue to work with
> the PaDEP to finalize the CO&A, and to complete the
> ongoing investigation and remediation.

ROA.4044–45 (¶ 281) (emphases omitted). Cabot filed another quarterly Form 10-Q on October 25, 2019, which again, in identical language, addressed the June 17, 2019 proposed consent order.

These statements concern two notices of violations the Department sent Cabot: (1) a June 2017 notice of violations, concluding that Cabot's gas wells in the Howell G pad had combustible gas in annular spaces and one gas well had gas outside the surface casing, and notifying Cabot of several violations of Pennsylvania law, potential penalties for those violations, and a corrective action plan; and (2) a November 2017 notice of violations regarding similar violations and water supply contamination in Cabot's Jeffers Farms pad, as well as other violations of Pennsylvania law, relevant penalties, and a corrective action plan.

Plaintiffs insist that "a reasonable investor could read the 2019 Statements as referring to Cabot's overall efforts to comply with, remediate, and address gas migration allegations raised in the 2017 [notices of violations], with respect to both the Howell and Jeffers Farms Wells."

Plaintiffs are partially correct. The statements share the same structure: the disclosures start out broad and speak about both wells, then narrow down to speaking about Howell (the subject of the June 2017 notice), then Jeffers Farms (the subject of the November 2017 notice), before speaking even more broadly about the regulatory space and possible sanctions. Naturally, then, it is reasonable for stockholders to read the

beginning and final portions of the statements as referring to both gas well areas.

As the general regulatory disclaimer is not at issue, we can focus in on the first portion, which states: "Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents."

The record makes clear that Cabot performed appropriate remediation efforts with respect to the Howell gas wells. As early as July 2017, the Committee heard a report that sampling showed a positive trend in the Howell wells. *Cabot*, 709 F. Supp. 3d at 345. In October 2017, management updated the Committee on workover activities, squeeze work, and bond log runs performed on a Howell well, and informed them that "dissolved gas concentrations have continued to decline over time . . . indicating the remedial efforts on the Howell well pad have been successful." *Id.* By February 2018, the water supply affected by the Howell Wells had "been permanently restored." *Id.* May 2018 and May 2019 reports included results suggesting that the remedial activities continued to be "successful." *Id.* at 346. Given the ample reports that the Howell gas well efforts were successful, even drawing all reasonable inferences in the shareholders' favor, we cannot reasonably infer that the statement that Cabot "performed appropriate remediation efforts" at the Howell wells is ambiguous, incomplete, materially misleading, dishonest, deceptive, or made in bad faith. *See Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 Del. Ch. LEXIS 92, at *6 ("If the record could support different inferences, and if the plaintiff seeks a reasonable inference, then the court must grant the plaintiff the inference.").

We turn to whether the statement of "appropriate remediation efforts" is true with respect to the Jeffers Farms wells. The shareholders argue that the "statement that Cabot 'ha[d] performed appropriate remediation efforts' was included in Cabot's disclosures immediately after Cabot's announcement of the receipt of the 2017 NOVs. A reasonable investor would have interpreted this statement to mean that Cabot had performed (i.e., already completed) the necessary remediation efforts." This argument is unconvincing. Given the complexity of dealing with gas leaks, reasonable investors would not expect completed remediation "immediately after" receiving notices of violations.

The board meeting notes from February 2018 include a report that Cabot provided bottled water and a permanent water treatment system to residents affected by issues at the Jeffers Farms wells. *Cabot*, 709 F. Supp. 3d at 346. Similarly, the July 2019 meeting notes include a report that a new well was installed, albeit with continued issues. *Id.* at 347. Thus, the clause about providing alternative sources of water is not misleading, deceptive, or dishonest.

The May 2018 meeting notes show that workover activities at the relevant Jeffers Farms wells pad were completed and that "with the Department's concurrence, the wells [were] currently being completed." *Id.* at 346. Additionally, the October 2017, May 2018, July 2018, February 2019, May 2019, and July 2019 board meeting notes collectively show ongoing testing for concentrations of dissolved methane in the relevant water supplies. *Id.* at 345–47. This suggests that the statement that Cabot had "been engaged with the PaDEP in investigating the incidents" was accurate, not misleading, deceptive, incomplete, dishonest, or made in bad faith.

Cabot underwent the process of providing something that "corrects or counteracts" the water contamination issues. *See Remedy*, MERRIAM-

WEBSTER, https://www.merriam-webster.com/dictionary/remedy [https://perma.cc/CP8U-QZJW]. Cabot certainly did not complete the process. As the district court put it, at the time the statements were made "the defendants knew that [two of the Jeffers Farms] water wells were still testing at above-background levels of dissolved methane." *Cabot*, 709 F. Supp. 3d at 348. But the best reading of "appropriate remediation" does not require completing the process, merely starting it. The methane levels trending downward at the Paolucci and Smith water wells and the creation of the new water well are a start. We thus conclude the statement was not misleading, deceptive, or dishonest.

Nor was the representation incomplete, deceptive, or made in bad faith. Later in the statement, while specifically discussing the Jeffers Farms investigation, the statement reads:

> With regard to the November 2017 NOV, the proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.

This language plainly states that Cabot has work left to do to resolve the Jeffers Farms wells issues. Given all the reports at the board meetings, this disclosure reflects reality and is not incomplete, deceptive, or made in bad faith.

Furthermore, the message about the Howell wells shows that the Cabot directors know how to use relatively stronger language — "we believe these water quality complaints have been resolved" —to indicate completion as opposed to the much vaguer and less conclusive "performed appropriate

remediation efforts." Given these two differing statements in the same disclosure, it seems unlikely that a reasonable investor would interpret the "appropriate remediation" statement to mean remediation was completed and the issue was resolved—as the shareholders now claim.

The shareholders point to a slew of other allegations as support for their position. But they are not much help. Many are conclusory, and "[w]e do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). Other allegations point to compliance issues with other wells, some of which predate the issues with the Howell and Jeffers Farms wells. However, failed remediation efforts at other wells does not render inaccurate the otherwise accurate statements about some remediation at the Howell and Jeffers Farms. Other allegations point to the local grand jury's conclusion that Cabot's failure to remediate the gas migration issues in the Dimock Box amounted to "long-term indifference." But we "infer scienter for such claims where *a plaintiff pleads with particularity* that directors had knowledge that any disclosures or omissions were false or misleading or . . . acted in bad faith in not adequately informing themselves." *Camping World*, 2022 WL 288152, at *13 (emphasis supplied) (cleaned up). This general conclusion does not suffice to demonstrate the Board misled directors about what was going on at the Howell and Jeffers Farms wells.

In short, the shareholders fail to plead—with sufficient particularity— any facts that undermine what the Section 220 documents show: the Board offered language that can reasonably be understood to be an accurate portrayal of Cabot's remediation efforts. The shareholders, thus, have failed to demonstrate that some directors faced a substantial likelihood of liability for knowingly causing Cabot to issue material misrepresentations. Accordingly, the shareholders failed to establish that demand of the board

would have been futile so as to excuse their failure to make a demand of the Board. We therefore AFFIRM the district court's Rule 23.1 dismissal.

## C. Insider Trading

The shareholders, in passing, discuss their *Brophy* insider trading claim in a footnote. This discussion lacks depth and does not cite relevant caselaw. A party waives an argument by inadequately briefing it. *Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 255 (5th Cir. 2008).

Even if the shareholders did not waive their *Brophy* claim, it fails. They "argue that Dinges could not fairly consider a demand because he allegedly both received a 'material personal benefit from the alleged misconduct' and 'faces a substantial likelihood of liability.'" *Cabot*, 709 F. Supp. 3d at 350 (quoting *Zuckerberg*, 262 A.3d at 1059). In turn, they say, the other board members could not fairly consider a demand to sue Dinges because they lacked independence from him. *Id.* at 349.

The district court found this theory unconvincing because "[e]ven assuming [Plaintiffs'] allegations support an inference that [board members] Jorden and Ables could not fairly consider a litigation demand against Dinges, which the court doubts, demand futility would not follow because the plaintiffs must adequately plead that at least five of the ten directors could not fairly consider a demand." *Id.* (citation omitted); *see id.* at 350 (saying that this theory fails as to the *Brophy* and contribution claims for the same reason).

We agree. As the shareholders' *Caremark* and material misrepresentation claims fail, even if they succeeded on the *Brophy* claim against a single director that influenced two others, they would still not be able to demonstrate demand futility as to at least half of the board—as is required to excuse the Rule 23.1 demand requirement. *See Zuckerberg*, 262 A.3d at 1059.

No. 24-20050

\* \* \*

We AFFIRM the district court's dismissal of all the shareholders' claims with prejudice.